**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **CARL WELLS** | § | |
| | § | |
| ***Plaintiff,*** | § | **CASE NO. 1:23-CV- 01081-RP** |
| | § | |
| **v.** | § | |
| | § | |
| | § | |
| **LOTTERY.COM, INC. d/b//a** | § | |
| **SPORTS.COM, INC.** | § | |
| | § | |
| ***Defendant.*** | § | |

---

**SECOND AMENDED COMPLAINT**

---

NOW COMES Carl Wells (“Plaintiff”) complaining of and about Lottery.com, Inc. d/b/a Sports.com, Inc. (“Defendant” or “Lottery”), by and through the undersigned counsel, and files this, his First Amended Complaint and states the following:

## I. PARTIES

1. Plaintiff CARL WELLS is an individual residing in the State of Texas.

2. Defendant LOTTERY.COM, INC. d/b/a SPORTS.COM is incorporated under the laws of Delaware with principal executive offices located in Spicewood, Texas. Lottery’s shares and warrants began trading on the NASDAQ under the symbols “LTRY” and “LTRYW,” respectively. At all times pertinent to this case, Plaintiff is employed by Defendant. Defendant Lottery may be served by and through its CEO, Matthew McGahan, at 20808 State Hwy 71, Unit B, Spicewood, TX 78669.

## II. JURISDICTION AND VENUE

3. This case is brought under 29 U.S.C. § 206(a) based on Defendant's failure to pay minimum wages. Lottery.com's practices violate the provisions of the federal Fair Labor Standards Act, 29 U.S.C. § 201 et seq. As a result of these unlawful practices, Plaintiff suffered a loss of wages.

4. Venue is proper in this judicial district since all Defendant's unlawful practices alleged herein, and/or the adverse effects from these unlawful practices negatively affecting Plaintiff, were committed and/or occurred in Spicewood, Texas, located in this judicial district pursuant to 28 USC § 1391.

## III. NATURE OF THE ACTION

5. This is an action brought pursuant to 29 U.S.C. § 201 et seq. for violations of the Fair Labor Standards Act, common law breach of contract, and fraud to correct and recover for Defendant Lottery's unlawful employment practices by failing to compensate Plaintiff for the wages he earned and continued to earn. Defendant's actions violate federal statues regarding compensating Plaintiff for his time. Moreover, Defendant's failure to pay consideration is a breach of the employment contract entered by Plaintiff and Defendant, which has caused Plaintiff to suffer damages.

## IV. WAIVER OF ARBITRATION

6. "Although waiver of arbitration is a disfavored finding, the right to arbitrate—like all contract rights—is subject to waiver." *Forby v. One Techs., L.P.*, 909 F.3d 780, 783 (5th Cir. 2018) (internal quotations omitted); *see Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 56 (Tex. 2008) (noting that federal and Texas law "strongly favor arbitration"). Generally, a party seeking to prove waiver of a right to arbitrate must demonstrate: "(1) knowledge of an existing right to

compel arbitration; (2) acts inconsistent with that existing right; and (3) prejudice to the party opposing arbitration resulting from such inconsistent acts." A party may waive enforcement of an arbitration clause by "substantially invoking the judicial process to the other party's detriment or prejudice." *Forby*, 909 F.3d at 783; *Miller Brewing Co. v. Fort Worth Distrib. Co.*, 781 F.2d 494, 497 (5th Cir. 1986); *Perry Homes v. Cull*, 258 S.W.3d 580, 590 (Tex. 2008); *In re Fleetwood Homes of Tex.*, 257 S.W.3d 692, 694–95 (Tex. 2008) (orig. proceeding) (per curiam).

7. Courts have repeatedly found default when the arbitrating authority terminates arbitration for non-payment of fees or enters a default due to non-payment. Here, AAA and JAMS administratively closed the arbitration expressly because of Defendant's nonpayment. There is no dispute that, after Plaintiff initiated arbitration, Defendant received every written notice from AAA and JAMS: requesting payment of the filing fee on July 27, 2023; the second requesting payment on August 15, 2023; and the third requesting payment on August 31, 2023. Having not received the payment in response to any of the above notices, JAMS "administratively closed" the arbitration, as evidenced by its August 31, 2023 letter.

8. If this Court denies waiver of the arbitration clause, it is feasible that the dispute would devolve into a stalemate, with neither forum willing or able to hear Plaintiff's claims. Such an outcome would be odious to the interests of justice and would not advance any public policy favoring arbitration. Therefore, Defendant has validly waived its right to abide by the Arbitration Clause located in the employment agreement.

## V. FACTS

9. Plaintiff's official Employment Start Date was March, 09 2022. See attached [Carl Wells - VP of IT Offer Letter - **Exhibit A**] hereinafter "Employment Agreement."

10. Plaintiff relocated from Houston, Texas based on conversations with then CFO, Ryan Dickenson, CEO, Anthony DiMatteo, COO/CLO, Katie Lever who all requested that he relocate to their main office in Spicewood, Texas to help facilitate and oversee the build out of their new corporate office which was to be located in Austin, Texas. Defendant even added a clause in the Employment Agreement that Lottery.com will pay reasonable expenses associated with relocating to the Austin, Texas area, the clause states in part:

> Lottery.com shall pay those reasonable expenses, approved in advance by Lottery.com, to relocate you and your immediate family members to the Austin, Texas area, including the expenses associated with the packing, loading, and transportation of your household goods, possessions and not more than two (2) vehicles; provided, however, you shall be required to provide Lottery.com with three (3) vendor quotes from companies not affiliated with you for such service; provided, further, however, Lottery.com reserves the right to obtain an additional quote or quotes and select a vendor or vendors of its choosing and to pay such vendor or vendors directly. Such relocation has been considered and agreed by you in connection with this offer letter.

When financial issues arose with the company in the summer of 2022, neither the CEO, CFO, COO/CLO ever suggested that the Plaintiff rescind his offer on the home that he purchased, even though all three knew, based on conversations with them, that he was closing on his home in November of 2022. **Exhibit A**. Plaintiff was never reimbursed nor has Lottery.com paid Plaintiff's reasonable expenses associated with moving after he accepted the offer and began employment with Lottery.com.

11. Plaintiff was hired as the Vice President of Information Technology for Lottery.com, and he reported directly to the Executive Vice President of Technology (Ryan Peterson) during his employment. Plaintiff is tasked with developing and implementing all IT strategies, ensuring the organization's data and systems are secure and comply with relevant regulations and standards,

overseeing the administration of Google Workspace with other enterprise systems and applications, managing user accounts, access permissions, and identity management to ensure that the right people have the right access to resources, implementing policies and procedures for data storage, backup, and recovery to ensure data integrity and availability, establishing and managing IT support services to address user issues, troubleshoot problems, and ensure continuous availability of services, managing the IT budget, controlling costs, and ensuring that investments in Google Workspace and related technologies provide a good return on investment, and managing relationships with vendors, negotiating contracts, and ensuring that third-party services and products meet the organization's needs and standards.

12. Plaintiff's date of last reimbursement paid by Defendant was May 3, 2022. Plaintiff was provided with medical benefits and enrolled in the Defendant's 401k. Plaintiff received regular pay roll from March 9, 2022 to July 8, 2022, and his last date of full payroll was July 8, 2022. Since that date Plaintiff has continued to be employed by Defendant and continued to complete work for Defendant on a weekly basis.

13. Between May 27, 2022 and July 6, 2022, Plaintiff provided IT related services in an internal investigation along with his regular duties as VP of IT. From the start of his employment and though December of 2022, Plaintiff used his personal Credit Card to pay IT related expenses with prior authorization of the CFO Ryan Dickinson and with reaffirmed authorization of CLO/COO Katie Lever as Ryan Dickenson's AMEX card was cancelled. Plaintiff was given notice that the "company couldn't get a new one (credit card) just yet because they were a gaming company and it was hard for a gaming company to get a credit card." With the understanding that reimbursements would be up and running soon, Plaintiff and Ryan Peterson paid for all of the company's IT related expenses moving forward through December of 2022.

14. On July 6, 2022, Lottery.com filed a Form 8-K with the SEC noting the termination of the CFO, Ryan Dickinson, and appointment of Harry Dhaliwal as CFO and appointment of Steven M. Cohen and Richard Kivel as co-chairs. At this time, Plaintiff reaffirmed his use of his personal credit card with Harry Dhaliwal (Interim CFO) who recommended Plaintiff only pay for the "critical" services necessary. Harry Dhaliwal confirmed that Lottery.com was working to reimburse Plaintiff for the expenses that were not paid since May 6, 2022, but Lottery.com was waiting on confirmation of cash in the bank and a "cursory audit" of the financials.

15. Between July 6, 2022 and July 29, 2022 Plaintiff was involved in the internal investigation along with my regular duties as VP of IT including the securing all CFO/CRO/CEO's data and securing of company wide data as it related to the various lawsuits and investigations. On July 11, 2022, Lottery.com filed a Form 8-K giving notice that Matthew Clemenson, the Chief Revenue Officer for Lottery resigned and also overstated the cash balance by approximately $30 million, in the prior fiscal quarter. On July 21, 2022, Lottery.com gave notice of the resignation of the CEO, Lawrence Anthony "Tony" DiMatteo II.

16. On July 29, 2022, Lottery.com filed a Form-8K giving notice, in part:

> "On July, 28, 2022, the Board of Directors of Lottery.com Inc. (the "Company") determined that the Company does not currently have sufficient financial resources to fund its operations or pay certain existing obligations, including its payroll and related obligations. Accordingly, the Company intends to furlough certain employees effective July 29, 2022. As of July 29, 2022, the Company owed approximately $425,000 in outstanding payroll obligations. The Company's inability to pay this amount may result in employees terminating their relationship with the Company and/or pursuing legal remedies. Since the Company's business is dependent on the efforts and talents of its employees, particularly its developers and engineers, and the provision of ongoing services to customers by its employees, a material loss of its employee base may result in the inability of the Company to operate its technology, meet its obligations to customers, the loss of key customer relationships and revenue, and claims for breach of contractual obligations."

17. On July 29, 2022, Defendant made a furlough announcement for "certain employees." Other employees, including Plaintiff, were asked to continue work **and were not** furloughed: (1) Carl Wells; (2) Greg Potts; (3) Brandon Marsh; (4) Trevor Selle; and (5) Ryan Peterson, (6) Amy Lawrence, (7) Andrew Grossman, (8) Chris Kohler, (9) John Bluher. These individuals were and are integral to maintaining Lottery.com services.

18. Between July 29, 2022 and August 16, 2022, Plaintiff was involved in numerous internal and external investigations along with his regular duties as VP of IT. Plaintiff was assured by Katie Lever (CLO/COO) that funding was being obtained and reimbursement and payroll would be back up as soon as possible.

19. On July 29, 2022, Katie Lever and Plaintiff had a conversation in Slack that was followed up with a Zoom Meeting where she specifically asked Plaintiff to stay on and stated that the furlough was not applicable to Plaintiff or Ryan Peterson, accounting or legal. Katie Lever stated she didn't know when payroll would be back up and running. However, her ability to keep up with the litigation matters and multitude of investigations would be nearly impossible without Plaintiff because he had all of the access to what was being requested by the various regulatory agencies and law firms, which required Plaintiff to complete work each week without any compensation.

20. On August 16, 2022, Lottery.com filed a Form 10-Q with the SEC, stating in part:

> On July 28, 2022, the Board determined that the Company did not have sufficient financial resources to fund its operations or pay certain existing obligations, including its payroll and related obligations, and the Company furloughed the majority of its employees effective July 29, 2022.

Lottery makes publicly known that it did not furlough **all** of its employees.

21. Between August 16, 2022 and September 5, 2022, Plaintiff continued to be involved in the internal and external investigations along with his regular duties as VP of IT under the direction of Ryan Peterson and Katie Lever. Plaintiff was still paying, on behalf of the company, some of

the critical IT services and there were some small amounts of reimbursements made to try and get him caught back up, however, Plaintiff was never fully reimbursed for all his out-of-pocket expenses on behalf of Lottery.com.

22. On September 5, 2022, Richard Kivel (Chairman of the Board) called Plaintiff and followed up with an email to inform him that Katie Lever was being terminated effective immediately.

23. On September 6, 2022, Lottery.com submitted a Form 8-K with the SEC regarding a Term Sheet with Woodford Eurasia Assets Ltd., the notice states in part:

> On September 6, 2022 (the "Signing Date"), Lottery.com Inc. (the "Company") entered into a Term Sheet (the "Term Sheet"), with Woodford Eurasia Assets Ltd. ("Woodford").The Term Sheet provides for a $2.5 million convertible loan (the "Initial Loan") to be funded no later than five business days following the fulfillment of its conditions, such as, the receipt of the Director Resignations (as defined below) and appointment of two new members of the Board and an interim chief executive officer of the Company.
>
> The Term Sheet also contemplates an additional convertible loan or another investment instrument (the "Expansion Capital") in a principal amount of up to $50.0 million (the "Accordion").

24. On September 8, 2022, Lottery.com's Board appointed Mr. Sohail S. Quraeshi as Interim Chief Executive Officer as well as Vladimir Klechtchev and Amer Rustom to the Board of Directors, and Richard Kivel remained as Chairman. Between September 8, 2022 and November 30, 2022 a "board fight" ensued between Sohail Quraeshi and Richard Kivel about Sohail's level of authority.

25. On October 9, 2022, Harry Dhaliwal resigned, and Edward K. Moffly is appointed as the Company's Interim Chief Financial Officer.

26. On October 11, 2022, after no movement toward reimbursements or payroll, Plaintiff reached out to Interim CEO Sohail Quraeshi to discuss payroll and reimbursements. Plaintiff spoke

with Mr. Quraeshi over the phone on October 11, 2022 and again on October 12, 2022. During these calls Plaintiff was informed that Lottery was waiting on Woodford Eurasia to put the $2.5 million in the bank and everyone would get caught back up and Lottery would be able to start moving the company forward again.

27. On October 17, 2022, CEO Sohail Quraeshi requested that Plaintiff set up Matthew McGahan, "a new board member," with email. Plaintiff checked with Richard Kivel, who told him not to "until such time the Board members are officially confirmed and background checks were complete."

28. On October 19, 2022, Vladimir Klechtchev resigned and Sohail Quraeshi appointed Matthew McGahan as an independent director of the Board. On October 25, 2022, Sohail Quraeshi is terminated by order of Richard Kivel. Plaintiff opted to stay clear of any perceived side (to the best of his ability) while still performing the duties and tasks of VP of IT to the best of his ability.

29. On November 2, 2022, Plaintiff received an email from Richard Kivel detailing Mathew McGahan's direct connection to Woodford Eurasia and PNN Group. On November 4, 2022, Richard Kivel resigned.

30. On November 4, 2022, Plaintiff had a conversation with Richard Kivel to confirm the 8K is accurate, he informed Plaintiff that it was accurate and that Matthew McGahan was the acting Chairman and Sohail Quraeshi was the CEO. Plaintiff was tasked with reactivating Sohail's lottery.com account.

31. On November 4, 2022, Plaintiff received a threatening email from Sohail stating in part:

> "The Company's position is that every employee owes the Company a duty of unselfish loyalty. This means an employee must not act contrary to the employer's interests. Refusing to obey the lawful instructions of the Company is a breach of the duty of loyalty. Therefore, if you fail to comply with these lawful instructions by 4:59 p.m. CDT, the Company may be damaged, seek to hold you civilly

> responsible for any such damage and shall take additional corrective measures in law and equity.

32. On November 10, 2022, Lottery filed a Form 8-K giving notice that Matthew Howard McGahan, Director, was to serve as the new Chairman of the Board, and the Board appointed Sohail S. Quraeshi, CEO, and appointed two new directors Barney Battles, Independent Director, and Narila Chowdhury, Director.

33. On November 23, 2022, Lottery filed a Form 8-K giving notice that:

> On November 23, 2022, the Company was presented with a Definitive Agreement (the "Agreement") by and between the Corporation and Woodford based on the Term Sheet, which Agreement the Corporation finds acceptable and in the best interests of its shareholders. As a result, the Corporation hereby authorized its Chief Executive Officer, Sohail S. Quraeshi, to execute the Agreement on its behalf. An executed copy of the Agreement will be filed at a later date.

34. On December 12, 2022, Dennis Ruggeri, Compliance Director for Lottery.com, reached out to Plaintiff via email asking Plaintiff to complete work, and stating in part:

> Respectfully, The Company acknowledges its monetary debt to you and is working to springboard funding in order to pay it down. Unfortunately, paying down said debt is connected to the Company's continuing ability to revitalize itself, which it won't be able to do if it fails to fulfill the SEC subpoena. Your help with this matter would be greatly appreciated.

35. Between September 5, 2022 and December 31, 2022, Plaintiff was managing the day-to-day IT operations and helped facilitate the IT requests of the Board and other executives that were on staff. Following the email from Sohail on November 4, 2022, the work environment became very hostile. Almost all communication about the company by the Board and CEO Sohail as well as External Legal Counsel Amar Ali were being directed to NON-Lottery.com email addresses. Emails that Plaintiff received to perform work were often sent from personal email addresses. It also became clear to Plaintiff that he was not receiving his reimbursement any time soon, so he

was forced to cancel the personal credit card he was using to pay lottery.com expenses which damaged his credit.

36. On February 2, 2023, Sohail Quraeshi acknowledged that the Board is comprised of Woodford "nominated inside directors who continue to interfere and jeopardize our company."

37. On February 13, 2023, Mark Gustavson appointed CEO and "principle financial/accounting officer" (No mention of what happened to Sohail other than "Mr. Mark Gustavson, as CEO, replaced Mr. Sohail S. Quraeshi, who is no longer serving as Chief Executive Officer or as a principal executive officer of the Company, effective February 1, 2023").

38. On March 29, 2023, Plaintiff was forwarded an email from Matthew McGahan acknowledging back pay and that debts were owed, the email stated in part:

> "The company acknowledges that back pay is owed to various members of the team who were not furloughed properly, or subsequently asked to do work after furlough. When the company resolves its current state of insolvency it will honor those debts and make good on all of the final calculation of all moneys owed once the audit is complete."

39. On April 24, 2023, Plaintiff spoke with Mark Gustavson on the phone regarding past debt and lack of payroll/reimbursements as well as request for arbitration, which Plaintiff started the process on March 30, 2023. Plaintiff sent Mark Gustavson the to-date dollar amount owed; and in response Mark Gustavson stated he would bring up with the board. However, that never came into fruition.

40. On July 14, 2023, Lottery's Board of Directors terminated Mark Gustavson from his role as Chief Executive Officer of the Company and appointed Matthew McGahan, the Chairman of the Board of Directors, to serve as interim Chief Executive Officer until the Company found a permanent replacement. The Board of Directors also appointed Robert J. Stubblefield as Chief

Financial Officer of the Company. In addition, on July 20, 2023, the Board of Directors appointed Paul S. Jordan and Tamer T. Hassan as independent members of the Board of Directors.

41. From January 1, 2023 through the filing of this Amended Complaint (June 2024), Plaintiff continues to receive requests for his services almost daily from the remaining employees and Plaintiff is still expected to maintain the technology systems which LTRY still has deployed (google workspace for example). Plaintiff has evidence of phone calls and text messages weekly with several employees and he is continuously required to perform general IT tasks as any IT department would.

42. At no time have any of the following Executives and or Board Members given notice to Plaintiff that he was terminated or furloughed, each of the following individuals have asked Plaintiff to perform work since July 2022: Katie Lever – CLO and COO; Richard Kivel – Chairman of the Board; Sohail Quraeshi – CEO; Dennis Ruggeri – CCO; Mark Gustavson – CEO and Principle Accounting and Financial Officer; Matt McGahan – Chairman of the Board and CEO; Amar Ali – External Counsel and CLO; Harry Dhaliwal – CFO; Rob Stubblefield – CFO; Greg Potts – COO; Ryan Peterson – EVP of IT.

43. On multiple occasions throughout Plaintiff's employment it has been represented that reimbursement and back payment of payroll were "coming soon" or "will happen as soon as Woodford or UCIL put in the money" either verbally or in writing. And all of the following Executives have stated that they understand that Plaintiff is owed payroll/reimbursements: Katie Lever – CLO and COO; Richard Kivel – Chairman of the Board; Sohail Quraeshi – CEO; Dennis Ruggeri – CCO; Mark Gustavson – CEO and Principle Accounting and Financial Officer; Matt McGahan – Chairman of the Board and CEO; Amar Ali – External Counsel and CLO; Harry Dhaliwal – CFO; Rob Stubblefield – CFO.

44. As of this filing, Lottery continues to maintain, as evidenced by its Q1 Form 10-Q/Q dated June 6, 2024, that General and Administrative Expenses for 2023 and 2024 total $633.980, Personnel Costs total $2,242,113 and Professional Fees total $739,928. Lottery.com states personnel costs include salaries, payroll taxes, health insurance, worker's compensation and other benefits for management and office personnel, and Defendant states that:

> "Only a few of these non-furloughed employees remain active in the efforts to restore Company operations and as of December 31, 2023, there remained approximately $3.85 million in outstanding payroll obligations that remained unpaid."

45. To date, Plaintiff has not been reimbursed for the following out-of-pocket and approved expenses he made on behalf of Lottery for the critical needs of the company:

| Bill.com Invoice # | Date of Payment | Amount | Reimbursement Notes |
|---|---|---|---|
| 7 | 06/10/22 | $ 7,589.08 | Hardware and software |
| 8 | 06/28/22 | $ 5,464.39 | Company Equipment, Nord VPN, Adobe, |
| 9 | 07/12/22 | $ 513.03 | Hardware for Rico and Bethany |
| 10 | 07/12/22 | $ 240.15 | Adobe Licenses |
| 11 | 07/14/22 | $ 639.29 | Zoom |
| 12 | 07/18/22 | $ 511.68 | DocuSign |
| 13 | 07/29/22 | $ 1,044.43 | Microsoft, Atlassian, One Hub Adobe |
| 14 | 08/01/22 | $ 614.31 | Slack |
| 15 | 08/11/22 | $ 1,519.68 | Atlassian, Slack, GitHub Stich data |
| 16 | 08/15/22 | $ 639.29 | Zoom |
| 17 | 08/19/22 | $ 113.98 | One Hub |
| 18 | 08/24/22 | $ 551.97 | Adobe Licenses |
| 19 | 09/06/22 | $ 1,427.26 | Atlassian, Slack, One hub, Zoom |
| 20 | 09/20/22 | $ 99.95 | One Hub |
| 21 | 09/26/22 | $ 551.97 | Adobe Licenses |
| 23 | 10/03/22 | $ 106.40 | Stitch Data |
| 24 | 10/18/22 | $ 99.95 | One Hub |
| 25 | 11/03/22 | $ 413.66 | Slack |
| 26 | 11/03/22 | $ 7,710.20 | Reimbursement of moving Expenses as authorized per employment agreement |
| 28 | 11/7/2022 | $ 528.00 | Lumigo |
| 29 | 11/23/2022 | $ 299.99 | AppFigures License |
| 30 | 11/23/2022 | $ 3,001.22 | Reimbursement of moving Expenses as authorized per employment agreement |
| 31 | 11/30/2022 | $ 551.97 | Adobe Licenses |

46. Total un-reimbursed credit card charges are **$34,231.85**. Also, to date Plaintiff has accrued 25% in interest every month. Plaintiff has calculated the total credit card interest for the above charges to be an additional **$22,768.59.**

47. For the following pay periods Defendant has failed to compensate Plaintiff for any wages, not even minimum wages, for the work completed daily and each week based on the terms of his employment contract and the requirements under the Fair Labor Standards Act:

- Pay Date Gross Salary

| | Pay Date | Gross Salary |
|---|---|---|
| i. | 7/22/2022 | $ 2,622.32 |
| ii. | 8/5/2022 | $ 4,807.69 |
| iii. | 8/19/2022 | $ 9,615.38 |
| iv. | 9/2/2022 | $ 9,615.38 |
| v. | 9/16/2022 | $ 9,615.38 |
| vi. | 9/30/2022 | $ 9,615.38 |
| vii. | 10/14/2022 | $ 9,615.38 |
| viii. | 10/28/2022 | $ 9,615.38 |
| ix. | 11/11/2022 | $ 9,615.38 |
| x. | 11/25/2022 | $ 9,615.38 |
| xi. | 12/9/2022 | $ 9,615.38 |
| xii. | 12/23/2022 | $ 9,615.38 |
| xiii. | 1/6/2023 | $ 9,615.38 |
| xiv. | Annual Bonus | $37,500.00 |
| xv. | 1/20/2023 | $ 9,615.38 |
| xvi. | 2/3/2023 | $ 9,615.38 |
| xvii. | 2/17/2023 | $ 9,615.38 |
| xviii. | 3/3/2023 | $ 9,615.38 |
| xix. | 3/17/2023 | $ 9,615.38 |
| xx. | 3/31/2023 | $ 9,615.38 |
| xxi. | 4/14/2023 | $ 9,615.38 |
| xxii. | 4/28/2023 | $ 9,615.38 |
| xxiii. | 5/12/2023 | $ 9,615.38 |
| xxiv. | 5/26/2023 | $ 9,615.38 |
| xxv. | 6/9/2023 | $ 9,615.38 |
| xxvi. | 6/23/2023 | $ 9,615.38 |
| xxvii. | 7/7/2023 | $ 9,615.38 |
| xxviii. | 7/21/2023 | $ 9,615.38 |
| xxix. | 8/4/2023 | $ 9,615.38 |
| xxx. | 8/18/2023 | $ 9,615.38 |
| xxxi. | 9/1/2023 | $ 9,615.38 |
| xxxii. | 9/15/2023 | $ 9,615.38 |

| | | |
|---|---|---|
| xxxiii. | 9/29/2023 | $ 9,615.38 |
| xxxiv. | 10/13/2023 | $ 9,615.38 |
| xxxv. | 10/27/2023 | $ 9,615.38 |
| xxxvi. | 11/10/2023 | $ 9,615.38 |
| xxxvii. | 11/24/2023 | $ 9,615.38 |
| xxxviii. | 12/8/2023 | $ 9,615.38 |
| xxxix. | 12/22/2023 | $ 9,615.38 |
| xl. | 12/31/2023 | $ 37,500.00 |
| xli. | 1/5/2024 | $ 9,615.38 |
| xlii. | 1/19/2024 | $ 9,615.38 |
| xliii. | 2/2/2024 | $ 9,615.38 |
| xliv. | 2/16/2024 | $ 9,615.38 |
| xlv. | 3/1/2024 | $ 9,615.38 |
| xlvi. | 3/15/2024 | $ 9,615.38 |
| xlvii. | 3/29/2024 | $ 9,615.38 |
| xlviii. | 4/12/2024 | $ 9,615.38 |
| xlix. | 4/26/2024 | $ 9,615.38 |
| l. | 5/10/2024 | $ 9,615.38 |
| li. | 5/24/2024 | $ 9,615.38 |
| lii. | 6/7/2024 | $ 9,615.38 |
| liii. | 6/21/2024 | $ 9,615.38 |
| | **TOTAL:** | **$554,364.13** |

For the above Plaintiff has is owed **$554,364.13** in unpaid payroll based on the terms of his employment contract:

48. To date Plaintiff has paid **$7,657.93** in legal expenses, arbitration attempts, and CPA fees. Plaintiff has not been reimbursed **$15,710.00** in closing/relocation costs on his home and relocation to Ausitn, Texas as according to his employment agreement. To date, Plaintiff has been forced to liquidate 4 of his IRAs in order to close on his house and pay the associated taxes. Total liquidation amount **$165,139.00**. Total amount paid in taxes associated with IRA liquidation **was $95,798.65**. Loss of potential earnings to date due to liquidation of IRAs **$98,483.92**.

49. The damages has caused Plaintiff to suffer damages, including but not limited to:

| | | |
|---|---|---|
| $ | 57,001.44 | Credit Card Charges - Reimbursement |
| $ | 15,710.00 | Closing Costs on House - Reimbursement |
| $ | 7,657.93 | Misc. Fees and Costs - Reimbursement |
| $ | 104,364.19 | 2022 Back Pay |
| $ | 37,500.00 | 15% Annual Bonus 2022 |
| $ | 409,838.23 | Loss Associated with Liquidation of IRA Investment |
| $ | 250,000.00 | 2023 Back Pay |
| $ | 37,500.00 | 15% Annual Bonus 2023 |
| $ | 124,999.94 | 2024 Back Pay |
| **$** | **1,044,571.73** | **Total Amount Owed** |

## VI. CAUSES OF ACTION

### 1. VIOLATION OF THE FAIR LABOR STANDARDS ACT – 29 U.S.C. § 206 (A)

50. Plaintiff incorporates by reference all of the foregoing allegations in each of the paragraphs above as if fully set forth herein.

51. FLSA guarantees certain minimum wages for employees. 29 U.S.C. § 206(a).

52. Plaintiff is not an exempt employee under the FLSA because he was compensated less than $684 per week, (no administrative or executive exemption applies). Specifically, Plaintiff received no compensation during the above-mentioned time period and continues to not receive compensation for his work performed. Plaintiff was not annually compensated at least $107,432 during the relevant period [July 2022 to present] and received no compensation.

53. For purposes of the FLSA, the employment practices of Defendant were and are uniform in all respects material to the claims asserted in this Complaint.

54. Plaintiff is covered by the Fair Labor Standards Act (FLSA) on an individual basis because he engaged in interstate or foreign commerce on the job. Interstate commerce means any work involving or related to the movement of persons or things (including intangibles, such as information) across state lines or from foreign countries (i.e. the sale of lottery tickets across the country).

55. The FLSA provides that "[a]ny employer who violates the provisions of section 6 or section 7 of the Act ... shall be liable to the employee or employees affected in the amount of ... their unpaid minimum wages, or their unpaid overtime compensation." 29 U.S.C. § 216(b).

56. Between July 22, 2022 and present (June 2024) Defendant has failed to pay Plaintiff minimum wages as required under the FLSA. As a result of Defendant's failure to pay full regular pay, Plaintiff was damaged in an amount to be proved at trial.

57. The FLSA is clear, Defendant was required to pay its exempt employees the full predetermined salary amount "free and clear" for any week in which the employee performed any work without regard to the number of days or hours worked. Defendant was required to pay Plaintiff the full predetermined salary amount "free and clear" for any week in which he performed any work without regard to the number of days or hours worked. **FLSA FACT SHEET #70.**

58. Plaintiff received no weekly compensation nor $684 per week at minimum, thus no exemption applies during the relevant time period [July 2022 to present].

59. FLSA Fact Sheet #70 – *questions regarding furloughs and other reductions in pay*:

> Reductions in the predetermined salary of an employee who is exempt under Part 541 of the Department of Labor's regulations will ordinarily cause **a loss of the exemption**. Fact Sheet 70 #4.
>
> FLSA section 13(a)(1) **requires payment of at least $684* per week on a "salary" basis for those employed as exempt executive, administrative, or professional employees. See Fact Sheet #17G** . Fact Sheet 70 #4.
>
> **An employer must pay an exempt employee the full predetermined salary amount "free and clear" for any week in which the employee performs any work without regard to the number of days or hours worked**…**If the employee is ready, willing, and able to work, deductions may not be made for time when work is not available. Salary deductions are generally not permissible if the employee works less than a full day**. Except for certain limited exceptions found in 29 C.F.R. 541.602(b)(1)-(7) ,

> **<u>salary deductions result in loss of the section 13(a)(1) exemption</u>**. <u>Fact Sheet 70 #4</u>.

60. Defendant's violations of the FLSA were willful within the meaning of 29 U.S.C. § 255(a).

61. Therefore, Plaintiff respectfully demand that he be paid full regular pay compensation as required by the FLSA for every hour worked in any workweek for which he was not compensated, plus interest, damages, penalties, and attorneys' fees as provided by law.

## 2. <u>BREACH OF CONTRACT</u>

62. On March 9, 2022, Plaintiff and Defendant entered into a written employment contract [**Exhibit A**] whereby Plaintiff was employed to perform services as Vice President of Information Technology of Lottery.com. The offer letter stated the essential terms of the employment relationship between Plaintiff and Defendant.

63. The contract was supported by mutual consideration.

64. The contract incorporated the laws of Texas.

65. Defendant Lottery breached the contract by:

- Failing to pay Plaintiff his bi-weekly salary of $9,615.39 (being $250,000 annualized) – from 7/22/2022 to present;
- Failing to pay Plaintiff his annual bonus
- Failing to reimburse Plaintiff for moving and closing costs; and
- Making false misrepresentations that Plaintiff would be compensated.

66. Plaintiff fully performed his obligations under the contract; however, Defendant continues to willfully breach the agreement by failing to compensate and reimburse Plaintiff during the relevant period. Plaintiff fully performed his obligations to be awarded his annual bonus, yet Defendant has not compensated Plaintiff since July 7, 2022.

67. Plaintiff alleges his total un-reimbursed credit card charges are **$34,231.85**, and he has accrued 25% in Interest every month. Plaintiff has calculated the total credit card interest for the above charges to be an additional **$22,768.59**. Defendant Lottery.com breached the employment

agreement with Plaintiff. Defendant contracted to pay Plaintiff $250,000 salary and since July 22, 2022 Plaintiff's salary never approached this level.

68. To date Plaintiff has paid **$7,657.93** in legal expenses, arbitration attempts, and CPA fees. Plaintiff has not been reimbursed **$15,710.00** in closing/relocation costs on his home and relocation to Texas as according to his employment agreement.

69. In Texas, the "Payday Law," provides an alternative remedial scheme for workers who have been denied wages. *See Igal*, 250 S.W.3d at 87; *Hull v. Davis*, 211 S.W.3d 461, 464 (Tex.App.-Houston [14th Dist.] 2006, no pet.). A worker has a choice either to file an administrative claim with the TWC or a common law breach of contract claim in district court. *Igal*, 250 S.W.3d at 82; *Hull*, 211 S.W.3d at 464. Here, Plaintiff has filed a breach of contract lawsuit rather than a wage claim with the TWC.

70. As a direct and proximate result of Defendant Lottery's breach, Plaintiff incurred direct damages including but not limited to, the loss of salary and lost employment benefits due him under the contract, together with reasonable attorney fees and interest as allowed by law.

71. Plaintiff's claim for breach of the employment agreement, does not seek unpaid minimum wages or unpaid overtime compensation, and is not preempted by the FLSA because Plaintiff seeks damages for breach of contract above and beyond the FLSA's recovery of unpaid minimum and overtime wages, including but not limited to, contracted wages, reasonable moving costs, and reimbursements.

72. Plaintiff's breach-of-contract claim alleges that Lottery.com Plaintiff relative to the agreed payment structure in the employment agreement, which is a claim separate and distinct from one brought under the FLSA for failure to pay minimum wages.

### 3. <u>COMMON LAW FRAUD AND FRAUD IN THE INDUCEMENT</u>

73. Plaintiff incorporates by reference all of the foregoing allegations in each of the paragraphs above as if fully set forth herein.

74. Plaintiff would not have entered into the contract but for the reasonable expectations from representations exhibited in the terms of the contract that he would not be compensated for his work for over ten months. In addition representatives for Defendant represented and assured Plaintiff that they would honor all contract terms and fully compensate Plaintiff. Defendant knew or should have known these representations were false or made recklessly.

75. Defendant made the following representations:

- WHO: <u>Katie Lever</u>
- WHAT: Material Representations:
    i. "**company couldn't get a new one (credit card) just yet because they were a gaming company and it was hard for a gaming company to get a credit card**."
    ii. "**the furlough was not applicable to Plaintiff**"
- WHEN: Approx. July 2022/August 2022
- WHERE: Verbal conversations, text messages, and messages on Slack.
- WHY: These statements, representations, and schemes were made because Defendant had not compensated Plaintiff to date, and never intended to do so when Defendant asked Plaintiff to continue to working in July 2022. The statements were made to induce Plaintiff to remain employed and to continue work for Lottery.com, Plaintiff that he was not furloughed in July 2022, and he has continued to complete work for Defendant as of this filing date.

- WHO: <u>Ryan Dickinson</u>
- WHAT: Material Representations:
    **i. "company couldn't get a new one (credit card) just yet because they were a gaming company and it was hard for a gaming company to get a credit card"**
    ii. **"Plaintiff would be fully reimbursed for all out-of-pocket expenses**"
- WHEN: Approx. March 2022/July 2022
- WHERE: Verbal Conversations, text messages, and emails.
- WHY: These statements, representations, and schemes were made because Defendant had not compensated Plaintiff to date, and never intended to do so when Defendant asked Plaintiff to continue to working in July 2022. The statements were made to induce Plaintiff to remain employed and to continue work for Lottery.com,

Plaintiff that he was not furloughed in July 2022, and he has continued to complete work for Defendant as of this filing date.

- WHO: Richard Kivel
- WHAT: Material Representations:
    i. "**Lottery.com was working to reimburse Plaintiff for the expenses that were not paid since May 6, 2022, but Lottery.com was waiting on confirmation of cash in the bank and a "cursory audit" of the financials**."
- WHEN: Approx. August 2022
- WHERE: Verbal Conversations, text messages, and emails.
- WHY: These statements, representations, and schemes were made because Defendant had not compensated Plaintiff to date, and never intended to do so when Defendant asked Plaintiff to continue to working in July 2022. The statements were made to induce Plaintiff to remain employed and to continue work for Lottery.com, Plaintiff that he was not furloughed in July 2022, and he has continued to complete work for Defendant as of this filing date.

- WHO: Dennis Ruggeri
- WHAT: Material Representation:
    i. The Company acknowledges its monetary debt to you and is working to springboard funding in order to pay it down. Unfortunately, paying down said debt is connected to the Company's continuing ability to revitalize itself, which it won't be able to do if it fails to fulfill the SEC subpoena. Your help with this matter would be greatly appreciated
- WHEN: Approx. December 2022
- WHERE: Verbal Conversations, text messages, and emails.
- WHY: These statements, representations, and schemes were made because Defendant had not compensated Plaintiff to date, and never intended to do so when Defendant asked Plaintiff to continue to working in July 2022. The statements were made to induce Plaintiff to remain employed and to continue work for Lottery.com, Plaintiff that he was not furloughed in July 2022, and he has continued to complete work for Defendant as of this filing date.

- WHO: Mark Gustavson
- WHAT: Material Representation:
    i. **"he would bring up Plaintiff's reimbursements and backpay with the board**."
- WHEN: Approx. March 2023/April 2023
- WHERE: Verbal Conversations, text messages, and emails.
- WHY: These statements, representations, and schemes were made because Defendant had not compensated Plaintiff to date, and never intended to do so when Defendant asked Plaintiff to continue to working in July 2022. The statements were made to induce Plaintiff to remain employed and to continue work for Lottery.com, Plaintiff that he was not furloughed in July 2022, and he has continued to complete work for Defendant as of this filing date.

- WHO: Matt McGahan
- WHAT: Material Representation:
    i. "**The company acknowledges that back pay is owed to various members of the team who were not furloughed properly, or subsequently asked to do work after furlough. When the company resolves its current state of insolvency it will honor those debts and make good on all of the final calculation of all moneys owed once the audit is complete**."
- WHEN: Approx. March 2023
- WHERE: Verbal Conversations, text messages, and emails.
- WHY: These statements, representations, and schemes were made because Defendant had not compensated Plaintiff to date, and never intended to do so when Defendant asked Plaintiff to continue to working in July 2022. The statements were made to induce Plaintiff to remain employed and to continue work for Lottery.com, Plaintiff that he was not furloughed in July 2022, and he has continued to complete work for Defendant as of this filing date.

- WHO: Sohail Quraeshi
- WHAT: Material Representation:
    i. "**Lottery was waiting on Woodford Eurasia to put the $2.5 million in the bank and everyone would get caught back up and Lottery would be able to start moving the company forward again**."
- WHEN: Approx. October 2022
- WHERE: Verbal Conversations, text messages, and emails.
- WHY: These statements, representations, and schemes were made because Defendant had not compensated Plaintiff to date, and never intended to do so when Defendant asked Plaintiff to continue to working in July 2022. The statements were made to induce Plaintiff to remain employed and to continue work for Lottery.com, Plaintiff that he was not furloughed in July 2022, and he has continued to complete work for Defendant as of this filing date.

- WHO: Amar Ali
- WHAT: Material Representation:
    i. "**Asked Plaintiff to complete work in return for payroll starting back up and reimbursements being paid out**."
- WHEN: Approx. March/April/June/July 2023
- WHERE: Verbal Conversations, text messages, and emails.
- WHY: These statements, representations, and schemes were made because Defendant had not compensated Plaintiff to date, and never intended to do so when Defendant asked Plaintiff to continue to working in July 2022. The statements were made to induce Plaintiff to remain employed and to continue work for Lottery.com, Plaintiff that he was not furloughed in July 2022, and he has continued to complete work for Defendant as of this filing date.

- WHO: Harry Dhaliwal
- WHAT: Material Representations

  i. "**Lottery.com was working to reimburse Plaintiff for the expenses that were not paid since May 6, 2022, but Lottery.com was waiting on confirmation of cash in the bank and a "cursory audit" of the financials**."

- WHEN: Approx. August 2022
- WHERE: Verbal Conversations, text messages, and emails.
- WHY: These statements, representations, and schemes were made because Defendant had not compensated Plaintiff to date, and never intended to do so when Defendant asked Plaintiff to continue to working in July 2022. The statements were made to induce Plaintiff to remain employed and to continue work for Lottery.com, Plaintiff that he was not furloughed in July 2022, and he has continued to complete work for Defendant as of this filing date.

- WHO: Robb Stubblefield
- WHAT: Material Representation:
  i. **"Once the company gets funding from UCIL or another outside investor then everyone will get paid. Were just waiting for the S1 to be finalized."**
- WHEN: Approx. July 2024
- WHERE: Verbal Conversations, text messages, and emails.
- WHY: These statements, representations, and schemes were made because Defendant had not compensated Plaintiff to date, and never intended to do so when Defendant asked Plaintiff to continue to working in July 2022. The statements were made to induce Plaintiff to remain employed and to continue work for Lottery.com, Plaintiff that he was not furloughed in July 2022, and he has continued to complete work for Defendant as of this filing date.

76. The elements of a fraud claim are (1) a material misrepresentation, (2) that was either known to be false when made or was asserted without knowledge of its truth, (3) which was intended to be acted upon, (4) which was relied upon, and (5) which caused injury. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001).

77. The above-mentioned representations and/or omissions were material and were made or omitted with the intent that Plaintiff rely upon them. Defendant Lottery had an obligation to fully disclose information to Plaintiff but failed to do so. Plaintiff relied upon such representations and/or omissions to his detriment and has suffered damages in excess of the minimum jurisdictional limits for which he now sues.

78. Defendant made a material misrepresentation that Plaintiff would be fully compensated for all the pay periods missed. Defendant Lottery's agents knew the representation was false or made the representation recklessly without any knowledge of its truth because Defendant continued to NOT compensate Plaintiff after these representations were made. Defendant made the representations with the intent that the Plaintiff would act on that representation or intended to induce the Plaintiff's reliance on the representation so that Plaintiff would not bring claims against it. Causing Plaintiff to suffer an injury by actively and justifiably relying on that representation so that he suffered damages including but not limited to the loss of contracted salary, future salary, lost employee benefits, diminished earnings capacity, lost career and business opportunities, litigation expenses, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages.

79. Here, the economic loss rule does not bar Plaintiff's fraud claim. Plaintiff's fraud claim stems from misrepresentations Lottery.com made before the parties entered into their contract—reimbursements of moving expenses, which constituted an important factor in his decision to accept employment. *See Formosa Plastics Corp. USA* , 960 S.W.2d at 46 ("it is well established that the legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself"); *Reservoir Sys., Inc. v. TGS-NOPEC Geophysical Co.* , 335 S.W.3d 297, 308 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) ("Tort damages are recoverable for a fraudulent-inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract.").

80. To date, Plaintiff has been forced to liquidate 4 of his IRAs in order to close on my house and pay the associated taxes. Total liquidation amount **$165,139.00**. Total amount paid in taxes

associated with IRA liquidation **was $95,798.65**. Loss of potential earnings to date due to liquidation of IRAs **$98,483.92**.

**4. <u>QUANTUM MERUIT/UNJUST ENRICHMENT (ALTERNATIVE)</u>**

81. Plaintiff incorporates by reference all of the foregoing allegations in each of the paragraphs above as if fully set forth herein.

82. In the alternative, if for any reason Plaintiff's employment contract is not enforceable then Defendant is liable to Plaintiff for unjust enrichment. Plaintiff continues to render valuable sales services to Defendant by participating in management of Defendant s business, the benefits of which were accepted by Defendant. Plaintiff rendered management services with an understanding and expectation that Plaintiff would be compensated for his services as agreed. Defendant has accepted and continues to retain the benefits of Plaintiff s efforts by receiving and retaining substantial revenues. In the alternative to Plaintiff s breach of contract allegations, Plaintiff is entitled to recover the reasonable value of his management services rendered to Defendant.

83. The elements of an action for quantum meruit are: (a) the Plaintiff provided valuable services or materials; (b) the services or materials were provided for the Defendant; (c) the Defendant accepted the services or materials; and (d) the Defendant had reasonable notice that the plaintiff expected compensation for the services or materials.

84. Plaintiff was not properly compensated for his work at the applicable salary that he contracted to earn. Such services to the Company provided by Plaintiff, at the request of and on behalf of Defendant, have a reasonable fair market value in excess of the minimum jurisdictional limits of this Court, for all of which Plaintiff hereby sues.

85. Plaintiff now seeks damages in the amount of all respective unpaid wages, bonuses, and reimbursements, plus liquidated damages. Plaintiff seeks recovery of all attorney fees, costs, and expenses of this action, to be paid by Defendant.

## VII. PRAYER

86. WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant be cited to appear and answer herein, and that on final hearing, Plaintiff have judgment against Defendant for:

- All damages to which Plaintiff may be entitled pursuant to this Original Complaint, or an amendment thereto, including but not limited to back pay, future wages, reinstatement, upgrading, and compensation for benefits not received;
- Past, present, and future physical pain and mental suffering;
- Compensatory damages, including, but not limited to, emotional distress;
- Liquidated Damages;
- Punitive damages in an amount above the minimum jurisdictional limits of the Court;
- Reasonable attorneys' fees as allowed by law (with conditional awards in the event of appeal);
- Pre-judgment interest at the highest rate permitted by law;
- Post-judgment interest from the judgment until paid at the highest rate permitted by law;
- Costs of Court; and
- Such other and further relief, at law or in equity, to which Plaintiff may be entitled, whether by this First Amended Complaint or by proper amendment thereto.

Respectfully submitted,

Kennard Law P.C.

**Eddie Hodges, Jr.**
Texas Bar No.: 24116523
W.D. Bar NO.
Southern District No. 3479748
**Alfonso Kennard, Jr.**
Texas Bar No. 24036888
Kennard Law, P.C.
5120 Woodway Dr. Suite 10010
Houston, Texas 77056
(713) 742-0900 (main)
(713) 742-0951 (facsimile)
Email: alfonso.kennard@kennardlaw.com
**ATTORNEYS FOR PLAINTIFF**

# EXHIBIT A (Employment Agreement)

Carl Wells
6714 Belmont Street
Houston, TX 77005

March 9, 2022

Dear Carl,

We are delighted that you are interested in joining our talented team of people and very pleased to present you with this offer of employment with AutoLotto, Inc. doing business as Lottery.com ("**Lottery.com**"), on the following terms and conditions:

**Position** You will be employed in the fulltime, exempt role of Vice President of Information Technology of Lottery.com, reporting to the Executive Vice President of Technology of Lottery.com or their designee, or as otherwise reasonably determined by the President of Lottery.com, or their designee, from time to time.

**Start Date** Subject to successful completion of our background investigation, your employment with Lottery.com will commence on or about March 21, 2022, unless another date is mutually agreed to (the "**Start Date**").

**Base Salary** You will be paid a bi-weekly salary of $9,615.39 (being $250,000 annualized), payable in accordance with Lottery.com's standard payroll policies and subject to required withholdings and requested deductions.

**Equity Grant** During your employment with Lottery.com, you will be eligible to participate in Lottery.com's equity incentive plans then in effect and be granted such equity awards thereunder, which may consist of restricted stock units, stock options, other equity grants, or a combination thereof, with such value and vesting schedule as recommended and approved by Lottery.com's Compensation Committee and Board of Directors from time to time, subject to the terms and conditions of such equity incentive plans and award agreements evidencing such grants.

**Benefits** During your employment with Lottery.com, you will be eligible to participate in the group health plans that Lottery.com provides to similarly situated employees, which will be effective as of the first day of the first month following your date of employment. Information on these group health plans will be separately provided to you. You may additionally be eligible for other benefit plans that Lottery.com may implement for the benefit of similarly situated employees from time to time.

**Paid Time Off** You are eligible for annual paid time off in accordance with Lottery.com's standard practices and policies.

**Location** At the commencement of your employment, you will work remotely, however, it is understood that you will relocate to and work from Lottery.com's headquarters located within the Austin, Texas, area upon reasonable notice by Lottery.com. Without limiting the "at will" nature of your employment, your failure to relocate in accordance with this Offer Letter may constitute immediate cause for termination of your employment. You may also be required to travel from time-to-time to Lottery.com's offices or as may otherwise

be necessary to fulfill your responsibilities. Lottery.com will reimburse your reasonable and necessary travel expenses under its standard travel reimbursement policy, as amended from time to time.

Lottery.com shall pay those reasonable expenses, approved in advance by Lottery.com, to relocate you and your immediate family members to the Austin, Texas area, including the expenses associated with the packing, loading, and transportation of your household goods, possessions and not more than two (2) vehicles; provided, however, you shall be required to provide Lottery.com with three (3) vendor quotes from companies not affiliated with you for such service; provided, further, however, Lottery.com reserves the right to obtain an additional quote or quotes and select a vendor or vendors of its choosing and to pay such vendor or vendors directly. Such relocation has been considered and agreed by you in connection with this offer letter.

**At-Will Employment**

Your employment with Lottery.com will be "at will" and for no specified period. Lottery.com has the unfettered right to terminate its employment relationship with you at any time, with or without cause, for any or no reason, and with or without notice. You are free to resign at any time, for any or no reason, as you deem appropriate. We request that, in the event of resignation, you give Lottery.com at least two weeks' notice. Notwithstanding the Section of this offer letter titled "Amendment", this provision can only be changed or revoked in a formal written contract signed by the Chief Executive Officer and cannot be changed or revoked by any express or implied agreement based on statements or actions by any member of the Board of Directors, executive, or employee, even if your job duties, title, compensation, benefits or Lottery.com's personnel policies and procedures change from time to time during your tenure.

**Standard Employee Agreements**

To enable Lottery.com to safeguard its proprietary and confidential information, it is a condition of employment that you agree to sign Lottery.com's standard form of At-Will Employee Inventions and Confidentiality Agreement, a copy of which will be separately provided to you.

You will also be required to agree to the requirements of Lottery.com's policies and procedures, including, without limitation, the Employee Handbook and such other policies and procedures that may be issued during your employment.

The execution of these agreements and your agreement to these requirements does not impact, alter or change the "at will" nature of our employment relationship.

**Prior and Other Employment**

We understand that you are likely to have signed confidentiality and invention agreements and made similar promises in prior employment or consultancy positions, and wish to impress upon you that Lottery.com does not want to receive the confidential or proprietary information of others, and will support you in respecting your lawful obligations to prior employers and contracts. We confirm that you will not bring any third party confidential information to Lottery.com, including that of your former employer, and that in performing your duties for Lottery.com you will not in any way utilize any such information.

We ask that, if you have not already done so, please disclose to Lottery.com all agreements relating to prior positions that may affect eligibility to be employed by, or limit your employment with, Lottery.com.

We also ask that you agree that while you are employed with Lottery.com, that you will not engage in any other employment, occupation, consulting or other business activity directly related to the business in which Lottery.com is now involved or becomes involved while you are employed with Lottery.com, nor will you engage in any other activities that conflict with your obligations to Lottery.com.

**Regulatory Approvals** Given the nature of Lottery.com's business, you may be required to apply for or hold a license, registration, permit or other approval of one or more regulatory or governmental authorities with jurisdiction over Lottery.com's business (an "**Approval**") to carry out your duties and responsibilities. In the event you are required to submit an application for an Approval or a renewal thereof, you will completely and timely do so at Lottery.com's expense. Failure to timely apply or receive an Approval may result in the termination of your employment relationship.

The application for any Approval does not impact, alter or change the "at will" nature of our employment relationship.

**Eligibility** This offer letter is contingent upon the successful completion of Lottery.com's background and reference checks. Should your employment commence prior to the completion of these checks, your employment may be immediately terminated as a result of such checks. For purposes of federal immigration law, you will be required to provide Lottery.com with documentary evidence of your identity and eligibility for employment in the United States. Such documentation must be provided to us within three business days of your date of hire, or our employment relationship with you may be terminated.

**No Waiver** No provision of this offer letter may be waived except by an agreement in writing signed by both parties. A waiver of any term or provision shall not be construed as a waiver of any other term or provision.

**Amendment** This offer letter may be amended, altered, or revoked at any time, in whole or in part, by a written instrument setting forth such changes, signed by both parties.

**Severability** If any provision of this offer letter is declared by any court of competent jurisdiction to be invalid for any reason, such invalidity shall not affect the remaining provisions, which shall be fully severable and the offer letter shall be construed and enforced as if such invalid portion had never been included.

**Governing Law** This offer letter shall be governed by the laws of the State of Delaware without reference to its choice of law provisions. Any litigation arising out of this offer letter shall be adjudicated in the state or federal courts located in Delaware.

**Dispute Resolution** In the event of any dispute or claim relating to or arising out of this offer letter or our employment relationship, you agree you (a) all disputes between you and Lottery.com shall be fully and finally resolved by binding arbitration; (b) any and all rights to a jury trial are waived, but all court remedies will be available in arbitration; (c) all disputes shall be resolved by a single neutral arbitrator who shall issue a written opinion; (d) the arbitration proceeding shall provide for adequate discovery; and (e) Lottery.com shall pay all arbitration fees in excess

of any court fees that you would be required to pay if the dispute were decided in a court of law. Any such arbitration shall be conducted in the Austin, Texas area by Judicial Arbitration and Mediation Services ("**JAMS"**) under the JAMS Employment Arbitration Rules and Procedures.

**Assignment** Neither this offer letter, nor any part hereof, shall be assigned by you without Lottery.com's express written consent. This offer letter shall be binding upon the parties, their heirs, personal representatives, successors and permitted assigns.

**Entire Agreement** This offer letter, along with any standard agreements that you execute supersedes all other agreements or understandings. By signing this offer letter, you acknowledge that you are not relying on any promises or representations that are not contained in this offer letter. This offer letter can only be modified or amended by a subsequent written agreement signed by you and an authorized officer of Lottery.com.

To confirm that you agree to the terms stated in this offer letter, please sign, date and return by no later than March 13, 2022. This offer letter will terminate if not accepted, signed and returned by close of business on March 13, 2022, unless Lottery.com agrees to employ you after such expiration date.

[**Signatures appear on the following page**]

We are very excited for you to join us and look forward to working with you and having you be part of the success of Lottery.com.

Very truly yours,

Lottery.com

DocuSigned by:
By: Ryan Dickinson Ryan Dickinson
8C0E2ED1FB33485...

Its: President & COO

Agreed to and accepted:

DocuSigned by:
Carl Wells
500AD51DD2AD4A4...

Name: 3/9/2022

Date:

# FLSA FACT SHEET #70

WAGE AND HOUR DIVISION
UNITED STATES DEPARTMENT OF LABOR

# Fact Sheet #70: Frequently Asked Questions Regarding Furloughs and Other Reductions in Pay and Hours Worked Issues

**September 2019**

> NOTICE: On April 23, 2024, the U.S. Department of Labor (Department) announced a final rule, *Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales, and Computer Employees*, which will take effect on July 1, 2024. The final rule updates and revises the regulations issued under section 13(a)(1) of the Fair Labor Standards Act implementing the exemption from minimum wage and overtime pay requirements for executive, administrative, and professional (EAP) employees. Revisions include increases to the standard salary level and the highly compensated employee total annual compensation threshold, and a mechanism that provides for the timely and efficient updating of these earnings thresholds to reflect current earnings data.

The Department of Labor's (DOL) Wage and Hour Division (WHD) is responsible for administering and enforcing some of our nation's most comprehensive labor laws, including the minimum wage, overtime, recordkeeping, and youth employment provisions of the Fair Labor Standards Act (FLSA).

The following information is intended to answer some of the most frequently asked questions that have arisen when private and public employers require employees to take furloughs and to take other reductions in pay and / or hours worked as businesses and State and local governments adjust to economic challenges.

## 1. If an employer is having trouble meeting payroll, do they need to pay non-exempt employees on the regular payday?

In general, an employer must pay covered non-exempt employees the full minimum wage and any statutory overtime due on the regularly scheduled pay day for the workweek in question. Failure to do so constitutes a violation of the FLSA. When the correct amount of overtime compensation cannot be determined until sometime after the regular pay period, however, the requirements of the FLSA will be satisfied if the employer pays the excess overtime compensation as soon after the regular pay period as is practicable.

Submit Feedback

## 2. Is it legal for an employer to reduce the wages or number of hours of an hourly employee?

The FLSA requires that all covered non-exempt employees receive at least the applicable Federal minimum wage for all hours worked. In a week in which employees work overtime, they must receive their regular rate of pay and overtime pay at a rate not less than one and one-half times the regular rate of pay for all overtime hours. The Act does not preclude an employer from lowering an employee's hourly rate, provided the rate paid is at least the minimum wage, or from reducing the number of hours the employee is scheduled to work.

# 3. Does an employer need to pay an hourly employee for a full day of work if he or she was scheduled for a full day but only worked a partial day due to lack of work?

The FLSA does not require employers to pay non-exempt employees for hours they did not work.

# 4. In general, can an employer reduce an otherwise exempt employee's salary due to a slowdown in business?

Reductions in the predetermined salary of an employee who is exempt under Part 541 of the Department of Labor's regulations will ordinarily cause a loss of the exemption. Such an employee must then be paid at least the federal minimum wage and overtime pay required by the FLSA, as discussed in **FAQ #2** above. In some circumstances, however, a prospective reduction in salary may not cause a loss of the exemption. See **FAQ #7** below.

Section 13(a)(1) of the FLSA exempts from minimum wage and overtime pay "any employee employed in a bona fide executive, administrative, or professional capacity" as defined in 29 C.F.R. 541 . An employee qualifies for exemption if the duties and salary tests are met. See Fact Sheet #17A .

FLSA section 13(a)(1) requires payment of at least $684* per week on a "salary" basis for those employed as exempt executive, administrative, or professional employees. See Fact Sheet #17G . A salary is a predetermined amount constituting all or part of the employee's compensation, which is not subject to reduction because of variations in the quality or quantity of the work performed. Beginning January 1, 2020, employers may use nondiscretionary bonuses and incentive payments (including commissions) paid on an annual or more frequent basis, to satisfy up to 10 percent of the standard salary level.

An employer must pay an exempt employee the full predetermined salary amount "free and clear" for any week in which the employee performs any work without regard to the number of days or hours worked. However, there is no requirement that the predetermined salary be paid if the employee performs no work for an entire workweek. Deductions may not be made from the employee's predetermined salary for absences occasioned by the employer or by the operating requirements of the business. If the employee is ready, willing, and able to work, deductions may not be made for time when work is not available. Salary deductions are generally not permissible if the employee works less than a full day. Except for certain limited exceptions found in 29 C.F.R. 541.602(b)(1)-(7) , salary deductions result in loss of the section 13(a)(1) exemption.

Deductions from the pay of an employee of a public agency for absences due to a budget-required furlough disqualify the employee from being paid on a salary basis only in the workweek when the furlough occurs and for which the pay is accordingly reduced under 29 C.F.R. 541.710 . See **FAQ #9** below.

Physicians, lawyers, outside salespersons, or teachers in bona fide educational institutions are not subject to any salary requirements. Deductions from the salary or pay of such employees will not result in loss of the exemption.

# 5. Can an employer reduce the leave of a salaried exempt employee?

An employer can substitute or reduce an exempt employee's accrued leave (or run a negative leave balance) for the time an employee is absent from work, even if it is less than a full day and even if the absence is directed by the employer because of lack work, without affecting the salary basis payment, provided that the employee still receives payment equal to the employee's predetermined salary in any week in which any work is performed even if the employee has no leave remaining.

Submit Feedback

# 6. Can a salaried exempt employee volunteer to take time off of work due to lack of work?

If the employer seeks volunteers to take time off due to insufficient work, and the exempt employee volunteers to take the day(s) off for personal reasons, other than sickness or disability, salary deductions may be made for one or more full days of missed work. The employee's decision must be completely voluntary.

## 7. Can an employer make prospective reduction in pay for a salaried exempt employee due to the economic downturn?

An employer is not prohibited from prospectively reducing the predetermined salary amount to be paid regularly to a Part 541 exempt employee during a business or economic slowdown, provided the change is bona fide and not used as a device to evade the salary basis requirements. Such a predetermined regular salary reduction, not related to the quantity or quality of work performed, will not result in loss of the exemption, as long as the employee still receives on a salary basis at least $684* per week. On the other hand, deductions from predetermined pay occasioned by day-to-day or week- to-week determinations of the operating requirements of the business constitute impermissible deductions from the predetermined salary and would result in loss of the exemption. The difference is that the first instance involves a prospective reduction in the predetermined pay to reflect the long term business needs, rather than a short-term, day-to-day or week-to-week deduction from the fixed salary for absences from scheduled work occasioned by the employer or its business operations.

## 8. Can an employee still be on-call or performing work at home during a furlough day?

Whether on-call time is hours worked under the FLSA depends upon the particular circumstances. Generally, the facts may show that the employee was engaged to wait (which is work time) or the facts may show that the employee was waiting to be engaged (which is not work time).

For example, a secretary who reads a book while waiting for dictation or a fireman who plays checkers while waiting for an alarm is working during such periods of inactivity. These employees have been "engaged to wait." An employee who is required to remain on call on the employer's premises is working while "on call." An employee who is allowed to leave a message where he/she can be reached is not working (in most cases) while on call. Additional constraints on the employee's freedom could require this time to be compensated.

Employees who perform part or all of their normal job duties during a furlough day are working while performing such duties.

## 9. Are the rules for paying furloughed employees different for State and local governments?

For non-exempt public employees, see **FAQ #2**.

For salaried exempt employees, in the case of public sector employees, a specific rule applies to furloughs as described in the following regulatory text, 29 C.F.R. 541.710 :

Deductions from the pay of an employee of a public agency for absences due to a budget-required furlough shall not disqualify the employee from being paid on a salary basis except in the workweek in which the furlough occurs and for which the employee's pay is accordingly reduced.

## 10. Does it matter if the State or local government employee is considered an essential or critical employee for the purposes of a required furlough?

Submit Feedback

The application of the FLSA is not affected by the classification of an employee as essential or critical for the purposes of a required furlough.

## 11. What remedies are available to correct violations of the FLSA when employees are not paid on a timely basis?

1. The Secretary of Labor may bring suit for back wages and an equal amount as liquidated damages or for interest on the back wages, or the Secretary of Labor may bring suit for an injunction against the failure to pay wages when due.

2. Employees who have filed complaints or provided information during an investigation are protected under the law. They may not be discriminated against or discharged for having done so. If they are, they may file a suit or the Secretary of Labor may file a suit on their behalf for relief, including reinstatement to their jobs and payment of wages lost plus monetary damages.
3. An employee may file suit to recover back wages, and an equal amount in liquidated damages, plus attorney's fees and court costs. Please note that the U.S. Supreme Court has ruled that the Eleventh Amendment prohibits employees of State governments from filing such suits against their State employers for monetary relief in federal courts (under *Seminole Tribe of Florida v. Florida* , 517 U.S. 44 (1996)), and in State courts unless the State waives its sovereign immunity (under *Alden v. Maine* , 527 U.S. 706 (1999)).
4. Civil money penalties may be assessed for repeat and / or willful violations of the FLSA's minimum wage or overtime requirements.
5. Employers willfully violating the law also may face criminal penalties, including fines and imprisonment.

***Note:** The Department of Labor revised the regulations located at 29 C.F.R. part 541 with an effective date of January 1, 2020. The 2004 part 541 regulations will remain in effect through December 31, 2019, including the $455 per week standard salary level and $100,000 annual compensation level for Highly Compensated Employees. The final rule is available at: https://www.federalregister.gov/documents/2019/09/27/2019-20353/defining-and-delimiting-the-exemptions-for-executive-administrative-professional-outside-sales-and .

## Where to Obtain Additional Information

**For additional information, visit our Wage and Hour Division Website: http://www.dol.gov/agencies/whd and/or call our toll-free information and helpline, available 8 a.m. to 5 p.m. in your time zone, 1-866-4USWAGE (1-866-487-9243).**

This publication is for general information and is not to be considered in the same light as official statements of position contained in the regulations.

The contents of this document do not have the force and effect of law and are not meant to bind the public in any way. This document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies.

Submit Feedback

# LOTTERY.COM SEC FILINGS

| Title of each class | Trading Symbol(s) | |
|---|---|---|
| Common Stock, par value $0.001 per share | LTRY | Th |
| Warrants to purchase one share of common stock, each at an exercise price of $11.50 | LTRYW | Th |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§2 the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for com accounting standards provided pursuant to Section 13 (a) of the Exchange Act. ☐

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Ar**

The Audit Committee of the Board of the Directors (the "Board") of Lottery.com (the "Company") retained outside counsel to condu revealed instances of non-compliance with state and federal laws concerning the state in which tickets are procured as well as order ful issues pertaining to the Company's internal accounting controls. Following a report on the findings of the independent investigation, on employment of Ryan Dickinson as the Company's President, Treasurer and Chief Financial Officer, effective July 1, 2022. Mr. Dicki and Treasurer since October 2021 and as the Company's Chief Financial Officer since March 2022. The Company is continuing to work matters that are the subject of the independent investigation and to institute appropriate remedial measures.

Effective July 1, 2022, Harry Dhaliwal has been named as the Company's Interim Chief Financial Officer and principal financial officer

Mr. Dhaliwal, age 63, served as Finance Transformation Leader and Global Process Owner at AIG from November 2019 until July 202 the company's finance transformation structure, including its systems architecture, process changes and operating model. Prior to AIG, Inc. from February 2019 to October 2019 and as CFO of Serv Co, a Barclays PLC subsidiary, from 2017 to 2019. He previously served 2017, including as Finance Leader, Global Operations and Finance Transformation at GE Inc. from 2014 to 2017 and as Global Contr Capital. Prior to joining GE, Mr. Dhaliwal served as Managing Director at NACCO Materials Handling Group, Inc. from 1999 to 2002 held positions in Group Accounting, Financial Planning & Analysis at Xerox Corporation. Prior to joining Xerox, Mr. Dhaliwal held a and Accounting at EW Fact and served in senior audit roles at a London city chartered accountancy practice. Mr. Dhaliwal earned a Bu London and Fellowship from the Chartered Association of Certified Accountants (London).

The Company entered into a consulting agreement with Mr. Dhaliwal on July 1, 2022 (the "Agreement").

The Agreement provides that Mr. Dhaliwal will serve as Interim Chief Financial Officer of the Company for six months, commenc December 31, 2022. Mr. Dhaliwal's consulting services may be terminated earlier than December 31, 2022 (i) upon Mr. Dhaliwal's Company or Mr. Dhaliwal without cause or reason upon written notice to the other party 15 days prior to the termination date of the Ag things, assist the Company with its financial systems, develop a financial dashboard for the Board of Directors and Senior Management the Company's finance function. The Agreement includes customer and employee non-solicitation provisions as well as confidentiality Mr. Dhaliwal will be paid a total of $209,550.00 based on completion of tasks and will have the opportunity to receive a discretionary Company will also reimburse Mr. Dhaliwal for all pre-approved travel and other out-of-pocket expenses incurred in the performa including reasonable accommodations. Mr. Dhaliwal will not be entitled to receive any employee benefits, including, but not limite insurance or paid time off.

The foregoing description of Mr. Dhaliwal's Agreement is qualified in its entirety by reference to the text of the Agreement filed as reference.

Mr. Dhaliwal does not have any family relationship with any director or executive officer of the Company, or person nominate chos or executive officer, and he has no direct or indirect material interest in any transaction required to be disclosed pursuant to Item 404(a)

| | | |
|---|---|---|
| Common Stock, par value $0.001 per share | LTRY | The Nas |
| Warrants to purchase one share of common stock, each at an exercise price of $11.50 | LTRYW | The Nas |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§2 the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for com accounting standards provided pursuant to Section 13 (a) of the Exchange Act. ☐

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Ar**

On July 11, 2022, Matthew Clemenson, the Chief Revenue Officer (the "CRO") of Lottery.com Inc. (the "Company"), provided a noti The Company accepted his resignation from all positions he held, including as a director, officer, and employee of the Company and al time, the duties of the CRO will be assumed by the Company's management team.

As previously announced on July 6, 2022, the Company is working with outside counsel with respect to the matters that are the sub named an Interim Chief Financial Officer. In connection with the appointment of the Interim Chief Financial Officer, the Company in related disclosures as well as its revenue recognition processes and other internal accounting controls. The review has led the Comp overstated its available unrestricted cash balance by approximately $30 million and that, relatedly, in the prior fiscal year, it impr amount. The Company, in consultation with its outside advisors, is currently validating its preliminary conclusion, assessing any impa and has begun to institute appropriate remedial measures.

**Forward Looking Statements**

This Current Report on Form 8-K (the "Form 8-K") contains statements that constitute "forward-looking statements" within the meanin 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. All statements, other than statements of prese 8-K, regarding Lottery.com's strategy, future operations, prospects, plans and objectives of management, are forward-looking staten words "could," "should," "will," "may," "believe," "anticipate," "intend," "estimate," "preliminary," "expect," "project," "initiatives," and other similar expressions are intended to identify forward-looking statements, although not all forward-looking statements contain looking statements are based on management's current expectations and assumptions about future events and are based on currently ava timing of future events. The forward-looking statements speak only as of the date of this Form 8-K or as of the date they are made. Lott looking statements are subject to numerous risks and uncertainties, most of which are difficult to predict and many of which are beyond Lottery.com cautions you that the forward-looking statements contained in this Form 8-K are subject to risks and uncertainties, includi of the ongoing independent investigation, any future findings from ongoing review of the Lottery.com's internal accounting controls, a conclusions of such investigation and review, and those additional risks and uncertainties discussed under the heading "Risk Factors" with the Securities and Exchange Commission (the "SEC") on April 1, 2022, and the other documents filed, or to be filed, by Lottery.co concerning these and other factors that may impact the operations and projections discussed herein can be found in the reports that Lott to time with the SEC. These SEC filings are available publicly on the SEC's website at www.sec.gov. Should one or more of the risks c K materialize or should underlying assumptions prove incorrect, actual results and plans could differ materially from those expressed in as otherwise required by applicable law, Lottery.com disclaims any duty to update any forward-looking statements, all of which are exp section, to reflect events or circumstances after the date of this Form 8-K.

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for com accounting standards provided pursuant to Section 13 (a) of the Exchange Act. ☐

**Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

(b) On July 20, 2022, Lottery.com Inc. (the "Company") was advised by Armanino LLP ("Armanino"), its registered independent pu December 31, 2022, that the audited financial statements for the year ended December 31, 2021, and the unaudited financial statemen should no longer be relied upon. Armanino advised and determined subsequent to the audit and review of such financial statements, entered into a line of credit in January 2022 that was not disclosed in the footnotes to the December 31, 2021 financial statements and financial statements.

The Chair of the Audit Committee, a member of management, and counsel to the Company discussed with Armanino the matters disclos

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Ar**

On July 21, 2022, Lawrence Anthony "Tony" DiMatteo III, the Chief Executive Officer (the "CEO") of the Company and a member provided a notice of resignation as CEO of the Company, its wholly owned subsidiary, AutoLotto, Inc. ("AutoLotto"), and all of its exception of LTRY WinTogether, Inc., with immediate effect. The Company accepted his resignation from such positions. Mr. DiMa AutoLotto since February 2015 and as CEO of the Company since the effectuation of the business combination in October 2021.

In connection with Mr. DiMatteo's resignation, the Company entered into a resignation and release agreement with Mr. DiMatteo effecti

Pursuant to the Agreement, Mr. DiMatteo resigned as CEO of the Company effective July 22, 2022.

Following Mr. DiMatteo's resignation, he will serve as Senior Advisor to the Board commencing on July 22, 2022 and continuing unt (10) days' prior notice to the other party (the "Consulting Period") unless certain conditions for earlier termination become applicable. (i) provide consulting and advisory services to the Board of Directors of the Company as requested and (ii) cooperate in any ongoing a to the Company. Non-compete and customer and employee non-solicitation provisions as well as confidentiality obligations from pri DiMatteo and the Company will apply while he consults and for a period of one year thereafter. Mr. DiMatteo may be paid $1,000 pe provides services to the Company, and reimbursed for business expenses validly incurred prior to his resignation. The Agreement inc DiMatteo.

The foregoing description of Mr. DiMatteo's Agreement is qualified in its entirety by reference to the text of the Agreement filed as reference.



**Forward Looking Statements**

This Current Report on Form 8-K (the "Form 8-K") contains statements that constitute "forward-looking statements" within the meanin 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. All statements, other than statements of prese 8-K, regarding the Company's strategy, future operations, prospects, plans and objectives of management, are forward-look ater words "could," "should," "will," "may," "believe," "anticipate," "intend," "estimate," "expect," "project," "initiatives," "cont the expressions are intended to identify forward-looking statements, although not all forward-looking statements contain such identifying

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Exchange Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.001 per share | LTRY | The Nasdaq Stock Market LLC |
| Warrants to purchase one share of common stock, each at an exercise price of $11.50 | LTRYW | The Nasdaq Stock Market LLC |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13 (a) of the Exchange Act. ☐

**Item 8.01 Other Events.**

On July, 28, 2022, the Board of Directors of Lottery.com Inc. (the "Company") determined that the Company does not currently have sufficient financial resources to fund its operations or pay certain existing obligations, including its payroll and related obligations. Accordingly, the Company intends to furlough certain employees effective July 29, 2022. As of July 29, 2022, the Company owed approximately $425,000 in outstanding payroll obligations. The Company's inability to pay this amount may result in employees terminating their relationship with the Company and/or pursuing legal remedies. Since the Company's business is dependent on the efforts and talents of its employees, particularly its developers and engineers, and the provision of ongoing services to customers by its employees, a material loss of its employee base may result in the inability of the Company to operate its technology, meet its obligations to customers, the loss of key customer relationships and revenue, and claims for breach of contractual obligations.

Additionally, the Company's capital resources are not sufficient to fund its operations for a twelve-month period and, therefore, there is substantial doubt about the Company's ability to continue as a going concern. If the Company is not able to secure additional capital resources or otherwise fund its operations, the Company will be forced to wind down some or all of its operations and pursue options for liquidating the Company's assets, including equipment and intellectual property.

**Forward Looking Statements**

This Current Report on Form 8-K (the "Form 8-K") contains statements that constitute "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. All statements, other than statements of present or historical fact included in this Form 8-K, regarding the Company's strategy, future operations, prospects, plans and objectives of management, are forward-looking statements. When used in this Form 8-K, the words "could," "should," "will," "may," "believe," "anticipate," "intend," "estimate," "expect," "project," "initiatives," "continue," the negative of such terms and other similar expressions are intended to identify forward-looking statements, although not all forward-looking statements contain such identifying words. These forward-looking statements are based on management's current expectations and assumptions about future events and are based on currently available information as to the outcome and timing of future events. The forward-looking statements speak only as of the date of this Form 8-K or as of the date they are made. The Company cautions you that these forward-looking statements are subject to numerous risks and uncertainties, most of which are difficult to predict and many of which are beyond the control of the Company. In addition, the Company cautions you that the forward-looking statements contained in this Form 8-K are subject to risks and uncertainties, including but not limited to, any future findings from ongoing review of the Company's internal accounting controls, additional examination of the preliminary conclusions of such review, the Company's ability to secure additional capital resources, the Company's ability to continue as a going concern, and those additional risks and uncertainties discussed under the heading "Risk Factors" in the Form 10-K filed by the Company with the Securities and Exchange Commission (the "SEC") on April 1, 2022, and the other documents filed, or to be filed, by the Company with the SEC. Additional information concerning these and other factors that may impact the operations and projections discussed herein can be found in the reports that the Company has filed and will file from time to time with the SEC. These SEC filings are available publicly on the SEC's website at www.sec.gov. Should one or more of the risks or uncertainties described in this Form 8-K materialize or should underlying assumptions prove incorrect, actual results and plans could differ materially from those expressed in any forward-looking statements. Except as otherwise required by applicable law, the Company disclaims any duty to update any forward-looking statements, all of which are expressly qualified by the statements in this section, to reflect events or circumstances after the date of this Form 8-K.



**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Lottery.com Inc.

By: /s/ Kathryn Lever
Name: Kathryn Lever
Title: Chief Operating Officer and Chief Legal Officer

Date: July 29, 2022

NT 10-Q 1 ea164522-nt10q_lottery.htm NOTIFICATION OF LATE FILING

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 12b-25**
**NOTIFICATION OF LATE FILING**

SEC FILE NUMBER
001-38508

CUSIP NUMBER
54570M108

*(Check One)* ☐ Form 10-K ☐ Form 20-F ☐ Form 11-K ☒ Form 10-Q ☐ Form 10-D ☐ Form N-SAR ☐ Form N-CSR

For Period Ended: June 30, 2022

☐ Transition Report on Form 10-K
☐ Transition Report on Form 20-F
☐ Transition Report on Form 11-K
☐ Transition Report on Form 10-Q
☐ Transition Report on Form N-SAR

For the Transition Period Ended: ______________________________

**Nothing in this form shall be construed to imply that the Commission has verified any information contained herein.**

If the notification relates to a portion of the filing checked above, identify the Item(s) to which the notification relates:

**PART I — REGISTRANT INFORMATION**

**Lottery.com Inc.**
**(Full Name of Registrant)**

**N/A**
**(Former Name if Applicable)**

**20808 State Hwy 71 W, Unit B**
**(Address of Principal Executive Office (Street and Number))**

**Spicewood, Texas 78669**
**( City, State and Zip Code)**

**PART II — RULES 12b-25(b) AND (c)**

If the subject report could not be filed without unreasonable effort or expense and the registrant seeks relief pursuant to Rule 12b-25(b), the following should be completed. (Check box if appropriate)

(a) The reasons described in reasonable detail in Part III of this form could not be eliminated without unreasonable effort or expense;

☐ (b) The subject annual report, semi-annual report, transition report on Form 10-K, Form 20-F, Form 11-K, Form N-CEN or Form N-CSR, or portion thereof, will be filed on or before the fifteenth calendar day following the prescribed due date; or the subject quarterly report or transition report on Form 10-Q or subject distribution report on Form 10-D, or portion thereof, will be filed on or before the fifth calendar day following the prescribed due date; and

(c) The accountant's statement or other exhibit required by Rule 12b-25(c) has been attached if applicable.

## PART III — NARRATIVE

State below in reasonable detail why forms 10-K, 20-F, 11-K, 10-Q, 10-D, N-CEN, N-CSR or the transition report or portion thereof, could not be filed within the prescribed time period.

Lottery.com Inc. (the "Company") is unable to file its Quarterly Report on Form 10-Q for the period ended June 30, 2022 (the "Form 10-Q") by the prescribed date of August 15, 2022, without unreasonable effort or expense, for the reasons described below.

As previously disclosed, the Audit Committee of the Board of the Directors (the "Board") of the Company retained outside counsel to conduct an independent investigation, which was initiated after it received certain information from Katie Lever, the Company's Chief Legal Officer and Chief Operating Officer, which investigation revealed instances of non-compliance with state and federal laws concerning the state in which tickets were procured as well as order fulfillment. The investigation also identified issues pertaining to the Company's internal accounting controls. Following a report on the findings of the independent investigation, on June 30, 2022, the Board terminated the employment of Ryan Dickinson as the Company's President, Treasurer and Chief Financial Officer, effective July 1, 2022. Effective July 1, 2022, Harry Dhaliwal was named as the Company's Interim Chief Financial Officer and principal financial officer. In connection with the appointment of Mr. Dhaliwal, the Company initiated a review of its cash balances and related disclosures as well as its revenue recognition processes and other internal accounting controls. The review led the Company to preliminarily conclude that it has overstated its available unrestricted cash balance by approximately $30 million and that, relatedly, in the prior fiscal year, it improperly recognized revenue in the same amount. On July 20, 2022, the Company was advised by Armanino LLP ("Armanino"), its registered independent public accountant for the fiscal years ended December 31, 2022 and December 31, 2021, that the audited financial statements for the year ended December 31, 2021, and the unaudited financial statements for the quarter ended March 31, 2022, should no longer be relied upon. Armanino advised and determined subsequent to the audit and review of such financial statements, respectively, that a Company subsidiary entered into a line of credit in January 2022 that was not disclosed in the footnotes to the December 31, 2021 financial statements and was not recorded in the March 31, 2022 financial statements. On July 28, 2022, the Board determined that the Company did not have sufficient financial resources to fund its operations or pay certain existing obligations, including its payroll and related obligations, and the Company furloughed the majority of its employees effective July 29, 2022. As the Company's capital resources are not sufficient to fund its operations for a twelve-month period, there is substantial doubt about the Company's ability to continue as a going concern. If the Company is not able to secure additional capital resources or otherwise fund its operations, the Company will be forced to wind down some or all of its operations and pursue options for liquidating the Company's assets, including equipment and intellectual property. As a result, the Company has not yet finalized its reviews of its financial statements or its assessment of the impact of the findings of the ongoing review of the Company's internal accounting controls on its historical financial statements or for the financial statements for the quarter ended June 30, 2022, and is therefore unable to file the Form 10-Q on a timely basis. The Company is working toward filing the Form 10-Q as soon as practicable, but does not expect to be in a position to file it within five calendar days following the prescribed due date.

**Forward Looking Statements**

This Form 12b-25 (the "Form 12b-25") contains statements that constitute "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. All statements, other than statements of present or historical fact included in this Form 8-K, regarding the Company's strategy, future operations, prospects, plans and objectives of management, are forward-looking statements. When used in this Form 12b-25, the words "could," "should," "will," "may," "believe," "anticipate," "intend," "estimate," "expect," "project," "initiatives," "continue," the negative of such terms and other similar expressions are intended to identify forward-looking statements, although not all forward-looking statements contain such identifying words. These forward-looking statements are based on management's current expectations and assumptions about future events and are based on currently available information as to the outcome and timing of future events. The forward-looking statements speak only as of the date of this Form 12b-25 or as of the date they are made. The Company cautions you that these forward-looking statements are subject to numerous risks and uncertainties, most of which are difficult to predict and many of which are beyond the control of the Company. In addition, the Company cautions you that the forward-looking statements contained in this Form 12b-25 are subject to risks and uncertainties, including but not limited to, any future findings from ongoing review of the Company's internal accounting controls, additional examination of the preliminary conclusions of such review, the Company's ability to secure additional capital resources, the Company's ability to continue as a going concern, and those additional risks and uncertainties discussed under the heading "Risk Factors" in the Form 10-K filed by the Company with the Securities and Exchange Commission (the "SEC") on April 1, 2022, and the other documents filed, or to be filed, by the Company with the SEC. Additional information concerning these and other factors that may impact the operations and projections discussed herein can be found in the reports that the Company has filed and will file from time to time with the SEC. These SEC filings are available publicly on the SEC's website at www.sec.gov. Should one or more of the risks or uncertainties described in this Form 12b-25 materialize or should underlying assumptions prove incorrect, actual results and plans could differ materially from those expressed in any forward-looking statements.

Except as otherwise required by applicable law, the Company disclaims any duty to update any forward-looking statements, all of which are expressly qualified by the statements in this section, to reflect events or circumstances after the date of this Form 12b-25.

**PART IV — OTHER INFORMATION**

(1) Name and telephone number of person to contact in regard to this notification

| Kathryn Lever | (844) | 752-9587 |
|---|---|---|
| **(Name)** | **(Area Code)** | **(Telephone Number)** |

(2) Have all other periodic reports required under Section 13 or 15(d) of the Securities Exchange Act of 1934 or Section 30 of the Investment Company Act of 1940 during the preceding 12 months or for such shorter period that the registrant was required to file such report(s) been filed? If answer is no, identify report(s).
Yes ☒ No ☐

(3) Is it anticipated that any significant change in results of operations from the corresponding period for the last fiscal year will be reflected by the earnings statements to be included in the subject report or portion thereof? Yes ☒ No ☐

If so, attach an explanation of the anticipated change, both narratively and quantitatively, and, if appropriate, state the reasons why a reasonable estimate of the results cannot be made.

The Company anticipates that there will be significant changes in the results of operations for the quarter ended June 30, 2022 compared to the quarter ended June 30, 2021, including a significant decrease in the Company's revenue. The Company cannot provide a reasonable estimate of the results because the Audit Committee of the Board has concluded that the Company will need to restate its historical financial statements to reflect that it has overstated its available unrestricted cash balance by approximately $30 million and relatedly, improperly recognized revenue in the same amount as a result of a line of credit that was entered into by a Company subsidiary in January 2022 that was not disclosed in the footnotes to the December 31, 2021 financial statements and was not recorded in the March 31, 2022 financial statements. As the Audit Committee's review of Company's internal accounting controls remains ongoing, the Company cannot at this time reasonably estimate the impact of the foregoing on it results of operations for the quarter ended June 30, 2022.

**Lottery.com Inc.**

**(Name of Registrant as Specified in Charter)**

has caused this notification to be signed on its behalf by the undersigned hereunto duly authorized.

Date August 16, 2022

By /s/ Kathryn Lever
**Name:** Kathryn Lever
**Title:** Chief Legal Officer and Chief Operating Officer

INSTRUCTION: The form may be signed by an executive officer of the registrant or by any other duly authorized representative. The name and title of the person signing the form shall be typed or printed beneath the signature. If the statement is signed on behalf of the registrant by an authorized representative (other than an executive officer), evidence of the representative's authority to sign on behalf of the registrant shall be filed with the form.

**ATTENTION**

**Intentional misstatements or omissions of fact constitute Federal Criminal Violations (See 18 U.S.C. 1001).**

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 8-K

## CURRENT REPORT
Pursuant to Section 13 OR 15(d)
of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): September 2, 2022

**Lottery.com Inc.**
(Exact Name of Registrant as Specified in Its Charter)

| Delaware | 001-38508 | |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | |

| 20808 State Hwy 71 W, Unit B Spicewood, Texas | 7866 |
|---|---|
| (Address of Principal Executive Offices) | (Zip Co |

(512) 592-2451
(Registrant's Telephone Number, Including Area Code)

N/A
(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant un General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Exchange Act:

| Title of each class | Trading Symbol(s) | Nam |
|---|---|---|
| Common Stock, par value $0.001 per share | LTRY | The |
| Warrants to purchase one share of common stock, each at an exercise price of $11.50 | LTRYW | The |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§2 the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☒

accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

SECTION 5. CORPORATE GOVERNANCE AND MANAGEMENT

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Ar**

As previously reported on Form 8-K filed on July 6, 2022, the Board of Directors ("Board") of Lottery.Com, Inc. (the "Compa employment of Ryan Dickinson as the Company's President, Treasurer and Chief Financial Officer, effective July 1, 2022. Mr. Dicki and Treasurer since October 2021 and as the Company's Chief Financial Officer since March 2022.

On September 8, 2022, the Board appointed Mr. Sohail S. Quraeshi as Chief Executive Officer ("CEO") of the Company effective fro entering into an executive consulting agreement with Mr. Quraeshi to be filed at a later date.

Sohail S. Quraeshi, age 66, Chief Executive Officer. Mr. Quraeshi is a graduate of Buckingham University in the United Kingdom (I involved in the financial and securities industry as a Security Analyst with various international banking institutions in the United States

In the past three decades Mr. Quraeshi has served in leading roles in several public and private companies and currently the Founde Managing Director Of Vahoca Pt Ltd, in Singapore, a private equity group, and Vice Chairman of Moveo Technologies Corporation, ww

As a prominent member of the local community Mr. Quraeshi serves on two notable non-profit Boards, the Coalition of Hope, www.coa Inc, that assist in disaster relief in, and around, the local community.

Also on September 8, 2022, the Board appointed two new outside directors other than pursuant to a shareholder vote at an annual convened for that purpose, and subject to successful background vetting:

Vladimir Klechtchev, Director. Mr. Klechtchev, is a Fellow Chartered Accountant (FCA), residing and practicing in the United Kingc audit, investment banking, project evaluation, risk management, compliance, fraud investigations, consultancy and business advisor delivering a wide range of assignments and projects implementation through working with various stakeholders in the context environment; (b) identifying and establishing new as well as fostering existing business relationships; and (c) working across emergi Upper Second BA in Business Administration from the University of Huddersfield (UK). Mr. Klechtchev is multi-lingual.

Amer Rustom, Director. Since 1984 when he co-founded The Platinum Group, Amer Rustom has successfully guided the many divers the most recent division of nanotechnology solutions and financial services. Diving more into harnessing the power of graphene and ir companies, Mr. Rustom has been instrumental in the creation of the Platinum Group USA as the operational platform for many business strong ties with many of the Middle East and North African leaders and country officials as well as the local and international busines Rustom is multi-lingual.

For each of the above 2 new outside directors:

1) there was no arrangement or understanding between the new director and any other person pursuant to which the person was selected

2) there are no related party transactions between the director (and entities related to the director) and the Registrant.

Richard Kivel, the sole prior Director of the Registrant, will continue as a member of the Board of Directors of the Registrant in the capa

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Exchange Act:

| Title of each class | Trading Symbol(s) | Name of e |
|---|---|---|
| Common Stock, par value $0.001 per share | LTRY | Th |
| Warrants to purchase one share of common stock, each at an exercise price of $11.50 | LTRYW | Th |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§2 the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for com accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Ar**

*Director Resignation*

On October 19, 2022, Vladimir Klechtchev, a member of the Board of Directors (the "Board") of Lottery.com Inc. (the "Company"), n the Board, effective immediately. Mr. Klechtchev's resignation was not the result of any disagreement with the Company on any matt policies or practices.

*New Director Appointment*

On October 19, 2022, the Board appointed Matthew Howard McGahan as an independent director of the Board. The appointment is background checks, which are to be completed on or before October 28, 2022.

Mr. McGahan, age 52, is the founder of the U.K. charity, "Mask Our Heroes" ("MOH"), created in memory of his father Alan, who w MOH was one of the first charities to recognize the urgent need for vital personal protection equipment and in the first months of th several plane loads of surgical masks to the U.K. Prior to founding MOH, Mr. McGahan had founded Magic Automotive Group, a E 2010, Mr. McGahan sold Magic Automotive Group to pursue other endeavors. In 1997, prior to founding Magic Automotive Grour business, Pinewood Motor Group, which his father founded in 1969. In the early 1990s Mr. McGahan left a public UK multi-brand au company specializing in the importing and exporting of luxury automotive brands, race cars and classics. Mr. McGahan is a grad Engineering Technology College. We believe that Mr. McGahan is qualified to serve on our Board due to his extensive business manage

There was no arrangement or understanding between Mr. McGahan and any other person pursuant to which Mr. McGahan was selecte direct or indirect material interest in any transaction required to be disclosed pursuant to Item 404(a) of Regulation S-K.

**Forward Looking Statements**

This Current Report on Form 8-K (the "Form 8-K") contains statements that constitute "forward-looking statements" within the meanin

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**FORM 8-K**

**CURRENT REPORT**
**Pursuant to Section 13 OR 15(d)**
**of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): November 4, 2022**

**Lottery.com Inc.**
(Exact Name of Registrant as Specified in Its Charter)

| | | |
|---|---|---|
| **Delaware** | **001-38508** | |
| **(State or Other Jurisdiction of Incorporation)** | **(Commission File Number)** | |

| | |
|---|---|
| **20808 State Hwy 71 W, Unit B** | |
| **Spicewood, Texas** | **7866** |
| **(Address of Principal Executive Offices)** | **(Zip Co** |

**(512) 592-2451**
**(Registrant's Telephone Number, Including Area Code)**

N/A
**(Former Name or Former Address, if Changed Since Last Report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant un General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Exchange Act:

| Title of each class | Trading Symbol(s) | Nam |
|---|---|---|
| Common Stock, par value $0.001 per share | LTRY | Th |
| Warrants to purchase one share of common stock, each at an exercise price of $11.50 | LTRYW | Th |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§2 the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

---

---

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Ar**

*Appointment of New Chairman of the Board of Directors*

At a Special Meeting of the Board of Directors (the "Board") of Lottery.Com, Inc. (the "Company") on October 29, 2022, (the "
Matthew Howard McGahan, Director, to serve as the new Chairman of the Board of the Company, replacing Richard Kivel, and shall
all future meetings of the Board.

Also, at the Special Meeting, the Board appointed Sohail S. Quraeshi, Interim-CEO, henceforth as Chief Executive Officer ("CEO")
shall have the general authority to perform such duties in the management of the business of the Corporation as it pertains to his office a
control of the Board.

The Company is entering into an executive consulting agreement with Mr. Quraeshi to be filed at a later date.

*Appointment of New Directors*

At a Special Meeting of the Board on November 3, 2022, the Board appointed two new directors to fill certain vacancies on the Boar
checks, which were completed on November 4, 2022:

Barney Battles, age 56, Independent Director. Since 2014, Mr. Battles has been the Founder of The League of Angels, a network of UI
fast growth British ventures with a global impact and strong corporate values. Mr. Battles is the former co-owner of Jackpot Games, a
then sold to a large German Media Group. Additionally, Mr. Battles is the former senior advisor to the Rank Group PLC (LSE: RN
Casinos and Bingo (a UK-based chain of 53 casinos located in major towns and cities across the UK and 76 bingo clubs located in Belgi
at Grosvenor Casinos and Bingo, Mr. Battles focused on delivering interactive digital gaming formats across their retail footprint. I
working as Executive Chairman/CFO in turnaround or high growth sectors and is a former CFO of London's largest digital agency. M
Science from the University of Aberdeen, and was a Scottish Chartered Accountant with Ernst & Young.

Naila Chowdhury, age 61, Director. Ms. Chowdhury has over 25 years of leadership experience in senior management in private, publi
she was co-founder and CEO of "Pillar 4 Dignity" supporting and empowering underserved women and girls worldwide who fac
Chowdhury is a global networker who has built bridges to foster strategic partnerships for women, girls, and youth internationally. For
economic empowerment of young people their human dignity, and rights through digital inclusion in technology, and programs t
procedures. Ms. Chowdhury holds an Executive MBA from the Stockholm School of Economics and a Master of Commerce & M
Bangladesh.

For newly appointed Independent Director Battles:

1) there was no arrangement or understanding between he and any other person pursuant to which the Mr. Battles was selected as

2) there are no related party transactions between the Mr. Battles (and entities affiliated with) and the Registrant.

For newly appointed Director Ms. Chowdhury, she satisfies the NASDAQ's Board Diversity Rule.

*Resignation of Director*

Effective at 6 p.m. EDT on November 4, 2022, Richard Kivel ("Kivel") resigned as director from the Company's Board because of a dis
relating to the Company's corporate governance, operations, policies, and practices (*see* Exhibit 17.1).

Through the Board's acceptance of Kivel's resignation, the Company categorically and unequivocally refutes all statements m y K
asserts that Kivel regularly acted in his best interest to the detriment of the Company. The Company finds that Kivel's resignation as d

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

**FORM 8-K**

**CURRENT REPORT**
Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

**Date of Report (Date of earliest event reported): September 6, 2022**

**LOTTERY.COM, INC.**
(Exact name of registrant as specified in its charter)

| **Delaware** | **001-38508** | |
|---|---|---|
| (State of Incorporation) | (Commission File Number) | |

**20808 State Hwy 71W, Unit B**
**Spicewood, Texas 78669**
(Address of Principal Executive Offices)

**(512) 592-2451**
(Registrant's Telephone Number including Area Code)

(Former name or address, if changed since last report)

Securities registered pursuant to Section 12(b) of the Exchange Act:

| Title of each class | Trading Symbol(s) | Name of e |
|---|---|---|
| Common Stock, par value $0.001 per share | LTRY | Th |
| Warrants to purchase one share of common stock, each at an exercise price of $11.50 | LTRYW | Th |

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§2 the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for com accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

| **Delaware** | **001-38508** | |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | |

**20808 State Hwy 71 W, Unit B, Spicewood, TX**
(Address of principal executive offices)

Registrant's telephone number, including area code: **512-592-2451**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Trading Symbol(s)** | **Name of each e** |
|---|---|---|
| Common Stock, par value $0.001 per share | LTRY | The Nas |
| Warrants to purchase one share of common stock, each at an exercise price of $11.50 | LTRYW | The Nas |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§2 the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for com accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Ar**

(b)-(c)

On February 1, 2023, the Board of Directors of Lottery.Com, Inc. (the "Company", "we" and "us") appointed Mr. Mark Gu principal executive officer of the Company. Mr. Gustavson will also serve as principal financial/accounting officer of the Company until

Mr. Mark Gustavson, as CEO, replaced Mr. Sohail S. Quraeshi, who is no longer serving as Chief Executive Officer or as a pri effective February 1, 2023, as a result of the change in Chief Executive Officer of the Company approved by the Board of Directors as d

Previously, on January 30, 2023, Mr. Edward K. Moffly resigned as Interim Chief Financial Officer of the Company.

Mr. Gustavson has no familial relationships with any executive officer or director of the Company. Mr. Gustavs not arrangement (whether or not written) with the Company, and there are no arrangements or understandings between Mr. Gusta and were selected to serve as an officer of the Company, nor is he a participant in any related party transaction required to be reported pursua

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, DC 20549**

# FORM 8-K

**CURRENT REPORT**

**Pursuant to Section 13 OR 15(d) of The Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): **July 14, 2023**

# LOTTERY.COM, INC.
(Exact name of registrant as specified in its charter)

| **Delaware** | **001-38508** | |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | |

**20808 State Hwy 71 W, Unit B, Spicewood, TX**
(Address of principal executive offices)

Registrant's telephone number, including area code: **(737) 309-4500**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each e |
|---|---|---|
| Common Stock, par value $0.001 per share | LTRY | The Nas |
| Warrants to purchase one share of common stock, each at an exercise price of $11.50 | LTRYW | The Nas |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§2 the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for com accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-Q/A
**(Amendment No. 1)**

(Mark One)

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended March 31, 2024**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _______________ to _________________**

Commission File Number: **001-38508**

# Lottery.com Inc.
(Exact name of registrant as specified in its charter)

| **Delaware** | **81-1996183** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **20808 State Hwy 71 W, Unit B, Spicewood, Texas** | **78669** |
| (Address of principal executive offices) | (zip code) |

**(737) 309-4500**
**(**Registrant's telephone number, including area code)

**N/A**
(Former name, former address and former fiscal year, if changed since last report)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, $0.001 par value | LTRY | The Nasdaq Stock Market LLC |
| Warrants to purchase one share of common stock, each at an exercise price of $230.00 | LTRYW | The Nasdaq Stock Market LLC |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). ☐ Yes ☒ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting

company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☐ | Accelerated filer ☐ |
| Non-accelerated filer ☒ | Smaller reporting company ☒ |
| | Emerging growth company ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). ☐ Yes ☒ No

As of May 17, 2024, 4,780,380 shares of common stock, par value $0.001 per share were issued and outstanding.

**EXPLANATORY NOTE**

In accordance with Rule 12b-15 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), Lottery.com Inc. (the "Company," "we," "us," or "our") is filing this Amendment No. 1 (this "Amended Report") to our Quarterly Report on Form 10-Q for the quarter ended March 31, 2024, which was originally filed with the U.S. Securities and Exchange Commission (the "SEC") on May 20, 2024 (the "Original Report"), to amend and revise the following Items of our Original Report:

Part I – Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations

Part I – Item 4. Controls and Procedures

Part II – Item 6. Exhibits

The complete text of those Items is revised in this Amended Report. The other Items of the Original Report have not been amended and, accordingly, have not been repeated in this Amended Report.

The only changes to the Original Report are those related to the matters described below and only in the items listed above. Except as described herein, this Amended Report does not modify, amend or update any of the other financial information or other information contained in the Original Report. In addition, in accordance with SEC rules, this Amended Report includes updated certifications from our Chief Executive Officer and Chief Financial Officer as Exhibits 31.1 and 32.1. Otherwise, the information contained in this Amended Report is as of the date of the Original Report and does not reflect any information or events occurring after the date of the Original Report. Such subsequent information or events include, among other things, the information and events described in our Current Reports on Form 8-K filed subsequent to the date of the Original Report and the information and events described in Amendment No. 1 to our Annual Report on Form 10-K for the year ended December 31, 2023 filed with the SEC on June 3, 2024 (the "Amended Annual Report"). For a description of such subsequent information and events, please read our reports filed pursuant to the Exchange Act subsequent to the date of the Original Report, which update and supersede certain information contained in the Original Report and this Amended Report.

**TABLE OF CONTENTS**


| | Page |
|---|---|
| Part I. Financial Information | |
| Item 1. Consolidated Financial Statements | 1 |
| Condensed Consolidated Balance Sheets as of March 31, 2024 (unaudited) and December 31, 2023 | F-1 |
| Condensed Consolidated Statements of Operations and Comprehensive Loss for the three months ended March 31, 2024 and 2023 (unaudited) | F-2 |
| Condensed Consolidated Statements of Equity for the three months ended March 31, 2024 and 2023 (unaudited) | F-3 |
| Condensed Consolidated Statements of Cash Flows for the three months ended March 31, 2024 and 2023 (unaudited) | F-4 |
| Notes to Condensed Consolidated Financial Statements (unaudited) | F-5 |
| Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations | 2 |
| Item 3. Quantitative and Qualitative Disclosures about Market Risk | 15 |
| Item 4. Controls and Procedures | 15 |
| Part II. Other Information | |
| Item 1. Legal Proceedings | 17 |
| Item 1A. Risk Factors | 18 |
| Item 2. Unregistered Sales of Equity Securities and Use of Proceeds | 19 |
| Item 3. Defaults Upon Senior Securities | 19 |
| Item 4. Mine Safety Disclosures | 19 |
| Item 5. Other Information | 19 |
| Item 6. Exhibits | 19 |

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Amended Quarterly Report on Form 10-Q/A (this "Report") contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act") and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), including statements about the financial condition, results of operations, earnings outlook and prospects of Lottery.com Inc. ("Lottery.com", the "Company", "we" or "us"). Forward-looking statements appear in a number of places in this Report, including, without limitation, under the heading in Part I, "*Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations.*" In addition, any statements that refer to projections, forecasts or other characterizations of future events or circumstances, including any underlying assumptions, are forward-looking statements. Forward-looking statements are typically identified by words such as "plan," "believe," "expect," "anticipate," "intend," "outlook," "estimate," "forecast," "project," "continue," "could," "may," "might," "possible," "potential," "predict," "should," "would" and other similar words and expressions, but the absence of these words does not mean that a statement is not forward-looking.

Forward-looking statements are based on the current expectations of the management of Lottery.com and are inherently subject to uncertainties and changes in circumstances and their potential effects and speak only as of the date of such statement. There can be no assurance that future developments will be those that have been anticipated. These forward-looking statements involve a number of risks, uncertainties or other assumptions that may cause actual results or performance to be materially different from those expressed or implied by these forward-looking statements. These risks and uncertainties include, but are not limited to, those factors discussed and identified in the section entitled "Risk Factors" in our Annual Report on Form 10-K/A for the year ended December 31, 2023 (the Amended "Annual Report") which was filed on May 20, 2024 and in this Report, as such factors may be updated in our periodic reports filed with the Securities and Exchange Commission (the "SEC"), as well as the following:

- The findings of the previously disclosed Internal Investigation (as defined herein) and other matters have exposed us to a number of legal proceedings, investigations and inquiries, resulted in significant legal and other expenses, required significant time and attention from our senior management, among other adverse impacts.

- We and certain of our former officers are, and in the future, we or our officers and directors may become, the subject of legal proceedings, investigations and inquiries by governmental agencies with respect to the findings of the Internal Investigation and other matters, which could have a material adverse effect on our reputation, business, financial condition, cash flows and results of operations, and could result in additional claims and material liabilities.

- We have been named as a defendant in a number of lawsuits filed by purchasers of our securities, including class action lawsuits that could have a material adverse impact on our business, financial condition, results of operation and cash flows, and our reputation.

- Matters relating to or arising from the restatement and the Internal Investigation, including adverse publicity and potential concerns from our users, customers or others with whom we do business, have had and could continue to have an adverse effect on our business and financial condition.

- In July 2022, we furloughed the majority of our employees and suspended our lottery game sales operations after determining that we did not have sufficient financial resources to fund our operations or pay certain existing obligations, including our payroll and related obligations. As a result, we may not be able to continue as a going concern.

- We need additional capital to, among other things, support and restart our operations, re-hire employees and pay our expenses. Such capital may not be available on commercially acceptable terms, if at all. If we do not receive the additional capital, we may be forced to curtail or abandon our plans to recommence our operations and we may need to permanently cease our operations.

- If we fail to implement and maintain an effective system of internal controls, we may be unable to accurately report our results of operations, meet our reporting obligations or prevent fraud, and investor confidence and the trading price of our common stock and warrants may be materially and adversely affected.
- The circumstances that led to the failure to file our annual report and quarterly reports on time, and our efforts to investigate, assess and remediate those matters have caused and may continue to cause substantial delays in our SEC filings.
- Our inability to compete with other forms of entertainment for consumers' discretionary time and income.
- Economic downturns, inflation, geopolitical and political and market conditions beyond our control.
- Negative events or media coverage relating to our business, our management and directors, the lottery, lottery games or online gaming or betting.
- Our inability to attract and retain users, including as a result of failing to appear in Internet search engine results.
- Our continued ability to use domain names to promote and increase the value of our brand.
- Scrutiny by stakeholders with respect to responsible gaming and ethical conduct.
- Our ability to achieve profitability and growth in the newly-developed market for online lottery games.
- Our inability to profitably expand into new markets or capitalize on new gaming and lottery industry trends and changes, such as by developing successful new product offerings.
- The effectiveness of our marketing efforts in developing and maintaining our brand and reputation.
- Failure to offer high-quality user support.
- Adverse impacts to user relationships resulting from disruptions to our information technology.
- The vulnerability of our information systems to cyberattacks and disruptions caused with respect thereto, including an inability to securely maintain personal and other proprietary user information.
- Our inability to adapt to changes or updates in the Internet, mobile or personal devices, or new technology platforms or network infrastructures.
- The exposure of our online infrastructure to risks relating to new and untested distributed ledger technology.
- Our inability to comply with complex, ever-changing and multi-jurisdictional regulatory regimes and other legal requirements applicable to the gaming and lottery industries.
- Geopolitical shifts and changes in applicable laws or regulations or the manner in which they are interpreted.
- Our inability to successfully expand geographically and acquire and integrate new operations.
- Our dependence on third-party service providers to timely perform services or software component products for our gaming platforms, product offerings and the processing of user payments and withdrawals.
- Our inability to maintain successful relationships and/or agreements with lottery organizations and other third-party marketing or service provider affiliates.

- Failure of third-party service providers to protect, enforce, or defend intellectual property rights required to fulfill contractual obligations required for the operation of our business.

- The effectiveness of our transition and compliance with the regulatory and other requirements of being a newly public company.

- Although we are currently in compliance with the continued listing standards of Nasdaq, we have had periods of non-compliance in the past and we may not be able to maintain compliance with Nasdaq's continued listing standards in the future.

- Limited liquidity and trading of our securities.

- Lenders may not loan us the amounts they agreed to under existing Loan Agreements.

- Our obligations under the Loan Agreement (as defined herein) are secured by a first priority security interest in substantially all of our assets and if we were to default, they could force us to curtail or abandon our business plans and operations.

- The issuance and sale of common stock upon conversion of the amounts owed or upon exercise of the warrants issued to Woodford, UCIL, or Univest (as defined herein) under their Loan Agreements may depress the market price of our common stock and cause substantial dilution.

- We currently owe a significant amount of money under our Loan Agreements, which we may not be able to repay.

The risks described herein or in the "Risk Factors" sections of our other public filings referenced above are not exhaustive. Other sections of this Report describe additional factors that could adversely affect our business, financial condition or results of operations. New risk factors emerge from time to time and it is not possible to predict all such risk factors, nor can we assess the impact of all such risk factors on our business, or the extent to which any factor or combination of factors may cause actual results to differ materially from those contained in any forward-looking statements. Forward-looking statements are not guarantees of performance. You should not put undue reliance on these statements, which speak only as of the date hereof. All forward-looking statements attributable to us or persons acting on our behalf are expressly qualified in their entirety by the foregoing cautionary statements. We undertake no obligations to update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law.

## PART I – FINANCIAL INFORMATION

### Item 1. Financial Statements


| | Page |
|---|---|
| Condensed Consolidated Balance Sheets as of March 31, 2024 (unaudited) and December 31, 2023 | F-1 |
| Condensed Consolidated Statements of Operations and Comprehensive Loss for the three months ended March 31, 2024 and 2023 (unaudited) | F-2 |
| Condensed Consolidated Statements of Equity for the three months ended March 31, 2024 and 2023 (unaudited) | F-3 |
| Condensed Consolidated Statements of Cash Flows for the three months ended March 31, 2024 and 2023 (unaudited) | F-4 |
| Notes to Condensed Consolidated Financial Statements (unaudited) | F-5 |

**LOTTERY.COM INC.**
**CONDENSED CONSOLIDATED BALANCE SHEETS**

| | March 31, 2024 | December 31, 2023 |
|---|---|---|
| ASSETS | | |
| Current assets: | | |
| Cash | $ 84,050 | $ 359,826 |
| Accounts receivable | 245,069 | 24,241 |
| Prepaid expenses | 19,044,832 | 19,020,159 |
| Other current assets | 901,042 | 907,632 |
| Total current assets | 20,274,993 | 20,311,858 |
| Notes receivable | 2,000,000 | 2,000,000 |
| Investments | 250,000 | 250,000 |
| Goodwill | 11,227,491 | 11,227,491 |
| Intangible assets, net | 16,399,733 | 17,681,874 |
| Property and equipment, net | 18,488 | 21,309 |
| Other long-term assets | 12,884,686 | 12,884,686 |
| Total assets | $ 63,055,391 | $ 64,377,218 |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | |
| Current liabilities: | | |
| Trade payables | $ 7,965,863 | $ 7,991,802 |
| Deferred revenue | 330,257 | 357,143 |
| Notes payable - current | 6,726,669 | 6,026,669 |
| Accrued interest | 961,081 | 858,875 |
| Accrued and other expenses | 11,292,243 | 11,359,616 |
| Other liabilities | 1,167,111 | 1,167,111 |
| Total current liabilities | 28,443,224 | 27,761,216 |
| Long-term liabilities: | | |
| Convertible debt, net - non current | - | - |
| Other long-term liabilities | - | - |
| Total long-term liabilities | - | - |
| Commitments and contingencies (Note 13) | - | - |
| Total liabilities | 28,443,224 | 27,761,216 |
| Equity | | |
| Controlling Interest | | |
| Preferred Stock, par value $0.001, 1,000,000 shares authorized, none issued and outstanding | - | - |
| Common stock, par value $0.001, 500,000,000 shares authorized, 4,728,322 and 2,877,045 issued and outstanding 2024 and December 31, 2023, respectively | 4,728 | 2,877 |
| Additional paid-in capital | 273,342,842 | 269,690,569 |
| Accumulated other comprehensive loss | 16,673 | (91,667) |
| Accumulated deficit | (240,815,185) | (235,106,206) |
| Total Lottery.com Inc. stockholders' equity | 32,549,058 | 34,495,573 |
| Noncontrolling interest | 2,063,109 | 2,120,429 |
| Total Equity | 34,612,167 | 36,616,002 |
| Total liabilities and stockholders' equity | $ 63,055,391 | $ 64,377,218 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

**LOTTERY.COM INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE LOSS (UNAUDITED)**

| | Three Months Ended March 31, 2024 | Three Months Ended March 31, 2023 |
|---|---|---|
| Revenue | $ 259,319 | $ 620,229 |
| Cost of revenue | 83,787 | 35,147 |
| Gross profit | 175,532 | 585,082 |
| Operating expenses: | | |
| Personnel costs | 984,679 | 1,257,434 |
| Professional fees | 3,204,048 | 739,928 |
| General and administrative | 296,652 | 337,328 |
| Depreciation and amortization | 1,284,982 | 1,405,480 |
| Total operating expenses | 5,770,361 | 3,740,170 |
| Loss from operations | (5,594,829) | (3,155,088) |
| Other expenses | | |
| Interest expense | 102,217 | 23 |
| Other expense | 52,676 | 58,871 |
| Total other expenses, net | 154,893 | 58,894 |
| Net loss before income tax | (5,749,722) | (3,213,982) |
| Income tax expense (benefit) | 4,150 | - |
| Net loss | (5,753,872) | (3,213,982) |
| Other comprehensive loss | | |
| Foreign currency translation adjustment, net | 102,214 | (114,095) |
| Comprehensive loss | (5,651,658) | (3,328,077) |
| Net income attributable to noncontrolling interest | (57,321) | 67,640 |
| Net loss attributable to Lottery.com Inc. | $ (5,708,979) | $ (3,260,437) |
| Net loss per common share | | |
| Basic and diluted | $ (1.42) | $ (1.29) |
| Weighted average common shares outstanding | | |
| Basic and diluted recheck WA shares | 4,008,381 | 2,527,045 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

**LOTTERY.COM, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF EQUITY (UNAUDITED)**
**For the Three Months Ended March 31, 2024 and 2023**

| | Common Stock | | Additional Paid-In Capital | Accumulated Deficit | Accumulated Other Comprehensive Income | Total AutoLotto Inc. Stockholders' Equity | Noncontrolling Interest | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | | |
| Balance as of December 31, 2022 | 2,527,045 | 2,527 | 267,597,370 | (208,187,210) | 3,622 | 59,416,309 | 2,400,176 | 61,816,485 |
| Stock based compensation | | | 358,349 | | | 358,349 | | 358,349 |
| Other comprehensive loss | | | | | (114,095) | (114,095) | | (114,095) |
| Net loss | | | | (3,260,437) | | (3,260,437) | (67,640) | (3,328,077) |
| Balance as of March 31, 2023 | 2,527,045 | $ 2,527 | $267,955,719 | $(211,447,647) | (110,473) | $ 56,400,126 | $ 2,332,536 | $ 58,732,662 |
| Balance as of December 31, 2023 | 2,877,045 | $ 2,877 | $269,690,569 | $(235,106,206) | (91,667) | $ 34,495,573 | $ 2,120,429 | $ 36,616,002 |
| Stock based compensation | 1,851,277 | 1,851 | 3,652,273 | | | 3,745,791 | | 3,745,791 |
| Other comprehensive loss | | | | | 16,673 | 16,673 | | 16,673 |
| Net loss | | | | (5,708,979) | | (5,708,979) | (57,320) | (5,766,299 |
| Balance as of March 31, 2024 | 4,728,322 | 4,728 | 273,342,842 | (240,815,185) | (74,994) | 32,549,058 | 2,063,109 | 34,612,167 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

**LOTTERY.COM INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS (UNAUDITED)**
**For the Three Months Ended March 31, 2024 and 2023**

| | Three Months Ended March 31, | |
|---|---|---|
| | 2024 | 2023 |
| CASH FLOWS FROM OPERATING ACTIVITIES | | |
| Net loss attributable to Lottery.com Inc. | $ (5,708,979) | $ (3,260,437) |
| Adjustments to reconcile net income to net cash used in operating activities: | | |
| Loss Attributable to noncontrolling interest | (57,321) | (67,640) |
| Depreciation and amortization | 1,283,558 | 1,405,601 |
| Stock based compensation expense | 3,651,655 | 358,349 |
| Changes in assets and liabilities: | | |
| Accounts receivable | (220,828) | 61,790 |
| Prepaid expenses | (24,673) | 5,368 |
| Other current assets | 6,590 | (23,584) |
| Trade payables | (25,939) | 6,351 |
| Accrued and other expenses | (57,373) | 448,110 |
| Deferred revenue | (26,886) | (26,786) |
| Other liabilities | - | - |
| Accrued interest | 102,206 | - |
| Other long-term liabilities | - | 125,000 |
| Net cash (used in) provided by operating activities | (1,077,990) | (967,878) |
| CASH FLOWS FROM INVESTING ACTIVITIES | | |
| Purchase of property and equipment | - | (896) |
| Purchase of intangibles | - | - |
| Net cash used in investing activities | - | (896) |
| CASH FLOWS FROM FINANCING ACTIVITIES | | |
| Proceeds from issuance of convertible debt | 700,000 | 1,021,016 |
| Net cash (used in) provided by financing activities | 700,000 | 1,021,016 |
| Net effect of exchange rate changes on Cash | 102,214 | (114,095) |
| NET CHANGE IN NET CASH AND RESTRICTED CASH | (275,776) | (61,853) |
| CASH AND RESTRICTED CASH - BEGINNING OF YEAR | 359,826 | 102,766 |
| CASH AND RESTRICTED CASH - END OF PERIOD | $ 84,050 | $ 40,913 |
| Supplemental Disclosure of Cash Flow Information: | | |
| Interest paid in cash | $ - | $ 23 |
| Taxes paid in cash | $ - | $ - |

The accompanying notes are an integral part of these condensed consolidated financial statements.

**LOTTERY.COM INC.**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED)**
**THREE MONTHS ENDED MARCH 31, 2024**

**Note 1. Nature of Operations**

Description of Business

Lottery.com Inc. (formerly Trident Acquisitions Corp) ("TDAC", "Lottery.com" or "the Company"), was formed as a Delaware corporation on March 17, 2016. On October 29, 2021, we consummated a business combination (the "Business Combination") with AutoLotto, Inc. ("AutoLotto"). Following the closing of the Business Combination (the "Closing") we changed our name from "Trident Acquisitions Corp." to "Lottery.com Inc." and the business of AutoLotto became our business. In connection with the Business Combination the Company moved its headquarters from New York, New York to Spicewood, Texas.

The Company is a leading provider of domestic and international lottery products and services. As an independent third-party lottery game service, the Company offers a platform that it developed and operates to enable the remote purchase of legally sanctioned lottery games in the U.S. and abroad (the "Platform"). The Company's revenue generating activities are focused on (i) offering the Platform via the Lottery.com app and our websites to users located in the U.S. and international jurisdictions where the sale of lottery games is legal and our services are enabled for the remote purchase of legally sanctioned lottery games (our "B2C Platform"); (ii) offering an internally developed, created and operated business-to-business application programming interface ("API") of the Platform to enable commercial partners in permitted U.S. and international jurisdictions to purchase certain legally operated lottery games from the Company and resell them to users located within their respective jurisdictions ("B2B API"); and (iii) delivering global lottery data, such as winning numbers and results, and sports data, such as scores and statistics, to commercial digital subscribers and provide access to other proprietary, anonymized transaction data pursuant to multi-year contracts ("Data Service").

As a provider of lottery products and services, the Company is required to comply with, and its business is subject to, regulation in each jurisdiction in which the Company offers the B2C Platform, or a commercial partner offers users access to lottery games through the B2B API. In addition, it must also comply with the requirements of federal and other domestic and foreign regulatory bodies and governmental authorities in jurisdictions in which the Company operates or with authority over its business. The Company's business is additionally subject to multiple other domestic and international laws, including those relating to the transmission of information, privacy, security, data retention, and other consumer focused laws, and, as such, may be impacted by changes in the interpretation of such laws.

On June 30, 2021, the Company acquired an interest in Medios Electronicos y de Comunicacion, S.A.P.I de C.V. ("Aganar") and JuegaLotto, S.A. de C.V. ("JuegaLotto"). Aganar has been operating in the licensed iLottery market in Mexico since 2007 as an online retailer of Mexican National Lottery draw games, instant digital scratch-off games and other games of chance. JuegaLotto is licensed by the Mexican federal regulatory authorities to sell international lottery games in Mexico.

On July 28, 2022, the Board determined that the Company did not currently have sufficient financial resources to fund its operations or pay certain existing obligations, including its payroll and related obligations and effectively ceased its operations furloughing certain employees effective July 29, 2022 (the "Operational Cessation"). Subsequently, the Company has had minimal day-to-day operations and has primarily focused its operations on restarting certain aspects of its core businesses (the "Plans for Recommencement of Company Operations").

On April 25, 2023, as part of the Plans for Recommencement of Company Operations, the Company resumed its ticket sales operations on a limited basis to support its affiliate partners through its Texas retail network.

**Note 2. Significant Accounting Policies**

Basis of Presentation

The accompanying consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America ("*GAAP*") and include the accounts of the Company and its wholly owned operating subsidiaries. Any reference in these notes to applicable guidance is meant to refer to the authoritative United States generally accepted accounting principles as found in the Accounting Standards Codification ("*ASC*") and Accounting Standards Update ("*ASU*") of the Financial Accounting Standards Board ("*FASB*"). All intercompany accounts and transactions have been eliminated in consolidation.

Going Concern

The accompanying consolidated financial statements have been prepared on a going concern basis of accounting, which contemplates continuity of operations, realization of assets and classification of liabilities and commitments in the normal course of business. The accompanying consolidated financial statements do not reflect any adjustments relating to the recoverability and classification of recorded asset amounts or the amounts and classifications of liabilities that might result if the Company is unable to continue as a going concern.

Pursuant to the requirements of the Financial Accounting Standards Board's ASC Topic 205-40, Disclosure of Uncertainties about an Entity's Ability to Continue as a Going Concern, management must evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern for one year from the date these financial statements are issued. This evaluation does not take into consideration the potential mitigating effect of management's plans that have not been fully implemented or are not within control of the Company as of the date the financial statements are issued. When substantial doubt exists under this methodology, management evaluates whether the mitigating effect of its plans sufficiently alleviates substantial doubt about the Company's ability to continue as a going concern. The mitigating effect of management's plans, however, is only considered if both (1) it is probable that the plans will be effectively implemented within one year after the date that the financial statements are issued, and (2) it is probable that the plans, when implemented, will mitigate the relevant conditions or events that raise substantial doubt about the entity's ability to continue as a going concern within one year after the date that the financial statements are issued.

In connection with the Company's Operational Cessation, the Company has experienced recurring net losses and negative cash flows from operations and has an accumulated deficit of approximately $241 million and working capital of approximately negative $8.2 million on March 31, 2024. For the quarter ended March 31, 2024, the company sustained a loss of $5.7 million. For the year ending December 31, 2023, the Company sustained a net loss of $25.5 million. The Company sustained a loss from operations of $60.0 million and $53.0 million for the years ending December 31, 2022 and 2021, respectively. Subsequently, the Company sustained additional operating losses and anticipates additional operating losses for the next twelve months. These conditions raise substantial doubt about the Company's ability to continue as a going concern.

The Company has historically funded its activities almost exclusively from debt and equity financing. Management's plans in order to meet its operating cash flow requirements include financing activities such as private placements of its common stock, preferred stock offerings, and issuances of debt and convertible debt. Although Management believes that it will be able to continue to raise funds by sale of its securities to provide the additional cash needed to meet the Company's obligations as they become due beginning with a loan agreement the Company entered into with United Capital Investments Ltd. ("UCIL") on July 21, 2023, the Plans for Recommencement of Company Operations to require substantial funds to implement and there is no assurance that the Company will be able to continue raising the required capital.

The Company's ability to continue as a going concern for the next twelve months from the issuance of these financial statements depends on its ability to execute the business plan for the relaunch of its core business, the successful monetization of Sports.com, and keep expenditures in line with available operating capital. Such conditions raise substantial doubt about the Company's ability to continue as a going concern.

Impact of Trident Acquisition Corp. Business Combination

We accounted for the October 29, 2021 Business Combination as a reverse recapitalization whereby AutoLotto was determined as the accounting acquirer and Trident Acquisition Corp. ("TDAC") as the accounting acquiree. This determination was primarily based on:

- former AutoLotto stockholders having the largest voting interest in Lottery.com Inc. ("Lottery.com");
- the board of directors of Lottery.com having 7 members, and AutoLotto's former stockholders having the ability to nominate the majority of the members of the board of directors;
- AutoLotto management continuing to hold executive management roles for the post-combination company and being responsible for the day-to-day operations;
- the post-combination company assuming the Lottery.com name;
- Lottery.com maintaining the pre-existing AutoLotto headquarters; and the intended strategy of Lottery.com being a continuation of AutoLotto's strategy.

Accordingly, the Business Combination was treated as the equivalent of AutoLotto issuing stock for the net assets of TDAC, accompanied by a recapitalization. The net assets of TDAC are stated at historical cost, with no goodwill or other intangible assets recorded.

While TDAC was the legal acquirer in the Business Combination, because AutoLotto was determined as the accounting acquirer, the historical financial statements of AutoLotto became the historical financial statements of the combined company, upon the consummation of the Business Combination. As a result, the financial statements included in the accompanying consolidated financial statements reflect (i) the historical operating results of AutoLotto prior to the Business Combination; (ii) the combined results of the Company and AutoLotto following the closing of the Business Combination; (iii) the assets and liabilities of AutoLotto at their historical cost; and (iv) the Company's equity structure for all periods presented.

In connection with the Business Combination transaction, we have converted the equity structure for the periods prior to the Business Combination to reflect the number of shares of the Company's common stock issued to AutoLotto's stockholders in connection with the recapitalization transaction. As such, the shares, corresponding capital amounts and earnings per share, as applicable, related to AutoLotto convertible preferred stock and common stock prior to the Business Combination have been retroactively converted by applying the exchange ratio established in the Business Combination.

Non-controlling Interest

Non-controlling interest represents the proportionate ownership of Aganar and JuegaLotto, held by minority members and reflect their capital investments as well as their proportionate interest in subsidiary losses and other changes in members' equity, including translation adjustments.

Segment Reporting

Operating segments are defined as components of an enterprise about which separate financial information is available that is evaluated regularly by the chief operating decision maker in deciding how to allocate resources and in assessing operating performance. Under the provisions of ASC 280, Segment Reporting, the Company is not organized around specific services or geographic regions. The Company operates in one service line, providing lottery products and services.

We determined that our Chief Financial Officer is the Chief Operating Decision Maker, and he uses financial information, business prospects, competitive factors, operating results and other non-U.S. GAAP financial ratios to evaluate our performance, which is the same basis on which our results and performance are communicated to our Board of Directors. Based on the information described above and in accordance with the applicable literature, management has concluded that we are organized and operated as one operating and reportable segment on a consolidated basis for each of the periods presented.

Concentration of Credit Risks

Financial instruments that are potentially subject to concentrations of credit risk are primarily cash. Cash holdings are placed with major financial institutions deemed to be of high-credit-quality in order to limit credit exposure. The Company maintains deposits and certificates of deposit with banks which may exceed the Federal Deposit Insurance Corporation ("FDIC") insured limit and money market accounts which are not FDIC insured. In addition, deposits aggregating approximately $19,790 on May 20, 2024 are held in foreign banks. Management believes the risk of loss in connection with these accounts is minimal.

Use of Estimates

The preparation of the financial statements requires management to make estimates and assumptions to determine the reported amounts of assets, liabilities, revenue and expenses. Although management believes these estimates are reasonable, actual results could differ from these estimates. The Company evaluates its estimates on an ongoing basis and prepares its estimates on historical experience and other assumptions the Company believes to be reasonable under the circumstances.

Reclassifications

Certain balances have been reclassified in the accompanying consolidated financial statements to conform to the current year presentation. These reclassifications had no effect on the balances of current or total assets and prior year's net loss or accumulated deficit.

Foreign currency translation

Assets and liabilities of subsidiaries operating outside the United States with a functional currency other than U.S. Dollars are translated into U.S. Dollars using year-end exchange rates. Sales, costs and expenses are translated at the average exchange rates in effect during the year. Foreign currency translation gains and losses are included as a component of accumulated other comprehensive income (loss).

Cash and Restricted Cash

As of March 31, 2024 and December 31, 2023, cash was comprised of cash deposits. From time-to-time cash deposits with some banks may exceed federally insured limits with the majority of cash held in one financial institution. Management believes all financial institutions holding its cash are of high credit quality and does not believe the Company is subject to unusual credit risk beyond the normal credit risk associated with commercial banking relationships.

The Company had no marketable securities as of March 31, 2024 and December 31, 2023.

Accounts Receivable

The Company through its various merchant providers pre-authorizes forms of payment prior to the sale of digital representation of lottery games to minimize exposure to losses related to uncollected payments and does not extend credit to the user of the B2C Platform or the commercial partner of the B2B API, which are its customers, in the normal course of business. The Company estimates its bad debt exposure each period and records a bad debt provision for accounts receivable it believes it may not collect in full. The Company increased its allowance for uncollectible receivables as of March 31, 2024 by $3,000. At December 31, 2023 the allowance for uncollectible receivables was $97,520. The Company has not incurred bad debt expense historically.

Prepaid Expenses

Prepaid expenses consist of payments made on contractual obligations for services to be consumed in future periods. The Company entered into an agreement with a third party to provide advertising services and issued equity instruments as compensation for the advertising services (“Prepaid advertising credits”). The Company expenses the service as it is performed by the third party. The value of the services provided were used to value these contracts, except for the year ended December 31, 2021 the Company reserved for potential inability to realize $2,000,000 of prepaid advertising credits in future periods. The current portion of prepaid expenses is included in current assets on the consolidated balance sheets. The Company has remaining prepaid expenses of $19,044,832 and $19,020,159 on March 31, 2024 and December 31, 2023, respectively.

Investments

On August 2, 2018, AutoLotto purchased 186,666 shares of Class A-1 common stock of a third-party business development partner representing 4% of the total outstanding shares of the company. As this investment resulted in less than 20% ownership, it was accounted for using the cost basis method.

Property and equipment, net

Property and equipment are stated at cost. Depreciation and amortization are generally computed using the straight-line method over estimated useful lives ranging from three to five years. Leasehold improvements are amortized over the shorter of the lease term or the estimated useful life of the asset. Routine maintenance and repair costs are expensed as incurred. The costs of major additions, replacements and improvements are capitalized. Gains and losses realized on the sale or disposal of property and equipment are recognized or charged to other expense in the consolidated statement of operations.

Depreciation of property and equipment is computed using the straight-line method over the following estimated useful lives:

| | |
|---|---|
| Computers and equipment | 3 years |
| Furniture and fixtures | 5 years |
| Software | 3 years |

Leases

Right-of-use assets (“ROU assets”) represent the Company’s right to use an underlying asset for the lease term and lease liabilities represent the obligation to make lease payments arising from the lease. Operating lease ROU assets and liabilities are recognized at commencement date based on the present value of lease payments over the lease term. Variable lease payments are not included in the calculation of the right-of-use asset and lease liability due to uncertainty of the payment amount and are recorded as lease expense in the period incurred. As most of the leases do not provide an implicit rate, the Company used its incremental borrowing rate based on the information available at commencement date in determining the present value of lease payments. Otherwise, the implicit rate was used when readily determinable. The lease terms may include options to extend or terminate the lease when it is reasonably certain that the Company will exercise that option. Lease expense for lease payments is recognized on a straight-line basis over the lease term.

Under the available practical expedient, the Company accounts for the lease and non-lease components as a single lease component for all classes of underlying assets as both a lessee and lessor. Further, management elected a short-term lease exception policy on all classes of underlying assets, permitting the Company to not apply the recognition requirements of this standard to short-term leases (i.e. leases with terms of 12 months or less).

Internal Use Software Development

Software development costs incurred internally to develop software programs to be used solely to meet our internal needs and applications are capitalized once the preliminary project stage is complete and it is probable that the project will be completed and the software will be used to perform the intended function. Additionally, we capitalize qualifying costs incurred for upgrades and enhancements to existing software that result in additional functionality. Costs related to preliminary project planning activities, post-implementation activities, maintenance and minor modifications are expensed as incurred. Internal-use software development costs are amortized on a straight-line basis over the estimated useful life of the software.

Goodwill and Other Intangible Assets

Goodwill represents the excess of the cost of assets acquired over the fair value of the net assets at the date of acquisition. Intangible assets represent the fair value of separately recognizable intangible assets acquired in connection with the Company's business combinations. The Company evaluates its goodwill and other intangibles for impairment on an annual basis or whenever events or circumstances indicate that an impairment may have occurred in accordance with the provisions of ASC 350, "*Goodwill and Other Intangible Assets*".

Revenue Recognition

Under the new standard, Accounting Standards Update ("ASU") 2014-09, "*Revenue from Contracts with Customers (Topic 606)*", the Company recognizes revenues when the following criteria are met: (i) persuasive evidence of a contract with a customer exists; (ii) identifiable performance obligations under the contract exist; (iii) the transaction price is determinable for each performance obligation; (iv) the transaction price is allocated to each performance obligation; and (v) when the performance obligations are satisfied. Revenues are recognized when control of the promised goods or services is transferred to the customers in an amount that reflects the consideration expected to be entitled to in exchange for those goods or services.

Lottery game revenue

Items that fall under this revenue classification include:

*Lottery game sales*

The Company's performance obligations of delivering lottery games are satisfied at the time in which the digital representation of the lottery game is delivered to the user of the B2C Platform or the commercial partner of the B2B API, therefore, are recognized at a point in time. The Company receives consideration for lottery game sales at the time of delivery to the customer, which may be the user or commercial partner, as applicable. There is no variable consideration related to lottery game sales. As each individual lottery game delivered represents a distinct performance obligation and consideration for each game sale is fixed, representing the standalone selling price, there is no allocation of consideration necessary.

In accordance with Accounting Standards Codification ("ASC") 606, the Company evaluates the presentation of revenue on a gross versus net basis dependent on if the Company is a principal or agent. In making this evaluation, some of the factors that are considered include whether the Company has control over the specified good or services before they are transferred to the customer. The Company also assesses if it is primarily responsible for fulfilling the promise to provide the goods or services, has inventory risk, and has discretion in establishing the price. For all of the Company's transactions, management concluded that gross presentation is appropriate, as the Company is primarily responsible for providing the performance obligation directly to the customers and assumes fulfillment risk of all lottery game sales as it retains physical possession of lottery game sales tickets from time of sale until the point of redemption. The Company also retains inventory risk on all lottery game sales tickets as they would be responsible for any potential winnings related to lost or unredeemable tickets at the time of redemption. Finally, while states have the authority to establish lottery game sales prices, the Company can add service fees to ticket prices evidencing its ability to establish the ultimate price of the lottery tickets being sold.

*Other associated revenue*

The Company's performance obligations in agreements with certain customers are to provide a license of intellectual property related to the use of the Company's tradename for marketing purposes by partners of the Company. Customers pay a license fee up front. The transaction price is deemed to be the license issue fee stated in the contract. The license offered by the Company represents a symbolic license which provides the customer with the right to use the Company's intellectual property on an ongoing basis with continued support throughout the term of the contract in the form of ongoing maintenance of the underlying intellectual property. There is no variable consideration related to these performance obligations.

*Arrangements with multiple performance obligations*

The Company's contracts with customers may include multiple performance obligations. For such arrangements, management allocates revenue to each performance obligation based on its relative standalone selling price. Management generally determines standalone selling prices based on the prices charged to customers.

*Deferred Revenue*

The Company records deferred revenue when cash payments are received or due in advance of any performance, including amounts which are refundable.

Payment terms vary by the type and location of the customer and the products or services offered. The term between invoicing and when payment is due is not significant. For certain products or services and customer types, management requires payment before the products or services are delivered to the customer.

*Contract Assets*

Given the nature of the Company's services and contracts, it has no contract assets.

*Taxes*

Taxes assessed by a governmental authority that are both imposed on and concurrent with specific revenue-producing transactions, that are collected by us from a customer, are excluded from revenue.

Cost of Revenue

Cost of revenue consists primarily of variable costs, comprising (i) the cost of procurement of lottery games, minus winnings to users, additional expenses related to the sale of lottery games, including, commissions, affiliate fees and revenue shares; and (ii) payment processing fees on user fees, including chargebacks imposed on the Company. Other non-variable costs included in cost of revenue include affiliate marketing credits acquired on a per-contract basis.

Stock-based Compensation

Effective October 1, 2019, the Company adopted ASU 2018-07, *Compensation - "Stock Compensation (Topic 718): Improvements to Nonemployee Share-based Payment Accounting"* ("ASC 718"), which addresses aspects of the accounting for nonemployee share-based payment transactions and accounts for share-based awards to employees in accordance with ASC 718, *Stock Compensation*. Under this guidance, stock compensation expense is measured at the grant date, based on the fair value of the award, and is recognized as an expense over the estimated service period (generally the vesting period) on the straight-line attribute method.

Income Taxes

For both financial accounting and tax reporting purposes, the Company reports income and expenses based on the accrual method of accounting.

For federal and state income tax purposes, the Company reports income or loss from their investments in limited liability companies on the consolidated income tax returns. As such, all taxable income and available tax credits are passed from the limited liability companies to the individual members. It is the responsibility of the individual members to report the taxable income and tax credits, and to pay any resulting income taxes. Therefore, the income and losses incurred by the limited liability companies have been consolidated in the Company's tax return and provision based upon its relative ownership.

Income taxes are accounted for in accordance with ASC 740, "*Income Taxes*" ("ASC 740"), using the asset and liability method. Under this method, deferred income tax assets and liabilities are recognized for the future tax consequences attributable to temporary differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred income tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which these temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. A valuation allowance is provided for those deferred tax assets for which it is more likely than not that the related benefit will not be realized.

The Company records uncertain tax positions in accordance with ASC 740 on the basis of a two-step process in which (i) the Company determines whether it is more likely than not that the tax positions will be sustained on the basis of the technical merits of the position; and (ii) for those tax positions that meet the more likely than not recognition threshold, the Company recognizes the largest amount of tax benefit that is more than 50 percent likely to be realized upon ultimate settlement with the related tax authority. The Company's policy is to recognize interest and penalties related to the underpayment of income taxes as a component of income tax expense or benefit. To date, there have been no interest or penalties charged in relation to the unrecognized tax benefits.

Generally, the taxing authorities can audit the previous three years of tax returns and in certain situations audit additional years. For federal tax purposes, the Company's 2020 through 2023 tax years generally remain open for examination by the tax authorities under the normal three-year statute of limitations. For state tax purposes, the Company's 2019 through 2023 tax years remain open for examination by the tax authorities under the normal four-year statute of limitations.

Fair Value of Financial Instruments

The Company determines the fair value of its financial instruments in accordance with the provisions of ASC 820, *Fair Value Measurements and Disclosures* ("ASC 820"), which establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value. The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities (Level 1 measurements) and the lowest priority to unobservable inputs (Level 3 measurements). The three levels of the fair value hierarchy under ASC 820 are described below:

- Level 1 - Unadjusted quoted prices in active markets that are accessible at the measurement date for identical, unrestricted assets or liabilities

- Level 2 - Quoted prices in markets that are not active, or inputs that are observable, either directly or indirectly, for substantially the full term of the asset or liability

- Level 3 - Valuation is generated from model-based techniques that use significant assumptions not observable in the market. These unobservable assumptions reflect our own estimates of assumptions that market participants would use in pricing the asset or liability.

Determination of fair value and the resulting hierarchy requires the use of observable market data whenever available.

The classification of an asset or liability in the hierarchy is based upon the lowest level of input that is significant to the measurement of fair value.

Fair value of stock options and warrants

Management uses the Black-Scholes option-pricing model to calculate the fair value of stock options and warrants. Use of this method requires management to make assumptions and estimates about the expected life of options and warrants, anticipated forfeitures, the risk-free rate, and the volatility of the Company's share price. In making these assumptions and estimates, management relies on historical market data.

Recent Accounting Pronouncements

In January 2017, the FASB issued ASU No. 2017-04, *Intangibles - Goodwill and other (Topic 350)* ("ASU 2017-04"). ASU 2017-04 simplifies the accounting for goodwill impairment and removes Step 2 of the goodwill impairment test. Goodwill impairment will now be the amount by which a reporting unit's carrying value exceeds its fair value limited to the total amount of goodwill allocated to that reporting unit. Entities will continue to have the option to perform a qualitative assessment to determine if a quantitative impairment test is necessary. The same one-step impairment test will be applied to goodwill at all reporting units, even those with zero or negative carrying amounts. The amendments in this ASU are effective for goodwill impairment tests in fiscal years beginning after December 15, 2021, and early adoption is permitted. The Company is currently evaluating this new standard and management does not currently believe it will have a material impact on its consolidated financial statements, depending on the outcome of future goodwill impairment tests.

In June 2016, the FASB issued ASU No. 2016-13, *Financial Instruments - Credit Losses (Topic 326)*: *Measurement of Credit Losses on Financial Instruments* ("ASU 2016-13"). ASU 2016-13 requires the measurement of all expected credit losses for financial assets held at the reporting date based on historical experience, current conditions, and reasonable and supportable forecasts. Adoption of ASU 2016-13 will require the Company to use forward-looking information to formulate its credit loss estimates. ASU 2016-13 is effective for annual reporting periods beginning after December 15, 2022, and early adoption is permitted. The Company is currently evaluating this new standard and currently does not expect it to have a significant impact on the Company's consolidated financial statements.

In December 2019, the FASB issued ASU No 2019-12, *Income Taxes (Topic 740): Simplifying the Accounting for Income Taxes (*"ASU2019-12"*)*. ASU 2019-12 removes certain exceptions to the general principles in Topic 740 in Generally Accepted Accounting Principles. ASU 2019-12 is effective for annual reporting periods beginning after December 15, 2021, and early adoption is permitted. The Company is currently evaluating this new standard and currently does not expect it to have a significant impact on the Company's consolidated financial statements.

In October 2020, the FASB issued *ASU No. 2020-09, Debt (Topic 470) ("ASU 2020-09"). ASU 2020-09* amendments to SEC paragraphs pursuant to SEC release NO. 33-10762 amends terms related to Debt Guarantors and Issuers of Guaranteed Securities Registered or to be Registered with the SEC. The Company is currently evaluating the timing of adoption and impact of the updated guidance on its financial statements.

**Note 3. Business Combination**

TDAC Combination

On October 29, 2021, the Company and AutoLotto consummated the transactions contemplated by the Merger Agreement. At the Closing, each share of common stock and preferred stock of AutoLotto that was issued and outstanding immediately prior to the effective time of the Merger (other than excluded shares as contemplated by the Merger Agreement) was cancelled and converted into the right to receive approximately 3.0058 shares (the "Exchange Ratio") of Lottery.com. common stock.

The Merger closing was a triggering event for the Series B convertible notes, of which $63.8 million was converted into 164,426 shares of AutoLotto that were then converted into 488,225 shares of Lottery.com common stock using the Exchange Ratio.

At the Closing, each option to purchase AutoLotto's common stock, whether vested or unvested, was assumed and converted into an option to purchase a number of shares of Lottery.com common stock in the manner set forth in the Merger Agreement.

The Company accounted for the Business Combination as a reverse recapitalization whereby AutoLotto was determined as the accounting acquirer and TDAC as the accounting acquiree. Refer to *Note 2, Summary of Significant Accounting Policies*, for further details. Accordingly, the Business Combination was treated as the equivalent of AutoLotto issuing stock for the net assets of TDAC, accompanied by a recapitalization. The net assets of TDAC are stated at historical cost, with no goodwill or other intangible assets recorded.

The accompanying consolidated financial statements and related notes reflect the historical results of AutoLotto prior to the merger and do not include the historical results of TDAC prior to the consummation of Business Combination.

Upon the closing of the transaction, AutoLotto received total gross proceeds of approximately $42,794,000, from TDAC's trust and operating accounts. Total transaction costs were approximately $9,460,000, which principally consisted of advisory, legal and other professional fees and were recorded in additional paid in capital. Cumulative debt repayments of approximately $11,068,000, inclusive of accrued but unpaid interest, were paid in conjunction with the close, which included approximately $5,475,000 repayment of notes payable to related parties, and approximately $5,593,000 payment of accrued underwriter fees.

Pursuant to the terms of the Business Combination Agreement, the holders of issued and outstanding shares of AutoLotto immediately prior to the Closing (the "Sellers") were entitled to receive up to 300,000 additional shares of Common Stock (the "Seller Earnout Shares") and Vadim Komissarov, Ilya Ponomarev and Marat Rosenberg (collectively the "TDAC Founders") were also entitled to receive up to 200,000 additional shares of Common Stock (the "TDAC Founder Earnout Shares" and, together with the Seller Earnout Shares, the "Earnout Shares"). One of the earnout criteria had not been met by the December 31, 2021 deadline thus no earnout shares were granted specific to that criteria. 150,000 of the Seller Earnout Shares and 100,000 TDAC Founder Earnout Shares were still eligible Earnout Shares until December 31, 2022.

Global Gaming Acquisition

On June 30, 2021, the Company completed its acquisition of 100 percent of equity of Global Gaming Enterprises, Inc., a Delaware corporation ("Global Gaming"), which holds 80% of the equity of each of Medios Electronicos y de Comunicacion, S.A.P.I de C.V. ("Aganar") and JuegaLotto, S.A. de C.V. ("JuegaLotto"). JuegaLotto is federally licensed by the Mexico regulatory authorities with jurisdiction over the ability to sell international lottery games in Mexico through an authorized federal gaming portal and is licensed for games of chance in other countries throughout Latin America. Aganar has been operating in the licensed Lottery market in Mexico since 2007 and is licensed to sell Mexican National Lottery draw games, instant win tickets, and other games of chance online with access to a federally approved online casino and sportsbook gaming license and additionally issues a proprietary scratch lottery game in Mexico under the brand name Capalli. The opening balance of the acquirees have been included in our consolidated balance sheet since the date of the acquisition. Since the acquirees' financial statements were denominated in Mexican pesos, the exchange rate of 22.0848 pesos per dollar was used to translate the balances.

The net purchase price was allocated to the assets and liabilities acquired as per the table below. Goodwill represents the future economic benefits arising from other assets acquired that could not be individually identified and separately recognized. The fair values of the acquired intangible assets were determined using Level 3 inputs which were not observable in the market.

The total purchase price of $10,989,691, consisting of cash of $10,530,000 and 687,439 shares of common stock of AutoLotto at $0.67 per share. The total consideration transferred was approximately $10,055,214, reflecting the purchase price, net of cash on hand at Global Gaming and the principal amount of certain loans acquired. The purchase price is for an 80% ownership interest and is therefore grossed up to $13,215,843 to reflect the 20% minority interest in the acquirees. The purchase price was allocated to the identified tangible and intangible assets acquired based on their estimated fair values at the acquisition date as follows:

| | | |
|---|---|---|
| Cash | $ | 517,460 |
| Accounts receivable, net | | 34,134 |
| Prepaids | | 5,024 |
| Property and equipment, net | | 2,440 |
| Other assets, net | | 65,350 |
| Intangible assets | | 8,590,000 |
| Goodwill | | 4,940,643 |
| **Total assets** | $ | 14,155,051 |
| | | |
| Accounts payable and other liabilities | $ | (387,484) |
| Customer deposits | | (134,707) |
| Related party loan | | (417,017) |
| **Total liabilities** | $ | (939,208) |
| | | |
| **Total net assets of Acquirees** | $ | 13,215,843 |

Goodwill recognized in connection with the acquisition - is primarily attributed to an anticipated growing lottery market in Mexico that is expected to be achieved from the integration of these Mexican entities. None of the goodwill is expected to be deductible for income tax purposes.

Following are details of the purchase price allocated to the intangible assets acquired.

| **Category** | **Fair Value** | |
|---|---|---|
| Customer relationships | $ | 410,000 |
| Gaming licensees | | 4,020,000 |
| Trade names and trademarks | | 2,540,000 |
| Technology | | 1,620,000 |
| | | |
| **Total Intangibles** | **$** | **8,590,000** |

**Note 4. Property and Equipment, net**

Property and equipment, net as of March 31, 2024 and December 31, 2023, consisted of the following:

| | **March 31, 2024** | | **December 31, 2023** | |
|---|---|---|---|---|
| Computers and equipment | $ | 124,199 | $ | 124,199 |
| Furniture and fixtures | | 16,898 | | 16,898 |
| Software | | 2,026,200 | | 2,026,200 |
| Property and equipment | | 2,167,297 | | 2,167,297 |
| Accumulated depreciation | | (2,148,809) | | (2,145,988) |
| Property and equipment, net | $ | 18,488 | $ | 21,309 |

Depreciation expense for the three months ended March 31, 2024 was $2,821 and was $24,556 for the three months ended March 31, 2023.

**Note 5. Prepaid Expenses**

Prepaid expenses consist primarily of advertising credits from two top tier media organizations that operate in the United States. The advertising credits were obtained in return for warrants, shares of common stock and shares of preferred stock. The agreements do not specify a time period for utilizing these credits and there is no requirement to provide cash or other consideration in connection with utilizing them. The balance can be utilized at any time at the mutual consent of the parties. The Company expects to begin utilizing these credits in the second quarter of 2024 and anticipates fully utilizing all of them by the end of 2024. Accordingly, they are presented as current assets.

**Note 6. Notes Receivable**

On March 22, 2022, the Company entered into a three-year secured promissory note agreement with a principal amount of $2,000,000. The note bears simple interest at the rate of approximately 3.1% annually, due upon maturity of the note. The note is secured by all assets, accounts, and tangible and intangible property of the borrower and can be prepaid any time prior to its maturity date. As of September 30, 2023, the entire $2,000,000 in principle was outstanding.

This note was received in consideration for a portion of the development work that the Company performed for the borrower who had intended to use the Company's technology to launch its own online game in a jurisdiction outside the U.S., where the Company is unlikely to operate.

**Note 7. Write-Off of Goodwill and Intangibles**

As required by ASC 350 Intangibles – Goodwill and Other Impairment and ASC 360 – Impairment Testing: Long-Lived Assets, in connection with preparing the consolidated financial statements for the period ended December 31, 2023, management conducted a review as to whether there are conditions or circumstances that may indicate the impairment of its long-lived assets, goodwill and other indefinite-lived intangible assets.

The Company reviewed the goodwill and intangibles acquired in the acquisitions of TinBu, LLC and Global Gaming Enterprises, Inc., the domain names and software purchased from third parties, and software developed in-house. Each of TinBu, Global Gaming, and Lottery.com is considered a reporting unit for application of the annual review for potential impairment.

The company performed a valuation of each of the reporting units described above, using discounted cash flow methodologies and estimates of fair market value. Given the results of the quantitative assessment, the company determined that the goodwill for the TinBu and Global Gaming reporting units was impaired. For the year ended December 31, 2023, the company recognized goodwill impairment charges of $5.65 million for the TinBu reporting unit and $1.06 million for the Global Gaming reporting unit. The total impairment charges related to goodwill were $6.71 million. In addition, it was determined that there was an impairment of certain intangible assets related to Global Gaming. For the year ended December 31, 2023, the Company recorded impairment charges of $488 thousand to trade names and trademarks and $312 thousand to technology acquired from Global Gaming. The total impairment charges to intangible assets were $800 thousand.

Additionally, in connection with completion of the tax provision for 2023, a transaction which had been recorded for the year ended December 31, 2021 was reevaluated and a decision was made that it should not have been recorded and should be reversed. Specifically, at the end of 2021, a decision was made to increase goodwill related to the acquisition of Global Gaming Enterprises, Inc. due to an incorrect conclusion that "an adjustment should be made to goodwill for the recording of related deferred tax liabilities as the Company released $1.6 million of valuation allowance since the additional deferred tax liabilities represent a future source of taxable income". This approach improperly accelerated the effects of future amortization of intangible assets related to Global Gaming, resulting in inappropriately releasing part of a valuation allowance for deferred taxes which is not in compliance with GAAP. At that time, the Company recorded an increase to goodwill for Global Gaming and an income tax benefit each in the amount of $1,653,067. We have reversed this transaction by reducing goodwill for Global Gaming by $1,653,067 and have increased accumulated deficit to remove the income tax benefit which was incorrectly recorded for year ended December 31, 2021.

**Note 8. Intangible assets, net**

Gross carrying values and accumulated amortization of intangible assets:

| | March 31, 2024 | | | | December 31, 2023 | | |
|---|---|---|---|---|---|---|---|
| | Useful Life | Gross Carrying Amount | Accumulated Amortization | Net | Gross Carrying Amount | Accumulated Amortization | Net |
| Amortizing intangible assets | | | | | | | |
| Customer relationships | 6 years | $ 1,350,000 | $ (1,062,639) | $ 287,361 | $ 1,350,000 | $ (1,006,389) | $ 343,611 |
| Trade name | 6 years | 2,550,000 | (1,626,896) | 923,104 | 2,550,000 | (1,555,925) | 994,075 |
| Technology | 6 years | 3,050,000 | (2,362,445) | 687,555 | 3,050,000 | (2,257,205) | 792,795 |
| Software agreements | 6 years | 14,450,000 | (9,470,000) | 4,980,000 | 14,450,000 | (8,791,944) | 5,658,056 |
| Gaming license | 6 years | 4,020,000 | (1,842,500) | 2,177,500 | 4,020,000 | (1,675,000) | 2,345,000 |
| Internally developed software | 2 - 10 years | 2,904,473 | (825,593) | 2,078,880 | 2,192,050 | (737,053) | 2,167,420 |
| Domain name | 15 years | 6,935,000 | (1,669,667) | 5,265,333 | 6,935,000 | (1,554,083) | 5,380,917 |
| | | $35,259,473 | $(18,859,740) | $16,399,733 | $34,547,050 | $(17,577,599) | $17,681,874 |

Amortization expense with respect to intangible assets for the three months ended March 31, 2024 and 2023 totaled $1,284,982 and $1,381,035, respectively, which is included in depreciation and amortization in the Statements of Operations. The Company determined that there was an impairment of long-lived assets of $412,450 during the year ended December 31, 2022, which relates to a project no longer being pursued by the Company. In connection with the annual review of goodwill and intangibles, the Company determined that it was necessary to write down goodwill by $5,650,000 for TinBu and $1,060,200 for Global Gaming. The total impairment charges related to goodwill were $6,710,200 for the year ended December 31, 2023. It was also determined that there was impairment of certain intangible assets related to Global Gaming. As a result, for the year ended December 31, 2023 the Company recorded impairment charges of $488,300 to trade names and trademarks and $311,500 to technology acquired from Global Gaming. The total impairment charges to intangible assets for the year ended December 31, 2023 were $798,800.

Estimated amortization expense for years of useful life remaining is as follows:

| **Years ending December 31,** | **Amount** |
|---|---|
| 2024 | $ 4,674,934 |
| 2025 | 4,509,655 |
| 2026 | 1,976,515 |
| 2027 | 944,729 |
| Thereafter | 4,293,900 |
| | $ 16,399,733 |

The Company had software development costs of $476,850 related to projects not placed in service as of both March 31, 2024 and December 31, 2023, which is included in intangible assets in the Company's consolidated balance sheets. Amortization will be calculated using the straight-line method over the appropriate estimated useful life when the assets are put into service.

**Note 9. Notes Payable and Convertible Debt**

*Secured Convertible Note*

In connection with the Lottery.com domain purchase, the Company issued a secured convertible promissory note ("Secured Convertible Note") with a fair value of $935,000 that matured in March 2021. The Company used the fair value of the Secured Convertible Note to value the debt instrument issued. In March 2021, the Secured Convertible Note was fully converted into 69,910 shares of the Company's common stock.

*Series A Notes*

From August to October 2017, the Company entered into seven Convertible Promissory Note Agreements with unaffiliated investors for an aggregate amount of $821,500. The notes bear interest at 10% per year, are unsecured, and were due and payable on June 30, 2019. The parties verbally agreed to extend the maturity of the notes to December 31, 2021. As of both December 31, 2023 and December 31, 2022, the balance due on these notes was $771,500. The Company cannot prepay the loan without consent from the noteholders. As of December 31, 2021, there were no Qualified Financing events, that trigger conversion, this included the TDAC combination. As of December 31, 2022, the remaining outstanding balance of $771,500 relates to notes that are no longer convertible which have been reclassified to Notes Payable as per the agreement. Accrued interest on the Series A notes payable was $318,909 on March 31, 2024.

*Series B Notes*

From November 2018 to December 2020, the Company entered into multiple Convertible Promissory Note agreements with unaffiliated investors for an aggregate amount of $8,802,828. The notes bear interest at 8% per year, are unsecured, and were due and payable on dates ranging from December 2020 to December 2021. For those notes maturing on or before December 31, 2020, the parties entered into amendments in February 2021 to extend the maturity of the notes to December 21, 2021. The Company cannot prepay the loans without consent from the noteholders.

During the year ended December 31, 2021, the Company entered into multiple Convertible Promissory Note agreements with unaffiliated investors for an aggregate amount of $38,893,733. The notes bear interest at 8% per year, are unsecured, and are due and payable on dates ranging from December 2021 to December 2022. The Company cannot prepay these loans without consent from the noteholders. As of December 31, 2021, the Series B Convertible Notes had a balance of $0.

During the year ended December 31, 2021, the Company entered into amendments with six of the Series B promissory noteholders to increase the principal value of the notes. The additional principal associated with the amendments totaled $3,552,114. The amendments were accounted for as a debt extinguishment, whereby the old debt was derecognized and the new debt was recorded at fair value. The Company recorded loss on extinguishment of $71,812 as a result of the amendment which was mapped in "Other expenses" on the consolidated statements of operations and comprehensive loss.

As of October 29, 2021, all except $185,095 of the series B convertible notes were converted into 488,226 shares of Lottery.com common stock after accounting for the 20:1 reverse stock split that took place on August 9, 2023. As of December 31, 2023, the remaining notes comprising the outstanding balance of $185,095 are no longer convertible and have been reclassified to notes payable. *See Note 9* Accrued interest on this note payable as of March 31, 2024 and December 31, 2023 was $68,491 and $64,799, respectively.

_Short term loans_

On June 29, 2020, the Company entered into a Promissory Note with the U.S. Small Business Administration ("SBA") for $150,000. The loan has a thirty-year term and bears interest at a rate of 3.75% per annum. Monthly principal and interest payments are deferred for twelve months after the date of disbursement. The loan may be prepaid at any time prior to maturity with no prepayment penalties. The Promissory Note contains events of default and other provisions customary for a loan of this type. As of December 31, 2023 and 2022, the balance of the loan was $150,000. As of March 31, 2024 and December 31, 2023, the accrued interest on this note was $5,626 and $5,253 respectively.

In August 2020, the Company entered into three separate note payable agreements with three individuals for an aggregate amount of $37,199. The notes bear interest at a variable rate, are unsecured, and the parties have verbally agreed the notes will be due upon a qualifying financing event. As of December 30, 2023 and 2022, the balance of the loans totaled $13,000, respectively.

_Notes payable_

On August 28, 2018, in connection with the purchase of the entire membership interest of TinBu, the Company entered into several notes payable for $12,674,635 with the sellers of the TinBu and a broker involved in the transaction. The notes had an interest rate of 0%, and original maturity date of January 25, 2022. The notes payable were modified during 2021 to extend the maturity to June 30, 2022 and change the interest rate to include simple interest of 4.1% per annum effective October 1, 2021. Each of the amendments were evaluated and determined to be loan modifications and accounted for accordingly.

As of both March 31, 2024 and December 31, 2023, the balance of the notes was $2,601,370. Accrued interest on these notes was $269,247 on March 31, 2024 and $242,381 on December 31, 2023, respectively.

**Note 10. Stockholders' Equity**

*Reverse Split*

On August 9, 2023, the Company amended its Charter to implement, effective at 5:30 p.m., Eastern time, a 1-for-20 Reverse Stock Split. At the effective time of the Reverse Stock Split, every 20 shares of common stock either issued and outstanding or held as treasury stock were automatically combined into one issued and outstanding share of common stock, without any change in the par value per share. Stockholders who would have otherwise been entitled to fractional shares of common stock as a result of the Reverse Stock Split received a cash payment in lieu of receiving fractional shares. In addition, as a result of the Reverse Stock Split, proportionate adjustments will be made to the number of shares of common stock underlying the Company's outstanding equity awards, the number of shares issuable upon the exercise of the Company's outstanding warrants and the number of shares issuable under the Company's equity incentive plans and certain existing agreements, as well as the exercise, grant and acquisition prices of such equity awards and warrants, as applicable. The Reverse Stock Split was approved by the Company's stockholders at the Company's 2023 Annual Meeting of Stockholders on August 7, 2023 and was subsequently approved by the Board of Directors on August 7, 2023.

The effects of the Reverse Stock Split have been reflected in this Amended Quarterly Report on Form 10-Q/A for all periods presented.

*Preferred Stock*

Pursuant to the Company's charter, the Company is authorized to issue 1,000,000 shares of preferred stock, par value $0.001 per share. Our board of directors has the authority without action by the stockholders, to designate and issue shares of preferred stock in one or more classes or series, and the number of shares constituting any such class or series, and to fix the voting powers, designations, preferences, limitations, restrictions and relative rights of each class or series of preferred stock, including, without limitation, dividend rights, conversion rights, redemption privileges and liquidation preferences, which rights may be greater than the rights of the holders of the common stock. As of March 31, 2024, there were no shares of preferred stock issued and outstanding.

*Common Stock*

Our Charter authorizes the issuance of an aggregate of 500,000,000 shares of Common Stock, par value $0.001 per share. The shares of Common Stock are duly authorized, validly issued, fully paid and non-assessable. Our purpose is to engage in any lawful act or activity for which corporations may now or hereafter be organized under the DGCL. Unless our Board determines otherwise, we will issue all shares of our common stock in an uncertificated form. Holders of our Common Stock are entitled to one vote for each share held of record on all matters submitted to a vote of stockholders. The holders of Common Stock do not have cumulative voting rights in the election of directors. Upon our liquidation, dissolution or winding up and after payment in full of all amounts required to be paid to creditors and to the holders of preferred stock having liquidation preferences, if any, the holders of our Common Stock will be entitled to receive pro rata our remaining assets available for distribution.

As of December 31, 2023 and December 31, 2022, 2,877,045 and 2,527,045 shares of Common Stock, post reverse stock split, respectively, were outstanding. During the year ended December 31, 2022, the Company issued the following shares of common stock. No similar issuances occurred in 2023.

| | |
|---|---|
| Issuance of Common Stock for legal settlement | 3,000 |
| Exercise of options (Note 10) | 3,006 |
| Restricted stock award | 8,224 |
| **Total** | **14,230** |

*Public Warrants*

The Public Warrants became exercisable 30 days after the Closing; the Company has an effective registration statement under the Securities Act covering the shares of common stock issuable upon exercise of the Public Warrants and a current prospectus relating to them is available (or the Company permits holders to exercise their Public Warrants on a cashless basis and such cashless exercise is exempt from registration under the Securities Act). The S-1 registration became effective November 24, 2021. The Public Warrants will expire five years after October 29, 2021, which was the completion of the TDAC Combination or earlier upon redemption or liquidation.

The Company may redeem the Public Warrants:

- in whole and not in part;
- at a price of $0.01 per warrant;
- upon a minimum of 30 days' prior written notice of redemption;
- if, and only if, the last sale price of the Company's common stock equals or exceeds $320.00 per share for any 20 trading days within a 30-trading day period ending on the third trading day prior to the date on which the Company sends the notice of redemption to the warrant holders; and
- if, and only if, there is a current registration statement in effect with respect to the shares of common stock underlying such warrants at the time of redemption and for the entire 30-day trading period referred to above and continuing each day thereafter until the date of redemption.

If the Company calls the Public Warrants for redemption, management will have the option to require all holders that wish to exercise the Public Warrants to do so on a "cashless basis," as described in the warrant agreement. These warrants cannot be net cash settled by the Company in any event.

After giving effect to the Business Combination, as of March 31, 2024 there were Public Warrants outstanding for the issuance of 1,006,250 shares of common stock of the Company, which total includes previously issued warrants of AutoLotto, now warrants of Lottery.com Inc., which are exercisable for the purchase of an aggregate of 19,784 shares of common stock of the Company.

Private Warrants

Private warrants of TDAC issued before the business combination were forfeited and did not transfer to the surviving entity.

*Unit Purchase Option*

On June 1, 2018, the Company sold to the underwriter (and its designees), for $100, an option to purchase up to a total of 87,500 Units exercisable at $240.00 per Unit (or an aggregate exercise price of $21,000,000) commencing on the consummation of the Business Combination. The 87,500 Units represents the right to purchase 87,500 shares of common stock and 87,500 warrants to purchase 87,500 shares of common stock. The unit purchase option, which was exercisable for cash or on a cashless basis, at the holder's option, expired on May 29, 2023. The Units issuable upon exercise of this option were identical to those offered by Lottery.com. The Company accounted for the unit purchase option, inclusive of the receipt of $100 cash payment, as an expense of the Business Combination resulting in a charge directly to stockholders' equity. As of December 31, 2023 all of the 87,500 Units have been forfeit.

*Common Stock Warrants*

The Company did not issue any warrants during the three months ended March 31, 2024 and the year ended December 31, 2023. All 24,415 outstanding warrants are fully vested and have a weighted average remaining contractual life of 2.7 years. The Company did not incur any expense for the three months ended March 31, 2024 or the year ended December 31, 2023.

| | Number of Shares | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Outstanding at December 31, 2022 | 24,415 | $ 0.11 | 2.82 | $ 1,200,387 |
| Granted | - | - | - | 0 |
| Exercised | - | - | - | |
| Forfeited/cancelled | - | - | - | |
| Outstanding at December 31, 2023 | 24,415 | 0.11 | 1.82 | 1,200,387 |
| Granted | - | - | - | |
| Exercised | - | - | - | |
| Forfeited/cancelled | - | - | - | |
| Outstanding at March 31, 2024 | 24,415 | $ 0.11 | 1.57 | $ 1,200,387 |

*Beneficial Conversion Feature - Convertible Debt*

As detailed in *Note 9* - Notes Payable and Convertible Debt, the Company has issued two series of convertible debt. Both issuances resulted in the recognition of the beneficial conversion features contained within both of the instruments. The Company recognized the proceeds allocable to the beneficial conversion feature of $8,480,697 as additional paid in capital and a corresponding debt discount of $2,795,000. This additional paid in capital is reflected in the accompanying consolidated Statements of Equity.

*Earnout Shares*

As detailed in *Note 3* - as part of the TDAC Combination as of December 31, 2021 a total of 5,000,000 Earnout Shares were eligible for issuance until December 31, 2022. Conditions for the earnout were not met and the potential earnout shares were forfeited on December 31, 2022.

**Note 11. Stock-based Compensation**

**Expense** *2015 Stock Option Plan*

Prior to the closing of the Business Combination, AutoLotto had the AutoLotto, Inc. 2015 Stock Option/Stock Issuance Plan (the "2015 Plan") in place. Under the 2015 Plan, incentive stock options may be granted at a price not less than fair market value of the common stock (110% of fair value to holders of 10% or more of voting stock). If the Common Stock is at the time of grant listed on any Stock Exchange, then the Fair Market Value shall be the closing selling price per share of Common Stock on the date in question on the Stock Exchange, as such price is officially quoted in the composite tape of transactions on such exchange and published in The Wall Street Journal. If there is no closing selling price for the Common Stock on the date in question, then the Fair Market Value shall be the closing selling price on the last preceding date for which such quotation exists. If the Common Stock is at the time neither listed on any Stock Exchange, then the Fair Market Value shall be determined by the Board of Directors or the Committee acting in its capacity as administrator of the Plan after taking into account such factors as the Plan Administrator shall deem appropriate. The maximum number of shares of Common Stock which may be issued over the term of the Plan shall not exceed Twenty-Two Thousand Five Hundred (22,500). Options are exercisable over periods not to exceed 10 years (five years for incentive stock options granted to holders of 10% or more of voting stock) from the date of grant. Shares of Common Stock issued under the Stock Issuance Program may, in the discretion of the Plan Administrator, be fully and immediately vested upon issuance or may vest in one or more instalments over the Participant's period of Service or upon attainment of specified performance objectives. The Plan Administrator may not impose a vesting schedule upon any option grant or the shares of Common Stock subject to that option which is more restrictive than twenty percent (20%) per year vesting, with the initial vesting to occur not later than one (1) year after the option grant date. However, such limitation shall not be applicable to any option grants made to individuals who are officers of the Corporation, non-employee Board members or independent consultants.

*2021 Equity Incentive Plan*

In connection with the Business Combination, our board of directors adopted, and our stockholders approved, the Lottery.com 2021 Incentive Award Plan (the "2021 Plan") under which 616,518 shares of Class A common stock were initially reserved for issuance. The 2021 Plan allows for the issuance of incentive and non-qualified stock options, stock appreciation rights, restricted stock, restricted stock units and other stock or cash-based awards. The number of shares of the Company's Class A common stock available for issuance under the 2021 Plan increases annually on the first day of each calendar year, beginning on and including January 1, 2022 and ending on and including January 1, 2031 by a number of shares of Company common stock equal to five percent (5%) of the total outstanding shares of Company common stock on the last day of the prior calendar year. Notwithstanding the foregoing, the Board may act prior to January 1st of a given year to provide that there will be no such increase in the share reserve for such year or that the increase in the share reserve for such year will be a lesser number of shares of Company common stock than would otherwise occur pursuant to the preceding sentence. As of December 31, 2023, the Company has not granted awards under the 2021 Plan.

*2023 Equity Incentive Plan*

On October 10, 2023, the Board adopted the Lottery.com 2023 Employees' Directors' and Consultants Stock Issuance and Option Plan (the "2023 Plan") under which 500,000 shares of Class A common stock were initially reserved for issuance. The 2023 Plan allows for the issuance of incentive and non-qualified stock options, and restricted stock. As of December 31, 2023, the Company

had awarded 350,000 shares under the 2023 Plan. The company granted an additional 1.85 million fully-vested shares during the quarter ended March 31, 2024.

*Stock Options*

The Company did not issue any new stock options during the quarter ended March 31, 2024. The following table shows stock option activity for the years ended December 31, 2023 and quarter ended March 31, 2024:

| | Shares Available for Grant | Outstanding Stock Awards | Average Exercise Price | Weighted Remaining Contractual Life (years) | Weighted Average Aggregate Intrinsic Value |
|---|---|---|---|---|---|
| Outstanding at December 31, 2023 | 10,455 | 17,283 | $ 8.20 | 2.4 | $ 944,544 |
| Granted | - | - | - | - | |
| Exercised | - | - | - | - | |
| Forfeited/cancelled | - | - | - | - | |
| Outstanding at March 31, 2024 | 10,455 | 17,283 | $ 8.20 | 2.4 | $ 944,544 |

*Restricted awards*

The Company awarded restricted stock to employees on October 28, 2021, which were granted with various vesting terms including immediate vesting, service-based vesting, and performance-based vesting. In accordance with ASC 718, the Company has classified the restricted stock as equity.

For employee issuances, the measurement date is the date of grant, and the Company recognizes compensation expense for the grant of the restricted shares, over the service period for the restricted shares that vest over a period of multiple years and for performance-based vesting awards, the Company recognizes the expense when management believes it is probable the performance condition will be achieved. As of December 31, 2021, the Company had granted 191,622 shares with vesting to begin April 2022. For the year ended December 31, 2022, the Company recognized $27,137,991 of stock compensation expense related to the employee restricted stock grants. As of December 31, 2023, unrecognized stock-based compensation associated with the restricted stock awards is $0.

The Company had restricted stock activity summarized as follows:

| | Number of Shares | Weighted Average Grant Fair Value |
|---|---|---|
| Outstanding at December 31, 2023 | - | $ - |
| Granted | 3,101,277 | 1.40 |
| Vested | 3,101,277 | 1.40 |
| Forfeited/cancelled | - | - |
| Restricted shares unvested at March 31, 2024 | - | $ - |

**Note 12. Income Taxes**

We are required to file federal and state income tax returns in the United States. The preparation of these tax returns requires us to interpret the applicable tax laws and regulations in effect in such jurisdictions, which could affect the amount of tax paid by us. In consultation with our tax advisors, we base our tax returns on interpretations that are believed to be reasonable under the circumstances. The tax returns, however, are subject to routine reviews by the various federal and state taxing authorities in the jurisdictions in which we file tax returns. As part of these reviews, a taxing authority may disagree with respect to the income tax positions taken by us ("uncertain tax positions") and, therefore, may require us to pay additional taxes. As required under applicable accounting rules, we accrue an amount for our estimate of additional income tax liability, including interest and penalties, which we could incur as a result of the ultimate or effective resolution of the uncertain tax positions. We account for income taxes using the asset and liability method. Under the asset and liability method, deferred tax assets and liabilities are recognized for the future tax consequences attributed to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax basis. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences and carry-forwards are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. A valuation allowance is established when necessary to reduce deferred tax assets to amounts expected to be realized.

**Note 13. Commitments and Contingencies**

*Indemnification Agreements*

The Company enters into indemnification provisions under its agreements with other entities in its ordinary course of business, typically with business partners, customers, landlords, lenders and lessors. Under these provisions, the Company generally indemnifies and holds harmless the indemnified party for losses suffered or incurred by the indemnified party as a result of the Company's activities or, in some cases, as a result of the indemnified party's activities under the agreement. The maximum potential amount of future payments the Company could be required to make under these indemnification provisions is unlimited. The Company has not incurred material costs to defend lawsuits or settle claims related to these indemnification agreements. As a result, the Company believes the estimated fair value of these agreements is minimal. Accordingly, the Company has no liabilities recorded for these agreements as of December 31, 2023 and 2022.

*Digital Securities*

In 2018, the Company commenced a sale offering and issuance (the "LDC Offering") of 285 million revenue participation interests (the "Digital Securities") of the net raffle revenue of LDC Crypto Universal Public Company Limited ("LDC"). The Digital Securities do not have any voting rights, redemption rights, or liquidation rights, nor are they tied in any way to other equity securities of LDC or the Company nor do they otherwise hold any rights that a holder of equity securities of LDC or the Company may have or that a holder of traditional equity securities or capital stock may have. Rather, each of the holders of the Digital Securities has a pro rata right to receive 7% of the net raffle revenue. If the net raffle revenue is zero for a given period, holders of the Digital Securities are not eligible to receive any cash distributions from any raffle sweepstakes of LDC for such period. For the years ended December 31, 2023 and December 31, 2022, the company did not incur any obligations to the holders of the outstanding Digital Securities. For the year ended December 31, 2021, the Company incurred an obligation to pay an aggregate amount of approximately $5,632 to holders of the outstanding Digital Securities. The Company did not satisfy any of those obligations during the three months ended March 31, 2024 or the years ended December 31, 2023, 2022, or 2021.

*Leases*

The Company leased office space in Spicewood, Texas which expired January 31, 2024 and has continued to utilize that facility on a month-to-month basis with monthly rent of $1,669 per month. Additionally, the Company has leased retail space in Waco, TX which expires on December 31, 2024 with monthly rent of $2,434. For the year ended December 31, 2023, the Company's total rent expense was approximately $61,960.

As of March 31, 2024, future minimum rent payments due under non-cancellable leases with initial are as follows:

| Years ending December 31, | | Amount |
|---|---|---|
| 2024 | | 21,907 |
| Thereafter | | - |
| | $ | 21,907 |

*Litigation and Other Loss Contingencies*

As of March 31, 2024, there were no pending proceedings that are deemed to be materially detrimental. The Company is a party to legal proceedings in the ordinary course of its business. The Company believes that the nature of these proceedings is typical for a company of its size and scope. See *Part II, Item 1* for additional information.

**Note 14. Related Party Transactions**

The Company has entered into transactions with related parties. The Company regularly reviews these transactions; however, the Company's results of operations may have been different if these transactions were conducted with nonrelated parties.

During the year ended December 31, 2020, the Company entered into borrowing arrangements with the individual founders to provide operating cash flow for the Company. The Company paid $4,700 during 2021 and the outstanding balance was $13,000 on December 31, 2023 and December 31, 2022.

During the years ended December 31, 2021 and 2020, the Company entered into a services agreement with Master Goblin Games, LLC ("Master Goblin Games"), an entity owned by Ryan Dickinson, a former officer of the Company, to facilitate the establishment of receipt of retail lottery licenses in certain jurisdictions. As of December 31, 2023, the Company had no outstanding related party payables.

Pursuant to the Service Agreement, Master Goblin was authorized and approved by the Company to incur up to $100,000 in initial expenses per location for the commencement of operations at each location, including, without limitation, tenant improvements, furniture, inventory, fixtures and equipment, security and lease deposits, and licensing and filing fees. Similarly, pursuant to the Service Agreement, during each month of operation, Master Goblin was authorized to submit to the Company for reimbursement on-going expenses of up to $5,000 per location for actually incurred lease expenses. The initial expenses were submitted by Master Goblin to the Company upon Master Goblin securing a lease and leases were only secured by Master Goblin in any location upon request of the Company. Such initial expenses were recorded by the Company as lease obligations. On-going expenses were submitted by Master Goblin to the Company on a monthly basis, subject to offset, and were recorded by the Company as an expense. To the extent Master Goblin had a positive net income in any month, exclusive of the sale of lottery games, such net income reduced or eliminated such reimbursable expenses for that month.

In January 2023, Woodford Eurasia Assets, Ltd. signed a letter of intent to acquire Master Goblin. Such letter of intent would give Woodford the right to appoint a director to the Board of Directors of the Company (see Subsequent Events). As of the date of this Report, no definitive documentation for this transaction has been signed.

The Company paid Master Goblin an aggregate of approximately $53,000 and $440,000, including expense reimbursements under the Service Agreement and additional reimbursable expenses, during the years ended December 31, 2023 and 2022, respectively. In January of 2023, the company paid $53,000 to Master Goblin Games for settlement of outstanding obligations of $316,919 and the parties mutually agreed to terminate the business relationship.

**Note 16. Subsequent Events**

On April 1, 2024, Lottery.com resumed its sweepstakes offerings through its partnership with the WinTogether.org foundation (DBA: DonateTo.Win). The initial sweepstakes will be active until at least September 30,2024.

On April 10, 2024, the company received notification from Nasdaq that the matter surrounding the Company's deficiency in meeting the minimum $5,000,000 threshold for the Market Value of Publicly Held Shares ("MVPHS") had been cured and the matter had been closed.

On April 29, 2024, the Board of Directors of the Company approved the addition of Mr. Warren Macal as a member of the Company's Board of Directors. Macal's nomination follows the December 2023 $18 million investment commitment from Prosperity Investment Management subject to due diligence.

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

*The following discussion and analysis of our financial condition and results of operations together with the condensed consolidated financial statements and the related notes appearing elsewhere in this Report contains forward-looking statements that involve risks and uncertainties. Our actual results and the timing of events may differ materially from those expressed or implied in such forward- looking statements as a result of various factors, including those set forth in the section entitled "Cautionary Note Regarding Forward-Looking Statements" included herein and the sections entitled "Risk Factors" included in this Report and in our Annual Report on Form 10-K/A for the year ended December 31, 2023 (our "Annual Report").*

**Overview**

During FY 2023, the Company addressed legacy issues while successfully regaining full compliance with Nasdaq's continued listing rules and restarting operations in order to stage Lottery.com for growth in FY 2024. The cornerstone of the Company's operational progress for FY 2024 will be driven by technology, product and service/capability enhancements.

This Amended Report is reflective of the Company's commitment to transparency, integrity, and responsible corporate governance. The investment commitments from United Investments Capital London, Univest Securities LLC, and Prosperity Investment Management outlined in this report are evidence of investor belief in Management's capability to resume core lottery and gaming operations, monetize the Sports.com brand, and expand all the Company's brand across the globe.

***Internal Investigation and Operational Cessation***

On July 6, 2022, the Company announced that the Audit Committee (the "Audit Committee") of the board of directors of the Company (the "Board") had retained outside counsel to conduct an independent investigation that revealed instances of non-compliance with state and federal laws concerning the states in which lottery tickets were procured as well as order fulfillment. The investigation also identified issues pertaining to the Company's internal accounting controls (the "Internal Investigation"). Following a report on the filings of the Internal Investigation, on June 30, 2022, the Board terminated the employment of Ryan Dickinson as the Company's President, Treasurer and Chief Financial Officer, effective July 1, 2022. Subsequently, the Company initiated a review of its cash balances and related disclosures as well as its revenue recognition processes and other internal accounting controls.

On July 20, 2022, Armanino LLP ("Armanino"), the Company's registered independent public accountant for the fiscal years ended December 31, 2021 and 2020, advised the Company that its audited financial statements for the year ended December 31, 2021 (the "2021 Audit") and the unaudited financial statements for the quarter ended March 31, 2022 (the "March 2022 Financials"), should no longer be relied upon. Armanino advised that it had determined, subsequent to the 2021 Audit and review of the March 2022 Financials, that the Company had entered into a line of credit in January 2022 that was not disclosed in the footnotes to the 2021 Audit and was not properly recorded in the March 2022 Financials.

On July 28, 2022, the Board determined that the Company did not have sufficient financial resources to fund its operations or pay certain existing obligations, including its payroll and related obligations, due to a significant misstatement of our cash balances.

The following day, on July 29, 2022, the Company effectively ceased operations (the "Operational Cessation"), when it furloughed the majority of its employees and generally suspended its lottery game sales. The Company's remaining employees were limited to the heads of the product, information technology and human resources teams as well as the entire legal and compliance team. Within one week, several additional employees were recalled from furlough. All non-furloughed employees were retained, at the discretion of the Company's then Chief Operating Officer and Chief Legal Officer, to provide the minimal business functions needed to address the Company's legal and compliance issues and to secure necessary funding to resume the Company's operations. Only a few of these non-furloughed employees remain active in the efforts to restore Company operations and as of December 31, 2023, there remained approximately $3.85 million in outstanding payroll obligations that remained unpaid.

On September 27, 2022, Armanino resigned as the independent registered public accounting firm of the Company, effective immediately and subsequently, on October 7, 2022, the Audit Committee approved the engagement of Yusufali & Associates, LLC, ("Yusufali") as the Company's new independent registered public accounting firm.

Since the Operational Cessation, the Company has had minimal day-to-day operations and has primarily focused its operations on restarting certain of its core businesses (as described in more detail under "- *Plans for Recommencement of Company Operations*" below), and completing and filing the following (i) the restatements of the Company's 2021 Audit and March 2022 Financials and preparing and filing the Company's delinquent periodic reports, including Amendment No. 1 to the Company's Annual Report on Form 10-K/A for the year ended December 31, 2021, which the Company filed on May 10, 2023: (ii) Amendment No. 1 to the Company's Quarterly Report on Form 10-Q/A for the three months ended March 31, 2022, which the Company filed on May 15, 2023; (iii) the Company's Quarterly Reports on Form 10-Q for the three months ended June 30, 2022 and September 30, 2022, which the Company filed on May 22 and 24, 2023, respectively; (iv) the Company's Annual Report on Form 10-K for the year ended December 31, 2022, (v) the Company's Quarterly Report on Form 10-Q for the three months ended March 31, 2023; (vi) the Company's Quarterly Report on Form 10-Q for the three months ended June 30, 2023; (vii) the Company's Quarterly Report on Form 10-Q for the three months ended September 30, 2023; Amendment No. 1 to the Company's Annual Report on Form 10-K/A for the year ended December 31, 2023; and (vii) this Amended Report.

***Nasdaq Listing***

On March 23, 2023, the Company requested a hearing before the Nasdaq Hearings Panel (the "Panel") to appeal a determination by the Listing Qualifications department (the "Staff") of Nasdaq dated February 23, 2023, to delist the Company's securities from Nasdaq. At the hearing before the Panel on April 24, 2023, the Company presented its plan to complete the restatement of its financial statements for the fiscal year ended December 31, 2021, and the subsequent quarter ended March 31, 2022, and to file the amended periodic reports and all subsequent required filings with the SEC. The Company requested the continued listing of its securities on Nasdaq pending the completion of its compliance plan.

By letter dated May 8, 2023, the Panel granted the Company's request for continued listing, on an interim basis, subject to the Company submitting financial projections for fiscal 2023 and filing the restated financial statements for the fiscal year ended December 31, 2021, and quarter ended March 31, 2022, with the SEC by May 15, 2023. The Company satisfied these conditions and the Panel indicated that it would review the filings, along with the updated projections, and thereafter determine whether to afford the Company additional time to complete the compliance plan presented at the hearing.

By letter dated May 24, 2023, the Panel notified the Company that it had determined to suspend trading and otherwise move to delist the Company's securities from Nasdaq effective with the open of the market on May 26, 2023. The Company's securities were suspended from trading on that date, but the securities were not delisted because the Company thereafter requested that the Panel reconsider its determination to delist the Company's securities from Nasdaq based upon what the Company believed to be mistakes of material fact upon which the Panel had based its decision.

On June 8, 2023, the Panel notified the Company that it had determined to reverse its prior decision and grant the Company's request for continued listing subject to the Company's timely compliance with a number of conditions ultimately expiring on August 17, 2023, on which date the Company must satisfy all applicable criteria for continued listing on Nasdaq (the "June 8th Decision"). As a result of the foregoing, the suspension from trading ceased and the Company's securities were reinstated for trading on Nasdaq effective with the open of the market on June 15, 2023. See "*Risk Factors - Risks Related to Our Common Stock and Warrants – Although we are currently in full compliance with the continued listing standards of Nasdaq. However, we may not be able to remain in full compliance with Nasdaq's continued listing standards in the future*" for more information.

As reported on form 8-K filed on December 7, 2023, on November 29, 2023, the Company received a letter from Nasdaq stating that based upon its review of the Company's Market Value of Publicly Held Shares ("MVPHS") for the last 30 consecutive business days, the Company no longer met the minimum requirement of $5,000,000 set forth in Nasdaq Listing Rule 5450(b)(1)(C). However, under the Listing Rules, the Company was provided a 180-calendar day grace period to regain compliance, through May 28, 2024.

If at any time during the compliance period the Company's MVPHS closes at $5,000,000 or more for a minimum of ten consecutive business days, Nasdaq will provide written confirmation of compliance and the matter will be closed. The company received such notification from Nasdaq on April 10, 2024 and the matter was closed.

Furthermore, the requirement that we maintain a majority of independent directors and at least three members on our audit committee are Nasdaq requirements that we currently meet but have not met from time to time.

If the Company's securities are delisted from Nasdaq, it could be more difficult to buy and sell the Company's common stock and warrants or to obtain accurate quotations, and the price of the Company's common stock and warrants could suffer a material decline. Delisting could also impair the Company's ability to raise capital and/or trigger defaults and penalties under its outstanding agreements or securities. Further, even if we regain compliance with Nasdaq listing requirements, there is no guarantee that we will be able to maintain our listing for any period of time.

Delisting from Nasdaq could also result in negative publicity. Further, if we are delisted, we would also incur additional costs under state blue sky laws in connection with any sales of our securities. These requirements could severely limit the market liquidity of our common stock and/or warrants and the ability of our stockholders to sell our common stock and/or warrants in the secondary market. If our common stock and/or warrants are delisted by Nasdaq, our common stock and/or warrants may be eligible to trade on an over-the-counter quotation system, such as the OTCQB Market, where an investor may find it more difficult to sell our stock or obtain accurate quotations as to the market value of our common stock and/or warrants. In the event our common stock and/or warrants are delisted from The Nasdaq Global Market, we may not be able to list our common stock and/or warrants on another national securities exchange or obtain quotation on an over-the counter quotation system.

Delisting from Nasdaq could also result in negative publicity. Further, if we are delisted, we would also incur additional costs under state blue sky laws in connection with any sales of our securities. These requirements could severely limit the market liquidity of our common stock and/or warrants and the ability of our stockholders to sell our common stock and/or warrants in the secondary market. If our common stock and/or warrants are delisted by Nasdaq, our common stock and/or warrants may be eligible to trade on an over-the-counter quotation system, such as the OTCQB Market, where an investor may find it more difficult to sell our stock or obtain accurate quotations as to the market value of our common stock and/or warrants. In the event our common stock and/or warrants are delisted from The Nasdaq Global Market, we may not be able to list our common stock and/or warrants on another national securities exchange or obtain quotation on an over-the counter quotation system.

***AutoLotto $30,000,000 Business Loan***

On January 4, 2022, AutoLotto entered into a Business Loan Agreement (the "Business Loan") with bank prov, pursuant to which the Company borrowed $30,000,000 from bank prov, which was evidenced by a $30,000,000 Promissory Note. The Promissory Note accrued interest at the rate of 2.750% per annum (7.750% upon the occurrence of an event of default) and had a maturity date of January 4, 2024. Monthly interest payments were due under the Promissory Note beginning February 4, 2022. The Promissory Note could be repaid at any time without penalty. The Promissory Note included customary events of default for a debt obligation of the size of the Promissory Note. The Business Loan included representations and warranties of AutoLotto and covenants (both positive and negative) which were customary for a transaction of this nature and size, including rights to set off. Upon the occurrence of an event of default, Provident could declare the entire amount owed immediately due and payable. We were required to pay a 1% commitment fee at the time of our entry into the Business Loan, and another 1% annual loan fee would have been due on the first anniversary thereof.

In accordance with the terms of the Business Loan, upon entering into the agreement, $30,000,000 in a separate account with bank prov was pledged as security for the amount outstanding under the loan ("Collateral Security"). The $30,000,000 Collateral Security became restricted and remained restricted until October 12, 2022, when AutoLotto defaulted on its obligations under the Business Loan and bank prov foreclosed on the $30,000,000 of Collateral Security. The Collateral Security, which was in the form of restricted cash, was presented as a contingent liability on the Company's balance sheet from March 31, 2022 until the obligation was satisfied in October of 2022. See our consolidated financial statements for additional information.

***Loan Agreement with Woodford***

On December 7, 2022, the Company entered into a loan agreement with Woodford Eurasia Assets, Ltd. ("Woodford"), (the "Woodford Loan Agreement") pursuant to which Woodford agreed to provide the Company with up to $52.5 million, subject to certain conditions and requirements, of which, per the Company's books and records $798,351 was received by December 31, 2023 and is owed pursuant to the terms of the Woodford Loan Agreement. Amounts borrowed accrue interest at the rate of 12% per annum (or 22% per annum upon the occurrence of an event of default) and are due within 12 months of the date of each loan advance. Amounts borrowed can be repaid at any time without penalty.

Amounts borrowed pursuant to the Woodford Loan Agreement are convertible, at Woodford's option, into shares of the Company's common stock, beginning 60 days after the first loan date at the rate of 80% of the lowest publicly available price per share of common stock within 10 business days of the date of the Loan Agreement (which was equal to $5.60 per share), subject to a 4.99% beneficial ownership limitation and a separate limitation preventing Woodford from holding more than 19.99% of the issued and outstanding common stock of the Company, without the Company obtaining shareholder approval for such issuance.

Conditions to the Loan Agreement included the resignation of four prior members of the Board (Lisa Borders, Steven M. Cohen, Lawrence Anthony DiMatteo and William Thompson, all of whom resigned from the Board in September 2022), and the appointment of two new independent directors. Subsequent loans under the Woodford Loan Agreement also require the Company to comply with all listing requirements, unless waived by Woodford. The Woodford Loan Agreement also allows Woodford to nominate another director to the Board of Directors, in the event any independent member of the Board of Directors resigns.

Proceeds of the loans can only be used by to restart the Company's operations and for general corporate purposes agreed to by Woodford.

The Woodford Loan Agreement includes confidentiality obligations, representations, warranties, covenants, and events of default, which are customary for a transaction of this size and nature. Included in the Loan Agreement are covenants prohibiting us from (a) making any loan in excess of $1 million or obtaining any loan in an amount exceeding $1 million without the consent of Woodford, which consent may not be unreasonably withheld; (b) selling more than $1 million in assets; (c) maintaining less than enough assets to perform our obligations under the Loan Agreement; (d) encumbering any assets, except in the normal course of

business, and not in an amount to exceed $1 million; (e) amending or restating our governing documents; (f) declaring or paying any dividend; (g) issuing any shares which negatively affects Woodford; and (h) repurchasing any shares.

The Company also agreed to grant warrants to purchase shares of common stock to Woodford (the "Woodford Warrants") in an amount equal to 15% of the Company's then issued and outstanding shares of common stock. Each Woodford Warrant has an exercise price equal to the average of the closing price of the Company's common stock for each of the ten days prior to the first amount being debited from the bank account of Woodford, which equates to an exercise price of $5.60 per share. In the event the Company fails to repay the amounts borrowed when due or Woodford fails to convert the amount owed into shares, the exercise price of the warrants may be offset by amounts owed to Woodford, and in such case, the exercise price of the warrants will be subject to a further 25% discount.

In connection with our entry into the Woodford Loan Agreement, the Company also entered into a Loan Agreement Deed, Debenture Deed and Securitization, with Woodford (the "Security Agreement"), which provides Woodford with a first floating charge security interest over all present and future assets of the Company in order to secure the repayment of amounts owed under the Loan Agreement.

On June 12, 2023, the Company entered into an amendment of the Woodford Loan Agreement (the "Woodford Loan Agreement Amendment"). The Woodford Loan Agreement Amendment provides that Woodford shall henceforth be able to convert, in whole or in part, the outstanding balance of its loan into the conversion shares at a conversion price that represents a further 25% discount to the original conversion price of 20%. The validity and application of the Woodford Loan Agreement Amendment is disputed by the Company.

Despite requests from the Company, Woodford has repeatedly amongst other things: failed to prove the amounts borrowed by the Company or claimed to have been advanced by Woodford to the Company; failed to indicate if it would accept accelerated payment of those verified amounts; failed to provide an anti-money laundering acceptable account to which payment could be made by the Company and failed to explain failure to respond to requests for other funding to be accepted in the context of the Woodford Loan Agreement; failed to respond to requests for funding under the accordion facility of the Woodford Loan Agreement; and failed to respond to allegations of money laundering and conspiracy to defraud the Company and others.

Information regarding ongoing legal proceedings with Woodford can be found in the "Legal Proceedings" section of this form.

***Loan Agreement with United Capital Investments London Limited***

The Company entered into a credit facility (the "UCIL Credit Facility"), which is represented by a loan agreement, which was initially entered into on July 26, 2023, and was amended and restated on August 8, 2023, and subsequently amended on August 18, 2023 (as so amended, the "UCIL Loan Agreement"). The UCIL Loan Agreement is with United Capital Investments London Limited ("UCIL"), an entity in which each of Matthew McGahan, the Company's Chief Executive Officer and Chair of the Company's Board, and Barney Battles, a member of the Board, have a direct or indirect interest. The decision by the Company to enter into the UCIL Loan Agreement followed an acknowledgment by the Company that it had not received the requisite funding on a timely basis that it expected from Woodford, despite the Company making several requests to Woodford for said funding under the Woodford Loan Agreement. Moreover, the Board of Directors determined that it was in the best interest of the Company and its stockholders to enter into the UCIL Loan Agreement with UCIL, as an alternative lender to Woodford, upon receiving an event of default notice on July 21, 2023 (the "Default Notice") and an event of default and crystallization notice on July 25, 2023 (the "Crystallization Notice") from Woodford under the Woodford Loan Agreement. Neither McGahan or Battles participated in the vote on the UCIL agreement to ensure proper independence and correct corporate governance. On July 24, 2023, the Company responded to the Default Notice disputing that an event of default had occurred given the Company's earlier announcement that UCIL had agreed to enter into a funding arrangement with the Company. On July 27, 2023, the Company replied to the Crystallization Notice denying that an event of default occurred or continued, and further asserted that Woodford's attempt for crystallization was inappropriate and unlawful under the Woodford Loan Agreement. Given the uncertainty of the continued financing under the Woodford Loan Agreement, the Board of Directors sought to secure and formalize the Company's alternative funding by entering into the UCIL Loan Agreement.

***Placement Agent Agreement with Univest Securities, LLC***

As reported on form 8-K filed with the SEC on February 6, 2024, on December 6, 2023 , the Company entered into a placement agent agreement (the "Placement Agent Agreement") with Univest Securities, LLC (the "Placement Agent"), whereby the Placement Agent agreed to act as placement agent in connection with the Company's offering ("Offering") of units ("Units") up to $1,000,000; each Unit consisting of a convertible promissory note (each, a "Convertible Note" or collectively, the "Convertible Notes"), and a common stock purchase warrant (each, a "Warrant", or collectively, the "Warrants") to purchase shares of common stock of the Company, par value $0.001 per share (the "Common Stock") which include specific registration rights ("Registration Rights"), directly to one or more investors (each, an "Investor" and, collectively, the "Investors") through the Placement Agent.

On February 1, 2024, the parties agreed to increase the offering amount from $1,000,000 to $5,000,000. All other terms and conditions of the offering remain the same. The Securities shall be offered and sold pursuant to Section 4(a)(2) under the Securities Act of 1933, as amended (the "Securities Act").

***Business Combination***

On October 29, 2021, we, as AutoLotto, Inc. ("AutoLotto"), consummated the Business Combination with Trident Acquisitions Corp. ("TDAC" and after the Business Combination described herein, the "Company"), pursuant to the terms of that certain Business Combination Agreement, dated as of February 21, 2021 (the "Business Combination Agreement"), by and among TDAC, Trident Merger Sub II Corp., a wholly-owned subsidiary of TDAC ("Merger Sub") and AutoLotto. Pursuant to the terms of the Business Combination Agreement, Merger Sub merged with and into AutoLotto with AutoLotto surviving the merger as a wholly owned subsidiary of TDAC, which was renamed "Lottery.com Inc." The aggregate value of the consideration paid by TDAC to the holders of AutoLotto common stock in the Business Combination (excluding shares that may be issued to former AutoLotto stockholders (the "Sellers") as earnout consideration) was approximately $440 million, consisting of approximately 2,000,000 shares of common stock valued at $220.00 per share. In addition, each Seller shall receive its pro rata portion of 150,000 Seller Earnout Shares and each Founder Holder shall receive one-third of 100,000 Founder Holders Earnout Shares, subject to adjustments in the normal course of business.

***Reverse Stock Split***

On August 9, 2023, the Company amended its Charter to implement, effective at 5:30 p.m., Eastern time, a 1-for-20 Reverse Stock Split. At the effective time of the Reverse Stock Split, every 20 shares of common stock either issued and outstanding or held as treasury stock were automatically combined into one issued and outstanding share of common stock, without any change in the par value per share. Stockholders who would have otherwise been entitled to fractional shares of common stock as a result of the Reverse Stock Split received a cash payment in lieu of receiving fractional shares. In addition, as a result of the Reverse Stock Split, proportionate adjustments will be made to the number of shares of common stock underlying the Company's outstanding equity awards, the number of shares issuable upon the exercise of the Company's outstanding warrants and the number of shares issuable under the Company's equity incentive plans and certain existing agreements, as well as the exercise, grant and acquisition prices of

such equity awards and warrants, as applicable. The Reverse Stock Split was approved by the Company's stockholders at the Company's 2023 Annual Meeting of Stockholders on August 7, 2023 and was subsequently approved by the Board of Directors on August 7, 2023.

The effects of the Reverse Stock Split have been reflected in this Amended Quarterly Report on Form 10-Q/A for all periods presented.

***International Expansion***

In June 2021, we closed the acquisition of Global Gaming, which holds 80% of the equity of each of Aganar and JuegaLotto. Aganar operates in the licensed Online Lottery market in Mexico and is licensed to sell Mexican National Lottery draw games, instant win tickets, and other games of chance online with access to a federally approved online casino and sportsbook gaming license. JuegaLotto is licensed by Mexico authorities to commercialize international lottery games in Mexico through an authorized gaming portal and to commercialize games of chance in other countries throughout Latin America. As of the date of this Report, according to Statista, the estimated size of the Latin American lottery market is $.68 billion with a compound annual growth rate projected at 6.05% through 2028. Furthermore, it is projected that there will be 3,000,000 online lottery players in the South American lottery market alone by 2028. Based on these projections, we believe these acquisitions will provide opportunities for growth of our international operations throughout Mexico and Latin America as we expand our portfolio of products and expose our existing products to new markets.

**Operations Prior to Operational Cessation**

Prior to the Operational Cessation, the Company was a provider of domestic and international lottery products and services. As an independent third-party lottery game service, we offered a platform that we developed and operated to enable the remote purchase of legally sanctioned lottery games in the U.S. and abroad (the "Platform"). Our revenue generating activities included (i) offering the Platform via our Lottery.com app and our websites to users located in the U.S. and international jurisdictions where the sale of lottery games was legal and our services were enabled for the remote purchase of legally sanctioned lottery games (our "B2C Platform"); (ii) offering an internally developed, created and operated business-to-business application programming interface ("API") of the Platform, which enabled our commercial partners, in permitted U.S. and international jurisdictions, to purchase certain legally operated lottery games from us and to resell them to users located within their respective jurisdictions ("B2B API"); and (iii) delivering global lottery data, such as winning numbers and results, and subscriptions to data sets of our proprietary, anonymized transaction data pursuant to multi-year contracts to commercial digital subscribers ("Data Service").

***Mobile Lottery Game Platform Services***

Both our B2C Platform and our B2B API provided users with the ability to purchase legally sanctioned draw lottery games via a mobile device or computer, securely maintain their acquired lottery game, automatically redeem a winning lottery game, as applicable, and receive support, if required, for the claims and redemption process. Our registration and user interfaces were designed to be easy to use, provide for the creation of an account and purchase of a lottery game with minimum friction and without the creation of a mobile wallet or requirement to pre-load minimum funds and - importantly - to provide instant confirmation of the user's lottery game numbers, whether selected at random or picked by the user. Users of our B2C Platform services paid a service fee and, in certain non-U.S. jurisdictions, a mark-up on the purchase price. Prior to the Operational Cessation, we generated revenue from this service fee and mark-up. Our B2B API Platform resumed limited operations for the month of April 2023. As of the date of this Report, our B2C Platform is not currently available to the public. We anticipate that our B2C Platform will become available again by mid-year 2024.

***The WinTogether Platform***

Prior to the Operational Cessation, we operated and administered of all sweepstakes offered by WinTogether, a registered 501(c)(3) charitable organization ("WinTogether"), which was formed in April 2020 to support charitable, educational, and scientific causes. In consideration of our operation of the WinTogether platform and administration of the sweepstakes, we received a percentage of the gross donations to a campaign, from which we paid certain dividends and all administration costs.

The WinTogether platform continued operating after the Operational Cessation, until all sweepstakes campaigns were completed, and all prizes awarded. On March 29, 2023, the board of directors of WinTogether voted to suspend its relationship with the Company. The suspension of the relationship was rescinded by the WinTogether board on November 16, 2023

**Current Operations compare**

Despite the Operational Cessation, the Company's subsidiaries have continued to operate under the direction of the leadership teams that were in place prior to the Company's acquisition of such companies. While the operational activities of these subsidiaries vary, from the Operational Cessation through the date of this Report, each of TinBu, Aganar and JuegaLotto has decreased its expenses and has had its revenue remain consistent or decrease slightly from pre-Operational Cessation levels.

***Data Services***

In 2018, we acquired TinBu, LLC ("TinBu"), a digital publisher and provider of lottery data results, jackpots, results, and other data, as a wholly-owned subsidiary. Through TinBu, our Data Service delivers daily results of over 800 domestic and international lottery games from more than 40 countries, including the U.S., Canada, and the United Kingdom, to over 400 digital publishers and media organizations. See "*Item 1A. Risk Factors – We are party to pending litigation and investigations in various jurisdictions and with various plaintiffs and we may be subject to future litigation or investigations in the operation of our business. An adverse outcome in one or more proceedings could adversely affect our business, financial condition, and results of operations*" for more information about our relationship with TinBu.

Our technology pulls real time primary source data, and, in some instances, we acquire data from dedicated data feeds from the lottery authorities. Our data is constantly monitored to ensure accuracy and timely delivery. We are not required to obtain licenses or approvals from the lottery authorities to pull this primary source data or to acquire the data from such dedicated feeds. Commercial acquirers of our Data Service pay a subscription for access to the Data Service and, for acquisition of certain large data sets, an additional per record fee.

We additionally enter into multi-year contracts pursuant to which we sell proprietary, anonymized transaction data pursuant to multi-year agreements and in accordance with our Terms of Service in consideration of a fee and in other instances provide the Data Service within a bundle of provided services.

***Aganar and JuegaLotto***

On June 30, 2021, we acquired 100% of the equity of Global Gaming Enterprises, Inc., a Delaware corporation ("Global Gaming"), which holds 80% of the equity of each of Medios Electronicos y de Comunicacion, S.A.P.I de C.V. ("Aganar") and JuegaLotto, S.A. de C.V. ("JuegaLotto"). JuegaLotto is federally licensed by the Mexican regulatory authorities with jurisdiction over the ability to commercialize lottery games in Mexico through an authorized federal gaming portal and to commercialize games of chance in other countries throughout Latin America. Aganar has been operating in the licensed Online Lottery market in Mexico since 2007 and has certain rights to sell Mexican National Lottery draw games, instant win tickets, and other games of chance online with access to a federally approved online casino and sportsbook gaming license and additionally issues a proprietary scratch lottery game in Mexico under the brand name Capalli. See "*Item 1A. Risk Factors – We need additional capital to, among other things, support and restart our operations, re-hire employees and pay our expenses. Such capital may not be available on commercially acceptable terms, if at all. If we do not receive the additional capital, we may be forced to curtail or abandon our plans to recommence our operations and we may need to permanently cease our operations"* for additional information.

***Nook Holdings, LTD***

On September 28, 2023, the company entered into Stock Purchase Agreement with the shareholders of Nook Holdings Limited ("Nook"), a private limited company incorporated and registered in the Abu Dhabi Global Market, Abu Dhabi, United Arab Emirates ("UAE"). The total purchase price is approximately $2.314 million. The Company made three payments totaling $137,500 in the fourth quarter and anticipates the transaction closing by June 30, 2024 or as otherwise agreed by the parties. Nook is known for its innovative approach to co-working in Dubai and has procured 200 licenses for individuals and companies in the sports, health and wellness sector seeking access to Dubai and the broader Middle Eastern market. With its exclusive partnership with the Dubai Multi-Commodities Centre Free Zone (DMCC), Nook offers a wide range of services, including business setup support, insurance, VAT registration, and networking opportunities for like-minded sports entrepreneurs. As part of the acquisition, Nook will be rebranded under the Sports.com umbrella.

***Sports.com***

In December 2021, we finalized the acquisition of the domain name https://sports.com and on November 15, 2022, we formed a wholly-owned subsidiary called Sports.com, Inc., a Texas corporation ("Sports.com"). Subsequently, Sports.com announced a partnership with the Saudi Motorsports Company, which enabled the Company to roll out the Sports.com brand at the FIFA World Cup decider at the end of November 2022. In December 2022, Sports.com signed an agreement with Data Sports Group, GmbH ("DSG"), which provides Sports.com the exclusive North American distribution rights for sports data products offered and maintained by DSG (the "DSG Data"). The DSG Data is being sold through the same sales resources and sales channels as the lottery data offered by TinBu. On July 23, 2023, DSG exercised its right to terminate the exclusive distribution rights due to Sports.com not meeting its contractual obligations.

As reported on form 8-K filed with the SEC on February 9, 2024, on February 5, 2024, the Company entered into a Memorandum of Understanding (the "MOU") with WA Technology Group Limited ("WATG"), whereby the Company has agreed to pay WATG a total of $500,000 US dollars in restricted common stock at a price of $3.00 per share. A second payment by Lottery.com to WATG shall be due in five years and 2 months from the date of the definitive agreement to be signed by the parties at a later date. The total consideration for the second payment is the equivalent of $500,000 US dollars in restricted common stock at market value on the date the second payment is due. In addition, the Company will nominate an individual (at a later date) from WATG to act as a dedicated consultant to the Company for the purpose of expanding its brand, ticket sales and global operations. In exchange, the Company shall own a non-exclusive perpetual single use license for WATG's Lottery Player & Account Management Software ("PAM") and WATG shall provide its full spectrum of iGaming solutions to the Company to manage its global growth strategy. The parties shall co-operate and collaborate with one another's businesses and shall enter a more definitive agreement at a later date. Not a subsequent event for Q1 which ended March 31, 2024

As reported on form 8-K filed with the SEC on February 21, 2024, on February 15, 2024, the Company entered into a Memorandum of Understanding (the "MOU") with S&MI Ltd. ("SportLocker.com"), whereby it agreed to pay the shareholders of S&MI Ltd. a total of $1,000,000 in restricted common stock at a valuation of $3.00 per share. The first payment of $150,000 in restricted common stock (50,000 shares) of the Company is due and payable not later than June 15, 2024. The remaining payments in restricted common stock to the shareholders of S&MI Ltd. by the Company will be made as follows: (i) a second payment of $212,500 (70,833 shares) due on or before August 14, 2024; (ii) a third payment, of $212,500 (70,833 shares) due on or before November 12, 2024; (iii) a fourth payment of $212,500 (70,833 shares) due on or before February 10, 2025; and (vi) a final and fifth payment of $212,500 (70,834 shares) due on or before May 16, 2025. The terms and conditions set forth in the MOU shall be incorporated into a

definitive agreement to be entered into by the parties with a Closing Date on or before June 30, 2024 or as otherwise agreed to by the parties.

In addition, the Company has agreed to make available to the business of SportLocker.com, cash, media credits or combination thereof over the twelve months following the Closing Date as additional capital investment into the business plan, to facilitate brand awareness, user acquisition and general performance marketing and promotion, influencer and subscription campaigns and branding activities of S&MI's streaming and social engagement, subject to the Company successfully raising a minimum of new capital.

On March 7, 2024, Sports.com, a wholly-owned subsidiary of the Company, announced by press release that it has launched the "Sports.com App". The App (which is available for download for free from all major app stores) connects sports content with audiences worldwide. By uniting a diverse community of sports enthusiasts across various genres, demographics, and countries, Sports.com plans to eliminate multiple cultural barriers and foster a global sports community. Not a subsequent event for Q1 which ended March 31, 2024

On March 28, 2024, Sports.com, a wholly-owned subsidiary of the Company, announced by press release that it has obtained the rights to live stream the March 31, 2024 heavyweight title fight between Frazier Clarke and Fabio Wardley. The live stream was available to view for free for millions of sports fans in Africa, via the Sports.com website. Not a subsequent event for Q1 which ended March 31, 2024

The live streaming event is the result of a partnership between Sports.com, BOXXER, the fast-growing UK boxing promotional company, and Sky Sports in the UK and Ireland. Sports.com had entered into an agreement with BOXXER to provide live coverage through the Sports.com platform in Africa, via local telecom partners such as Vodacom, which will provide free access to millions of viewers.

This partnership underscores Sports.com's commitment to bringing inclusivity, innovation, and entertainment to sports. To view the live streaming event on Sports.com, African-based sports fans were able to sign up via local mobile operators to watch the fight on the Sports.com platform. Sports.com's strategic intent is to provide more such content to sports fans in underserved markets including those in the Middle East and Africa.

***Lottery.com and WA Technology Group***

As reported on form 8-K filed with the SEC on February 9, 2024, on February 5, 2024, the Company entered into a Memorandum of Understanding (the "MOU") with WA Technology Group Limited ("WATG"), whereby the Company has agreed to pay WATG a total of $500,000 US dollars in restricted common stock at a price of $3.00 per share. A second payment by Lottery.com to WATG shall be due in five years and 2 months from the date of the definitive agreement to be signed by the parties at a later date. The total consideration for the second payment is the equivalent of $500,000 US dollars in restricted common stock at market value on the date the second payment is due. In addition, the Company will nominate an individual (at a later date) from WATG to act as a dedicated consultant to the Company for the purpose of expanding its brand, ticket sales and global operations. In exchange, the Company shall own a non-exclusive perpetual single use license for WATG's Lottery Player & Account Management Software ("PAM") and WATG shall provide its full spectrum of iGaming solutions to the Company to manage its global growth strategy. The parties shall co-operate and collaborate with one another's businesses and shall enter a more definitive agreement at a later date.

**Plans for Recommencement of Company Operations**

As noted above, since the Operational Cessation, the Company has had minimal day-to-day operations and has primarily focused on restarting certain of its core businesses. The Company has developed a three-phase plan to recommence its operations, which plan is outlined below.

*Phase 1 - Relaunch B2B API Platform***.** During the Operational Cessation, the Company maintained positive relationships with its ticket-printing and courier partners, as well as several distribution partners that have been found to be in compliance with local, state, and federal rules related to ticket procurement and distribution. These partners have implemented the Lottery.com API and have advised the Company that they expect to be ready to offer lottery games to their customers through their sales channels when the Company resumes operations. As such, the Company believes that it has sufficient demand to resume operation of its B2B API platform operations, assuming it is able to maintain the core employee team to manage the lottery ticket fulfillment process and access sufficient capital to relaunch Project Nexus, which was designed to, among other things, handle high levels of user traffic and transaction volume, while maintaining expediency, security, and reliability in the administrative and back-office functionality required by the B2B API. Our B2B API Platform resumed limited operations in April 2023.

*Phase 2 - Resume B2C Platform Operations.* The Company believes that it will be in a position to relaunch its B2C Platform by mid-year 2024. As of the date of this Report, the Company expects that it will initially relaunch its B2C Platform to customers in Texas for a period of time before rolling it out to other jurisdictions. The Company may elect to accelerate the relaunch of its Platform to customers in another state. The Company plans to limit the rollout in order to give it additional time to properly vet and confirm compliance with local, state and federal rules related to ticket procurement and distribution. For more information, see "*Item 1A. Risk Factors - Regulatory and Compliance Risks - A jurisdiction may enact, amend, or reinterpret laws and regulations governing our operations in ways that impair our revenues, cause us to incur additional legal and compliance costs and other operating expenses, or are otherwise not favorable to our existing operations or planned growth, all of which may have a material adverse effect on us or our results of operations, cash flow, or financial condition*." The Company has also maintained various pre-paid media credits that it expects to use to launch and maintain promotional campaigns geared towards encouraging prior customers to return to the Platform and to acquire new customers.

*Phase 3 - Restore Other Business Lines and Projects.* Assuming the success of Phase 1 and Phase 2, the Company expects to restore other products it used to offer, such as supplying lottery tickets to consumers in approved domestic jurisdictions, partnering

with licensed providers in international jurisdictions to supply legitimate domestic lottery games, and reviving other products and services that were under development when the Operational Cessation occurred.

As of the date of this Report, the current estimated cash balance of the Company and subsidiaries is approximately $36,799. The Company believes that this cash on hand, along with future borrowings, will be sufficient for the Company to resume its core operations.

As of the date of this Report, our common stock and warrants are traded on The Nasdaq Stock Market LLC ("Nasdaq") under the ticker symbols "LTRY" and "LTRYW," respectively. As of the date of this Report, we are in compliance with Nasdaq's continued listing requirements (the "Listing Rules"). *See,* "*Risk Factors - Risks Related to Our Common Stock and Warrants – Although we are not currently in full compliance with the continued listing standards of Nasdaq, we may not be able to remain in full compliance with Nasdaq's continued listing standards in the future*." Additionally, under its new management, the Company continues to work to improve its disclosure and reporting controls. Also, the Company plans to overhaul its systems of internal control over financial reporting and invest in additional legal, accounting, and financial resources.

Even if the Company's three phase plan to recommence its operations is successful, there can be no assurance that the Company will be able to fully regain compliance with the applicable Listing Rules, or that the Nasdaq Panel will continue to stay the delisting of the Company's securities on Nasdaq. If the Company's securities are delisted from Nasdaq, it could be more difficult to buy or sell the Company's common stock and warrants or to obtain accurate quotations, and the price of the Company's common stock and warrants could suffer a material decline. Delisting could also impair the Company's ability to raise additional capital needed to fund its operations and/or trigger defaults and penalties under outstanding agreements or securities of the Company.

There can be no assurance that we will have sufficient capital to support our operations and pay expenses, repay our debt, or that additional funds will be available on favorable terms, if at all. We may not be able to restart our operations or generate sufficient funding to support such operations in the future. The Company's ability to continue its current operations, prepare and refile deficient and restated reports, and restart its prior operations, is dependent upon obtaining new financing. Future financing options available to the Company include equity financings, debt financings or other capital sources, including collaborations with other companies or other strategic transactions. Equity financings may include sales of common stock. Such financing may not be available on terms favorable to the Company or at all. The terms of any financing may adversely affect the holdings or rights of the Company's stockholders and may cause significant dilution to existing stockholders. There can be no assurance that the Company will be successful in obtaining sufficient funding on terms acceptable to the Company, if at all, which would have a material adverse effect on its business, financial condition and results of operations, and it could ultimately be forced to discontinue its operations and liquidate. These matters, when considered in the aggregate, raise substantial doubt about the Company's ability to continue as a going concern for a reasonable period of time, which is defined as within one year after the date that the financial statements are issued. The accompanying financial statements do not contain any adjustments to reflect the possible future effects on the classification of assets or the amounts and classification of liabilities that might result from the outcome of this uncertainty.

**Components of Our Results of Operations (Prior to the Operational Cessation)**

**Our Revenue**

*Revenue from B2C Platform.* Our revenue is the retail value of the acquired lottery game and the service fee charged to the user, which we impose on each lottery game purchased from our B2C Platform. The amount of the service fee is based upon several factors, including the retail value of the lottery game purchased by a user, the number of lottery games purchased by a user, and whether such user is located within the U.S. or internationally. Currently, in the U.S, the minimum service fee is $0.50 for the purchase of a $1 lottery game and $1 for the purchase of a $2 lottery game; the service fee for additional lottery games purchased in the same transaction is 6% of the face value of all lottery games purchased. For example, the service fee for the purchase of five $2 tickets is $1.60, comprised of the $1 base service fee, plus 6% of the aggregate value of the face value of all lottery games purchased. The Company did not operate its B2C platform in 2023.

Internationally, B2C sales in jurisdictions where we do not have direct or indirect authority generate an immaterial amount of revenue, and we are assessing our operations in these jurisdictions. As discussed above, our B2C Platform is not currently operational. We anticipate that our B2C Platform will become operational by mid-year 2024.

*Revenue from B2B API.* Together with our third-party commercial partner(s), we agree on the amount of the technology usage fee to be imposed on the sale of each lottery game purchased through the B2B API, if any, together with a service fee to be charged to the user; we receive up to 50% of the net revenues from such technology usage fee and service fee pursuant to our commercial agreement with each commercial partner. As discussed above, following the Operational Cessation, our B2B API Platform resumed limited operations in April 2023.

*Data Services.* Commercial acquirers of our Data Service pay a subscription for access to the Data Service and, for acquisition of certain large data sets, an additional per record fee. The Company additionally enters into multi-year contracts pursuant to which it sells proprietary, anonymized transaction data pursuant to multi-year agreements and in accordance with our Terms of Service in consideration of a fee. Our Data Services operations were not impacted by the Operational Cessation.

**Our Operating Costs and Expenses**

*Personnel Costs.* Personnel costs include salaries, payroll taxes, health insurance, worker's compensation and other benefits for management and office personnel.

*Professional Fees.* Professional fees include fees paid for legal and financial advisors, accountants and other professionals related to the Business Combination and other transactions.

*General and Administrative.* General and administrative expenses include marketing and advertising expenses, office and facilities lease payments, travel expenses, bank fees, software dues and subscriptions, expensed research and development ("R&D") costs and other fees and expenses.

*Depreciation and Amortization.* Depreciation and amortization expenses include depreciation and amortization expenses on real property and other assets.

**Key Trends and Factors Affecting Our Results**

The following describes the trends associated with our business prior to the Operational Cessation that have impacted, and which we expect will continue to impact, our business and results of operations in a material way:

*International operations*. We face challenges related to expanding our footprint globally and the related process of obtaining the licenses and regulatory approvals necessary to provide services and products within new and emerging markets. The international jurisdictions where we operate and seek to expand have been subject to increasing foreign currency fluctuations against the U.S. dollar, inflationary pressures and political and economic instability. We expect these trends to continue during fiscal 2024 and believe they are likely to affect consumer spending, which could have a material impact on our revenues. As a result, it may take longer to achieve projected revenue gains or generate cash in any such regions affected or any new foreign jurisdiction into which we expand.

*Introduction of a new gaming platform*. We developed a proprietary, blockchain-enabled gaming platform, which we named Project Nexus. Project Nexus is designed to handle high levels of user traffic and transaction volume, while maintaining expediency, security, and reliability in (i) the processing of lottery game sales, (ii) fulfillment of retail requirements of the B2C Platform, (iii) the administrative and back-office functionality required by our B2B API, and (iv) the requirements of our claims and redemption process. We expect to utilize this platform to launch new products, including any proprietary products we may introduce. The introduction of new technology like Project Nexus is subject to risks including, among other things, implementation delays, issues successfully integrating the technology into our solutions, or the possibility that the technology does not produce the expected benefits.

*Our growth plans and the competitive landscape.* Our direct competitors operate in the global entertainment and gaming industries and, like us, seek to expand their product and service offerings with integrated products and solutions. Our short-to-medium term focus is on increasing our penetration in our existing U.S. jurisdictions by increasing direct to consumer marketing campaigns, introducing our B2C Platform into new U.S. and select foreign jurisdictions and acquiring synergistic regulated and sports betting enterprises domestically and abroad.

Competition in the sale of online lottery games has significantly increased in recent years, is currently characterized by intense price-based competition, and is subject to changing technology, shifting needs and frequent introductions of new games, development platforms and services. To maintain our competitive edge alongside other established industry players (many of which have more resources, or capital), we expect to incur greater operating short-term expenses, such as increased marketing expenses, increased compliance expenses, increased personnel and advisory expenses associated with being a public company, additional operational expenses and salaries for personnel to support expected growth, additional expenses associated with our ability to execute on our strategic initiatives including our aim to undertake merger and acquisition activities, as well as additional capital expenditures associated with the ongoing development and implementation of Project Nexus.

**Current Plan of Operations**

As of the date of this Report, the Company's primary revenue drivers are the resumption of its B2B API platform and the launch of Sports.com. It is anticipated that operational costs for the next 12 months through April 30, 2024 will be greater than revenues. It is anticipated that the liquidity gap will be satisfied by equity investment or debt incurred, of which there is no assurance. We anticipate that our B2C Platform will become operational by mid-year 2024.

Beyond the next 12 months, the Company plans to continue to expand in domestic and international operations. The Moreover, the Company plans to enhance its mobile application to include pool plays, ticket subscriptions, loyalty programs and various gamification modules.

**Results of Operations**

Our consolidated financial statements have been prepared assuming that we will continue as a going concern and, accordingly, do not include adjustments relating to the recoverability and realization of assets and classification of liabilities that might be necessary should we be unable to continue in operation. We will require additional capital to meet our long-term operating requirements. We expect to raise additional capital through, among other things, the sale of equity or debt securities.

***Three Months Ended March 31, 2024 Compared to Three Months Ended March 31, 2023***

The following table summarizes our results of operations for the three months ended March 31, 2024 and March 31, 2023, respectively.

**For the three months Ended March 31, 2024 and 2023**

| | March 31, | | | |
|---|---|---|---|---|
| | **2024** | **2023** | **$ Change** | **% Change** |
| Revenue | $ 259,319 | $ 620,229 | (360,910) | -58% |
| Cost of revenue | 83,787 | 35,147 | 48,640 | 138% |
| Gross profit | 175,532 | 585,082 | (409,550) | -70% |
| Operating expenses: | | | | |
| Personnel costs | 984,679 | 1,257,434 | (272,755) | -22% |
| Professional fees | 3,204,048 | 739,928 | 2,464,120 | 333% |
| General and administrative | 296,652 | 337,328 | (40,676) | -12% |
| Depreciation and amortization | 1,284,982 | 1,405,480 | (120,498) | -9% |
| Total operating expenses | 5,770,361 | 3,740,170 | 2,030,191 | 54% |
| Loss from operations | (5,594,829) | $ (3,155,088) | 2,439,741 | 77% |
| Other expenses | | | | |
| Interest expense | 102,217 | 23 | 102,194 | % |
| Other (income) expense | 52,676 | 58,871 | (6,195) | -11% |
| Total other expenses, net | 154,893 | 58,894 | 95,999 | 163% |
| Net loss before income tax | $ (5,749,722) | $ (3,213,982) | 2,535,740 | 79% |
| Income tax expense (benefit) | 4,150 | - | 4,150 | -% |
| Net loss | (5,753,872) | (3,213,982 | 2,539,890 | 155% |

Revenue.

*Revenue*. Revenue for the three months ended March 31, 2024 was $259 thousand, a decrease of $361 thousand, or 58%, compared to revenue of $620 thousand for the three months ended March 31, 2023. Revenue from the TinBu subsidiary is approximately $320,000 lower for the three months ended March 31, 2024 than for the three months ended March 31, 2023. It appears that revenue from the TinBu subsidiary has begun to decline from pre–Operational Cessation levels. However, part of this difference may be due to timing and may be at least partially made up in the second quarter of 2024.

*Cost of Revenue*. Cost of revenue includes product costs, commission expense to affiliates and commercial partners, and merchant processing fees. Cost of revenue for the three months ended March 31, 2024 was $84 thousand, an increase of $49 thousand, or 138%, compared to cost of revenue of $35 thousand for the three months ended March 31, 2023. The increase in cost of revenue was driven by increases of approximately $20 thousand each for JuegaLotto and Aganar.

Gross Profit. Gross profit for the three months ended March 31, 2024 was $175 thousand compared to $585 thousand for the three months ended March 31, 2023, a decrease of $410 thousand, or 70%. This decrease was primarily due to lower revenue in the first quarter of 2024 as compared to the same period in 2023 and the increase in cost of revenue described above.

*Operating Costs and Expenses.*

**For the three months Ended**

| | March 31, | | | |
|---|---|---|---|---|
| | **2024** | **2023** | **$ Change** | **% Change** |
| Operating expenses: | | | | |
| Personnel costs | 984,679 | 1,257,434 | (272,755) | -22% |
| Professional fees | 3,204,048 | 739,928 | 2,464,120 | 333% |
| General and administrative | 296,652 | 337,328 | (40,676) | -12% |
| Depreciation and amortization | 1,284,982 | 1,405,480 | (120,498) | -9% |
| Total operating expenses | 5,770,361 | 3,740,170 | 2,030,191 | -54% |
| Loss from operations | (5,594,829) | $ (3,155,088) | 2,439,741 | -45% |

Operating expenses for the three months ended March 31, 2024 were $5.8 million, an increase of $2.1 million, or 54%, compared to $3.7 million for the three months ended March 31, 2023. The increase was primarily driven by an increase of $2.5 million in professional fees accompanied by decreases in general and administrative expenses and depreciation and amortization of $393 thousand. Reasons for these decreases are described below.

*Personnel Costs*. Personnel costs were $985 thousand for the three months ended March 31, 2024, a decrease of $273 thousand from $1.3 million for the three months ended March 31, 2023. The composition of the team is different for the three months ended March 31, 2024 than it was for the three months ended March 31, 2023, resulting in lower costs.

*Professional Fees*. Professional fees increased by $2.5 million or 333%, from $740 thousand for the three months ended March 31, 2023 to $3.2 million for the three months ended March 31, 2023. The increase was primarily due to payments made to outside attorneys, other consultants, and directors in the three months ended March 31, 2024. Activity levels for the business and these expenses were lower for the same period in 2023.

*General and Administrative*. General and administrative expenses were essentially the same for the three months ended March 31, 2024 and March 31, 2023.

*Depreciation and Amortization.* Depreciation and amortization decreased $120 thousand, or 9%, from $1.4 million for the three months ended March 31, 2024 to $1.3 million for the three months ended March 31, 2023. The decrease was primarily driven by write-offs to intangible assets related to Global Gaming for the year ended December 31 2023 as well as another intangible asset becoming fully amortized at the end of 2023 - - both of which resulted in lower amortization expense for the three months ended March 31, 2024.

Other (Income) Expense, Net.

| | For the three months Ended March 31, 2024 | 2023 | $ Change | % Change |
|---|---|---|---|---|
| Other expenses | | | | |
| Interest expense | 102,217 | 23 | 102,194 | % |
| Other (income) expense | 52,576 | 58,871 | (6,195) | -11% |
| Total other expenses, net | 154,893 | 58,894 | 95,999 | 163% |

*Interest Expense*. Interest expense for the three months ended March 31, 2024 was $102 thousand vs interest expense of $0 for 2023, an increase of $102 thousand. Interest expense in 2024 relates to the convertible notes from Woodford, UCIL, and Univest. In 2023, the company was working to meet tight deadlines to regain compliance with reporting requirements and inadvertently missed accruing interest in the first quarter. Interest accruals for 2023 were corrected in subsequent quarters.

*Other (Income) Expense*. Was essentially the same for the three months ended March 31, 2024 and 2023.

**Liquidity and Capital Resources**

Prior to the Operational Cessation, our primary need for liquidity was to fund working capital requirements of our business, growth, capital expenditures and for general corporate purposes. Our primary source of liquidity had historically been funds generated by financing activities. Upon the Closing of the business combination on October 29, 2021, we received net proceeds of approximately $42.8 million in cash.

Following the Operational Cessation, our primary need for liquidity has been to fund the restart of our business operations, re-hire employees and pay our expenses. The most likely source of such future funding presently available to us is through additional borrowings under loan agreements or through the issuance of equity or debt securities. If lenders do not advance us amounts as agreed under loan agreements or we are otherwise not able to secure the necessary capital to restart our operations, hire new employees, and obtain funding sufficient to support and restart our operations, we may be forced to permanently cease our operations, sell off our assets and operations, and/or seek bankruptcy protection, which could cause the value of our securities to become worthless.

These conditions, along with our current lack of material revenue producing activities, and significant debt, raise substantial doubt about our ability to continue as a going concern for the next 12 months. For more information, see *Note 2 - Significant Accounting Policies, Going Concern* to the consolidated financial statements included herein, as well as the risk factors included in Item 1A of this Report entitled "*In July 2022, we furloughed the majority of our employees and suspended our lottery game sales operations after determining that we did not have sufficient financial sources to fund our operations or pay certain existing obligations, including our payroll and related obligations. As a result, we may not be able to continue as a going concern*" and "*We need additional capital to, among other things, support and restart our operations, re-hire employees and pay our expenses. Such capital may not be available on commercially acceptable terms, if at all. If we do not receive the additional capital, we may be forced to curtail or abandon our plans to recommence our operations and we may need to permanently cease our operations.*"

***Prior Convertible Debt Obligations***

Prior to the Closing, we funded our operations through the issuance of convertible promissory notes.

From August to October 2017, the Company entered into seven Convertible Promissory Note Agreements with unaffiliated investors for an aggregate amount of $821,500. The notes bore interest at 10% per year, were unsecured, and were due and payable on

June 30, 2019. The Company and the noteholders executed amendments in February 2021 to extend the maturity date to December 21, 2021.

From November 2019 through October 28, 2021, we issued approximately $48.2 million in aggregate principal amount of Series B convertible promissory notes. The notes bore interest at 8% per year, were unsecured, and were due and payable on dates ranging from December 2020 to December 2022. For those promissory notes that would have matured on or before December 31, 2020, the parties extended the maturity date to December 21, 2021 through amendments executed in February 2021. The amendments also allowed for automatic conversion to equity as a result of the Business Combination. Nearly all of the aforementioned promissory notes automatically converted into shares of Common Stock or were terminated pursuant to their terms, as applicable, in connection with the Closing. Those that remain outstanding do not have conversion terms that were triggered by the Closing.

Immediately prior to the Closing, approximately $60.0 million of convertible debt was converted into equity of AutoLotto.

As of March 31, 2024, we had $3,270,993 of convertible debt outstanding. A portion of this debt has matured and a portion is in default.

See "*-Recent Developments- Loan Agreement with Woodford*" and *"Loan Agreement with United Capital Investments London Limited"* above for additional information.

**Cash Flows**

Net cash used in operating activities was $1.1 million for the three months ended March 31, 2024, compared to net cash used in operating activities of $968,000 for the three months ended March 31, 2023.

Net cash used in investing activities during the three months ended March 31, 2024 was $0, compared to $1 thousand for the prior year.

Net cash provided by financing activities was $700,000 for the three months ended March 31,2024, compared to net cash provided of $1 million for the three months ended March 31, 2023, which was $300 thousand lower year over year. In the quarter ended March 31, 2024 the Company received funding from Univest and UCIL.

**Emerging Growth Company Accounting Election**

Section 102(b)(1) of the JOBS Act exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies are required to comply with the new or revised financial accounting standards. The JOBS Act provides that a company can choose not to take advantage of the extended transition period and comply with the requirements that apply to non-emerging growth companies, and any such election to not take advantage of the extended transition period is irrevocable. We are an "emerging growth company" as defined in Section 2(a) of the Securities Act of 1933, as amended, and have elected to take advantage of the benefits of this extended transition period. We expect to remain an emerging growth company through the end of the 2023 fiscal year and we expect to continue to take advantage of the benefits of the extended transition period. This may make it difficult or impossible to compare the financial results with the financial results of another public company that is either not an emerging growth company or is an emerging growth company that has chosen not to take advantage of the extended transition period exemptions for emerging growth companies because of the potential differences in accounting standards used.

**Critical Accounting Policies and Estimates**

Our financial statements and the related notes thereto included elsewhere in this Report are prepared in accordance with U.S. Generally Accepted Accounting Principles (GAAP). The preparation of financial statements requires management to make estimates and assumptions that affect the reporting values of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenue and expenses during the reporting period. The more significant estimates and assumptions are those used in determining the recoverability of long-lived assets. Accordingly, actual results could differ from those estimates. To the extent that there are differences between our estimates and actual results, our future financial statement presentation, financial condition, results of operations and cash flow will be affected.

Our critical accounting policies are described under the heading "Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Policies and Estimates" in the Annual Report and the notes to the audited financial statements appearing elsewhere in the Annual Report. During the nine months ended September 30, 2023, there were no material changes to our critical accounting policies from those discussed in our 2022 Annual Report. In February 2016, the FASB issued ASU 2016-02, "Leases (Topic 842)." This guidance requires recognition of most lease liabilities on the balance sheet to give investors, lenders, and other financial statement users a more comprehensive view of a company's long-term financial obligations, as well as the assets it owns versus leases. ASU 2016-02 will be effective for fiscal years beginning after December 15, 2021, and for interim periods within annual periods after December 15, 2022. In July 2018, the FASB issued ASU 2018-11 making transition requirements less burdensome. The standard provides an option to apply the transition provisions of the new standard at its adoption date instead of at the earliest comparative period presented in the Company's financial statements. We are currently evaluating the impact that this guidance will have on our financial statements as well as the expected adoption method. The adoption of this standard will not have a material impact on our financial statements.

In June 2016, the FASB issued ASU 2016-13, "Financial Instruments – Credit Losses: Measurement of Credit Losses on Financial Instruments", as additional guidance on the measurement of credit losses on financial instruments. The new guidance requires the measurement of all expected credit losses for financial assets held at the reporting date based on historical experience, current conditions and reasonable supportable forecasts. In addition, the guidance amends the accounting for credit losses on available-for-sale debt securities and purchased financial assets with credit deterioration. The new guidance is effective for all public companies for interim and annual periods beginning after December 15, 2019, with early adoption permitted for interim and annual periods beginning after December 15, 2018. In October 2019, the FASB approved a proposal which grants smaller reporting companies additional time to implement FASB standards on current expected credit losses (CECL) to January 2023. As a smaller reporting company, we will defer adoption of ASU No. 2016-13 until January 2023. We are currently evaluating the impact this guidance will have on our condensed consolidated financial statements.

**Item 3. Quantitative and Qualitative Disclosures About Market Risk.**

As a "smaller reporting company" as defined by Rule 10(f)(1) of Regulation S-K, the Company is not required to provide this information.

**Item 4. Controls and Procedures.**

***Evaluation of Disclosure Controls and Procedures***

As previously disclosed, in connection with the filing of the Company's Annual Report on Form 10-K for the year ended December 31, 2021 (the "Original 2021 Annual Report") on April 1, 2022, our management, with the participation of our then Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of December 31, 2021. Based on their evaluation, our then Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2021, our disclosure controls and procedures were not effective due to material weaknesses in our internal control over financial reporting with respect to our financial statement close and reporting process.

In connection with the filing of Amendment No. 1 to the Company's Annual Report on Form 10-K/A for the year ended December 31, 2021 (the "Amended 2021 Annual Report"), our management, with the participation of our Chief Executive Officer, reevaluated the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of December 31, 2021 and determined they were not effective due to the material weaknesses in our internal control over financial reporting with respect to our financial statement close and reporting process. Our disclosure controls and procedures are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and that such

information is accumulated and communicated to our management, including our Chief Executive Officer, to allow timely decisions regarding required disclosures.

***Material Weakness in Internal Control Over Financial Reporting compare***

In connection with the audit of our condensed consolidated financial statements included in this Report, our management has identified material weaknesses in our internal control over financial reporting as of December 31, 2023 and 2022 relating to deficiencies in the design and operation of the procedures relating to the closing of our financial statements. These include: (i) our lack of a sufficient number of personnel with an appropriate level of knowledge and experience in accounting for complex or non-routine transactions, (ii) the fact that our policies and procedures with respect to the review, supervision and monitoring of our accounting and reporting functions were either not designed and in place or not operating effectively; (iii) our inability to complete the timely closing of financial books at the quarter and fiscal year end, and (iv) incomplete segregation of duties in certain types of transactions and processes.

Specifically, management did not design and maintain sufficient procedures and controls related to revenue recognition including those related to ensuring accuracy of revenue recognized from non-routine transactions such as the sales of LotteryLink Credits. As a result, we determined that there was an overstatement of revenue in the consolidated statement of operations of approximately $52.1 million during the year ended December 31, 2021, which required a restatement of the previously issued financial statements for the year ended December 31, 2021 contained in the Amended 2021 Annual Report.

We have begun implementing remediation steps to improve our internal control over financial reporting and to remediate the identified material weaknesses, including (i) adding personnel with sufficient accounting knowledge; (ii) adopting a more rigorous period-end review process for financial reporting; (iii) adopting improved period close processes and accounting processes, and (iv) clearly defining and documenting the segregation of duties for certain transactions and processes. Management has expanded and will continue to enhance our system of identifying transactions and evaluating and implementing the accounting standards that apply to our financial statements, including through enhanced analyses by our personnel and third-party professionals with whom we consult regarding complex accounting applications. We intend to continue take steps to remediate the material weaknesses described above and further continue re-assessing the design of controls, the testing of controls and modifying processes designed to improve our internal control over financial reporting. The Company plans to continue to assess its internal controls and procedures and intends to take further action as necessary or appropriate to address any other matters it identifies or are brought to its attention. We will not be able to fully remediate these material weaknesses until these steps have been completed and have been operating effectively for a sufficient period of time. The implementation of our remediation will be ongoing and will require validation and testing of the design and operating effectiveness of internal controls over a sustained period of financial reporting cycles. We may also conclude that additional measures may be required to remediate the material weaknesses in our internal control over financial reporting.

We cannot assure you that the measures we take will be sufficient to remediate the material weaknesses we identified or avoid the identification of additional material weaknesses in the future. If the steps we take do not remediate the material weaknesses in a timely manner, there could continue to be a reasonable possibility that this control deficiency or others could result in another material misstatement of our annual or interim financial statements that would not be prevented or detected on a timely basis.

For more information, see "*Item 1A. Risk Factors - Public Company Operating Risks - If we fail to implement and maintain an effective system of internal controls, we may be unable to accurately report our results of operations, meet our reporting obligations or prevent fraud, and investor confidence and the trading price of our common stock and warrants may be materially and adversely affected*."

***Changes in Internal Control Over Financial Reporting***

Except as otherwise described herein, there was no change in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) and 15d-15(d) of the Exchange Act that occurred during the quarter ended March 31, 2024 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

## PART II – OTHER INFORMATION

**Item 1. Legal Proceedings.**

The Company is from time to time a party to various lawsuits, claims and other legal proceedings that arise in the ordinary course of business. In addition, the Company is a party to several material legal proceedings, which are described below. The outcome of litigation is inherently uncertain. If one or more legal matters were resolved against the Company in a reporting period for amounts in excess of management's expectations, the Company's financial condition and operating results for that reporting period could be materially adversely affected.

**J. Streicher**

On July 29, 2022, the Company filed its original *Verified Complaint for Breach of Contract and Specific Performance* (the "Streicher Complaint") against J. Streicher Financial, LLC ("Streicher") in the Court of Chancery of the State of Delaware (the "Chancery Court"), styled *AutoLotto, Inc. dba Lottery.com v. J. Streicher Financial, LLC (Case No. 2022-0661-MTZ)*. In the Streicher Complaint, the Company alleged that Streicher breached the contract entered into by the parties on March 9, 2022 and demanded that Streicher return $16,500,000 it owes to the Company. On September 26, 2022, the Chancery Court entered an order in favor of the Company, *Granting with Modifications Company's Motion for Partial Summary Judgment* in the amount of $16,500,000 (the "Streicher Judgment"). On October 27, 2022, the Chancery Court further awarded the Company $397,037 in attorney's fees (the "Fee Order"). On November 15, 2022, the Company initiated efforts against Streicher to seek collections on the Judgment. On December 8, 2022, the Company's prior attorney Skadden, Arps, Slate, Meagher & Flom, LLP ("Skadden") filed its *Combined Motion to Withdraw as Counsel and For a Charging Lien* in amount of $3,024,201 for legal fees unpaid by Company ("Skadden's Motion"). On December 30, 2022, the Company filed its response to Skadden's Motion, alleging that the Chancery Court should deny Skadden's *Motion for a Charging Lien* as a matter of law or, in the alternative, limit the charging lien to the amount of the attorneys' fees awarded by the Fee Order. As of the date of this Report, the Chancery Court has not set Skadden's Motion for an oral hearing, nor has it entered an order on the motion. On January 20, 2023, faced with post-judgment discovery and depositions, Streicher remitted a partial payment towards the Judgment in the amount of $75,000. On February 13, 2023, Streicher made another payment towards the Judgment in the amount of $50,000 and had agreed to make another payment in the amount of $75,000 on February 28, 2023, which it failed to make. The Company intends to fully collect on the Judgment and shall pursue all legal and equitable means to enforce the Judgment against Streicher until the Judgment is fully satisfied. See "*Item 1A. Risk Factors - Legal Proceedings Risks - We may not recover amounts owed to us from J. Streicher Financial, LLC*" for further information.

**Preston Million Class Action**

On August 19, 2022, Preston Million filed a *Class Action Complaint* (the "Class Action Complaint") against the Company and certain former officers and directors of the Company in the United States District Court for Southern District of New York (the "SDNY"), styled *Preston Million, Individually and on Behalf of All Others Similarly Situated vs. Lottery.com, Inc. f/k/a Trident Acquisitions Corp., Anthony DiMatteo, Matthew Clemenson and Ryan Dickinson (Case No. 1:22-cv-07111-JLR)*. The Class Action Complaint alleged violations by all defendants of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") 15 U.S.C. §§ 78j(b), 78t(a), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), U.S.C. § 78u-4 *et seq*. (collectively "Federal Securities Laws"). On November 18, 2022, the SNDY ordered the appointment of RTD Bros, LLC, Todd Benn, Tom Benn and Tomasz Rzedian (collectively "Lottery Investor Group") as lead plaintiff and Glancy Prongay & Murray, LLP as lead counsel for plaintiffs and for the class in the case. On December 5, 2022, the Court stipulated a *Scheduling Order* in the case. On January 12, 2023, the Company's legal counsel timely filed its *Notice of Appearance*. On January 31, 2022, plaintiffs filed their *Amended Complaint* adding Kathryn Lever, Marat Rosenberg, Vadim Komissarov, Thomas Gallagher, Gennadii Butkevych, Ilya Ponomarev as additional defendants in the case. The *Amended Complaint* alleges, among other things, that defendants made materially false and misleading statements in violation of Section 10(b),14(a) and 20(a) of the Exchange Act and plaintiffs seek compensatory damages, reasonable costs and expenses including counsel fees and expert fees. Pursuant to the *Scheduling Order*, the Company filed its motion to dismiss the Amended Complaint on April 3, 2023, under the newly consolidated caption and its proposed order to dismiss the matter. Plaintiffs were expected to file their opposition to the motion to dismiss no later than May 18, 2023, which would trigger the Company's deadline to file its reply brief in support of their motion to dismiss no later than June 20, 2023. On February 6, 2024, the SDNY granted the Company's Motion to Dismiss. The Class Action Plaintiffs amended their complaint within the twenty-one day period provided by the judge.

**TinBu Complaint**

On March 13, 2023, John Brier, Bin Tu and JBBT, LLC (collectively, the "TinBu Plaintiffs") filed its original complaint against Lottery.com, Inc. f/k/a AutoLotto, Inc. and its wholly-owned subsidiary TinBu, LLC ("TinBu") in the Circuit Court of the 13th

Judicial District in and for Hillsborough County, Florida (the "TinBu Complaint"). The Complaint alleges breach of contract(s) and misrepresentation with alleged damages in excess of $4.6 million. The parties agreed to extend the Company's and its subsidiary's deadline to respond until May 1, 2023. On May 2, 2023, the Company and its subsidiary retained local counsel who filed a Notice of Appearance on behalf of the Company and TinBu and filed a Motion for Enlargement requesting the Court to extend its deadline to file its initial response to the Complaint by an additional 30 days (the "Motion for Enlargement"). As of the date of this Amended Report, the Motion for Enlargement has not been set for a hearing. On May 5, 2023, Plaintiffs filed their Motion for Court Default ("Plaintiffs' Motion for Default"), despite Company's Motion for Enlargement. As of the date of this Amended Report, the Motion for Enlargement has not been set for a hearing. The Company intends to oppose Plaintiffs' Motion for Default. On May 9, 2023, Plaintiffs served Plaintiffs' First Request for Admissions (the "RFA") to the Company. On October 13, 2023, the Court granted the Defendants' Motion to Stay Litigation and Discovery pending a ruling on its Motion to Compel Arbitration. On November 16, 2023, the Court granted Defendants' Motion to Compel Arbitration in Texas. The parties await a signed written order from the Court to that effect. The TinBu Plaintiffs have appealed the Court's Order to Compel Arbitration in Texas.

**Global Gaming Data**

On November 21, 2023, the Company and its wholly owned subsidiary TinBu, LLC ("TinBu") (Company and TinBu collectively, "Plaintiffs") filed their *First Amended Verified Complaint* in Federal Court for the Middle District of Florida ("MDF") against John J. Brier, Jr. ("Brier"), Bin Tu ("Tu"), and Global Gaming Data, LLC ("GGD") (collectively, "Defendants") for violations of the Federal Defend Trade Secrets Act ("DTSA"), the Florida Uniform Trade Secrets Act ("FUTSA") and the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), and for breaches of contract and fiduciary duties, including the duty of loyalty, styled *Lottery.com, Inc. f/k/a AutoLotto, Inc. and TinBu, LLC* v. *John J. Brier, Jr., Bin Tu, and Global Gaming Data, LLC (Case No.: 8:23-cv-2594-KKM-TGW)* Defendants filed certain counterclaims against Plaintiffs. The Company's request for a Temporary Restraining Order was denied by the MDF in February 2024.

**Woodford Eurasia**

Woodford Eurasia filed a complaint in the High Court of Justice in London chancery Division. October 16, 2023, The High Court of Justice in London Chancery Division ("the Court") dismissed an application for injunctive relief initiated by Woodford against the Company. (Case: FL-2023-000023. Woodford Eurasia Assets Limited v Lottery.com Inc.) The Court characterized Woodford's application as "fundamentally misconceived" and ordered Woodford to pay the Company's legal costs. Woodford subsequently, on the Judges' recommendation, withdrew the proceedings.

Woodford filed an additional action in the United States District Court for the District of Delaware on February 14, 2024 in Case No. 23-1317-GBW. Woodford subsequently filed a Notice of Voluntary Dismissal Without Prejudice, which stated that Woodford provides notice of dismissal of all claims without prejudice against Defendants Lotttery.com and its directors.

With the dismissal of this lawsuit by Woodford, no further action is required by Lottery.com or its directors at this time. The Company is determining its next course of action in resolving any further matters regarding Woodford.

The validity and application of the Woodford Loan Agreement Amendment is disputed by the Company.

Despite requests from the Company, Woodford has repeatedly amongst other things: failed to prove the amounts borrowed by the Company or claimed to have been advanced by Woodford to the Company; failed to indicate if it would accept accelerated payment of those verified amounts; failed to provide an anti-money laundering acceptable account to which payment could be made by the Company and failed to explain failure to respond to requests for other funding to be accepted in the context of the Woodford Loan Agreement; failed to respond to requests for funding under the accordion facility of the Woodford Loan Agreement; and failed to respond to allegations of money laundering and conspiracy to defraud the Company and others.

**Item 1A. Risk Factors.**

As of the date of this Report, there have been no material changes to the risk factors disclosed in the Company's Annual Report, other than as set forth below. In addition, we may disclose additional changes to such factors or disclose additional factors from time to time in our future filings with the SEC. Any of these factors could result in a significant or material adverse effect on our results of operations or financial condition. Additional risk factors not presently known to us or that we currently deem immaterial may also impair our business or results of operations.

***The ultimate effect of the Reverse Stock Split on the market price of our common stock cannot be predicted with any certainty and may decrease the liquidity of our common stock and magnify any decrease in our overall market capitalization.***

The ultimate effect of the Reverse Stock Split on the market price of our common stock cannot be predicted with any certainty, and we cannot assure you that the Reverse Stock Split will result in any or all of the expected benefits, including enabling the Company to regain compliance with the Nasdaq listing standards, for any meaningful period of time, or at all. While we expect that the reduction in the number of outstanding shares of common stock will proportionally increase the market price of our common stock, we cannot assure you that the Reverse Stock Split will increase the market price of our common stock by a multiple of the Reverse Stock Split ratio or result in any permanent or sustained increase in the market price of our common stock. The market price of our common stock depends on multiple factors, many of which are unrelated to the number of shares outstanding, including our business and financial performance, general market conditions and prospects for future success, any of which could have a counteracting effect to the Reverse Stock Split on the per share price.

In addition, the Reverse Stock Split also reduced the total number of outstanding shares of common stock, which may lead to reduced trading for our common stock. As a result of a lower number of shares outstanding, the market for our common stock may also

become more volatile. The Reverse Stock Split also increased the number of stockholders who own "odd lots" of less than 100 shares of common stock. A purchase or sale of less than 100 shares of common stock (an "odd lot" transaction) may result in incrementally higher trading costs through certain brokers, particularly "full service" brokers. Therefore, those stockholders who own fewer than 100 shares of common stock following the Reverse Stock Split may be required to pay higher transaction costs if they sell their common stock.

Finally, the decline in the per share price of our common stock and the decline in our overall market capitalization may be greater following the Reverse Stock Split than would have occurred in the absence of a Reverse Stock Split. Any reduction in our market capitalization may be magnified as a result of the smaller number of total shares of common stock outstanding following the Reverse Stock Split.

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds.**

None.

**Item 3. Defaults Upon Senior Securities.**

None.

**Item 4. Mine Safety Disclosures.**

Not applicable.

**Item 5. Other Information.**

None.

**Item 6. Exhibits.**

| Exhibit Number | Description |
|---|---|
| 10.1 | Amendment and Restatement Agreement in respect of Loan Agreement (Deed), dated as of June 12, 2023, between Lottery.com and Woodford Eurasia Assets Ltd. (incorporated by reference to Exhibit 10.28 of the Annual Report on Form 10-K filed by Lottery.com with the SEC on June 15, 2023). |
| 10.2 | Loan Agreement, dated as of July 26, 2023, by and between Lottery.com Inc. and United Capital Investments London Limited (incorporated by reference to Exhibit 10.1 of the Current Report on Form 8-K filed by Lottery.com with the SEC on August 1, 2023). |
| 10.3 | Amended and Restated Loan Agreement, dated as of August 8, 2023, by and between Lottery.com Inc. and United Capital Investments London Limited (incorporated by reference to Exhibit 10.3 of the Quarterly Report on Form 10-Q filed by Lottery.com with the SEC on August 22, 2023). |
| 10.4 | Amendment to Amended and Restated Loan Agreement, dated as of August 18, 2023, by and between Lottery.com Inc. and United Capital Investments London Limited (incorporated by reference to Exhibit 10.1 of the Current Report on Form 8-K filed by Lottery.com with the SEC on August 24, 2023). |
| 10.5* | Entry into Stock Purchase Agreement for the Acquisition of Nook Holdings Limited |
| 10.6 | Lottery.com Inc. 2023 Employees', Directors' and Consultant's Stock Issuance and Option Plan (incorporated by reference to Exhibit 10.1 of the Registration Statement on Form S-8 filed by Lottery.com with the SEC on October 11, 2023). |
| 10.40* | Lottery.com Inc. 2023 Employees', Directors' and Consultant's Stock Issuance and Option Plan |
| 10.50* | Nook Holdings Share Purchase Agreement |
| 10.51* | Amendment 1 to Nook Holdings Share Purchase Agreement |
| 31.1* | Certification of Principal Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act |
| 31.2* | Certification of Principal Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act |
| 32.1** | Certification of Principal Executive Officer Pursuant to Section 906 of the Sarbanes-Oxley Act |
| 32.2** | Certification of Principal Financial Officer Pursuant to Section 906 of the Sarbanes-Oxley Act |
| 101.INS* | Inline XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document |
| 101.SCH* | Inline XBRL Taxonomy Extension Schema Document. |
| 101.CAL* | Inline XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.DEF* | Inline XBRL Taxonomy Extension Definition Linkbase Document. |
| 101.LAB* | Inline XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE* | Inline XBRL Taxonomy Extension Presentation Linkbase Document. |
| 104* | Inline XBRL for the cover page of this Amended Quarterly Report on Form 10-Q/A included in the Exhibit 101 Inline XBRL Document Set |

* Filed herewith.

** Furnished herewith.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**Lottery.com Inc.**

By: */s/ Matthew McGahan*
Name: Matthew McGahan
Title: Chief Executive Officer
(Principal Executive Officer)

**Lottery.com Inc.**

By: */s/ Robert J. Stubblefield*
Name: Robert J. Stubblefield
Title: Chief Financial Officer
(Principal Accounting/Financial Officer)

Dated: June 6, 2024